UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

EDMUND ZAGORSKI,　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　Petitioner,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　　Case No. 3:99-1193
v.　　　　　　　　　　　　　　　　)　　　Judge Trauger
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
RICKY BELL, WARDEN,　　　　　　 )
　　　　　　　　　　　　　　　　　)
　　　　　Respondent.　　　　　　 )

<u>MEMORANDUM</u>

## I. INTRODUCTION

The petitioner, Edmund Zagorski, is a prisoner in the Riverbend Maximum Security Institution ("Riverbend") in Nashville, Tennessee. He brings this action under 28 U.S.C. § 2254 challenging the constitutionality of his convictions and death sentence. Zagorski names Ricky Bell, Warden at Riverbend, as the respondent to this action.

## II. FACTUAL BACKGROUND

On May 6, 1983, the badly decomposed bodies of Dale Dotson and Jimmy Porter were discovered in a remote, wooded area near Interstate-65 in Robertson County. (DE # 9, Add. 1, Vol. V, pp. 579-581, 634) Dotson and Porter had both been shot in the chest and abdomen, and their throats had been cut. (DE # 9, Add. 1, Vol. V, pp. 634-641) While it could not be determined whether the gunshot wounds or the knife wounds were inflicted first, autopsies revealed that both victims died as a result of their gunshot wounds. (DE # 9, Add. 1, Vol. V, p. 634) According to the pathologist, Dotson and Porter would have lived between for five to seven minutes after being shot. (DE # 9, Add. 1, Vol. V, p. 641) Due to the advanced stages of decomposition, the pathologist could not fix the victims' time or date of death more precisely than between a week to a month prior to the time that the autopsies were performed. (DE # 9, Add. 1, Vol. V, p. 634) It was established,

however, that at the time of their deaths, Dotson and Porter were both legally intoxicated. Dotson's blood-alcohol level was .25; Porter's was .10. (DE # 9, Add. 1, Vol. V, pp. 641–43)

Dotson and Porter were last seen alive on the afternoon of April 23, 1983, at the Eastside Tavern in Dickson, Tennessee. (DE # 9, Add. 1, Vol. V, pp. 653-654; Vol. VI, 699, 756-757, 759) While there, Porter showed Don Peery, the owner of a convenience market in Dickson, a bank bag containing cash and a .357 magnum pistol. According to Peery, Porter did not say what the money was for. (DE # 9, Add. 1, Vol. VI, pp. 757-758, 761-763). At approximately 4:30 p.m., Dotson and Porter left the tavern in Porter's Datsun pick-up truck. (DE # 9, Add. 1, Vol. V, p. 656; Vol. VI, p. 759) The next day, on April 24, 1983, Dotson's wife, Marsha, told Jimmy Blackwell, manager of the Lakeland Trout Farm ("the trout farm") in Hickman County, that her husband was missing. (DE # 9, Add. 1, Vol. V, p. 701)

According to Marsha Dotson, Zagorski and her husband had previously arranged a drug deal that was to take place on April 23, 1983. (DE # 9, Add. 1, Vol. V, pp. 651-655, 663) Earlier that month, the Dotsons and Zagorski had met through Blackwell. (DE # 9, Add. 1, Vol. V, pp. 648-649, 662-664) Zagorski, calling himself "Jesse Lee Hardin," had first appeared at the trout farm on April 5, 1983, wearing camouflage clothing and carrying a .308 caliber HK-91 semi-automatic rifle, a survival knife, and other weapons and survival gear. (DE # 9, Add. 1, Vol. V, p. 649; Vol. VI, pp. 689-699) Zagorski claimed to have been working as a mercenary in Honduras and El Salvador and, although he professed to have made as much as $100 a day as a mercenary, he did not have any money. (DE # 9, Add. 1, Vol. V, pp. 676-677; Vol. VI, pp. 690-691, 703, 731)

Shortly after Zagorski's arrival in Hickman County, he and Dotson arranged a marijuana purchase involving Porter, who was from nearby Dickson.[1] (DE # 9, Add. 1, Vol. V, pp. 651-653,

---

[1]    According to Marsha Dotson, the original deal included Blackwell, rather than Porter. However, Blackwell backed out because he could not come up with his part of the money. (DE # 9, Add. 1, Vol. V, pp. 665–66, 668)

Case 3:99-cv-01193    Document 183    Filed 03/31/06    Page 2 of 164 PageID #: 210

663) Porter was to pay $23,000 for one hundred pounds of marijuana that Zagorski would arrange to have dropped from an airplane into the woods. (DE # 9, Add. 1, Vol. V, p. 653) For his part of the deal, Dotson was to receive $10,000 from Porter. (DE # 9, Add. 1, Vol. V, p. 653)

At midnight on April 21, 1983, an airplane flew low over the trout farm and Zagorski, who was with Blackwell at the time, announced, "it's here" and left. (DE # 9, Add. 1, Vol. VI, p. 702) Zagorski later informed Dotson that the marijuana had arrived and that it was in the woods with a man named Dave. (DE # 9, Add. 1, Vol. V, pp. 654, 670, 672) According to Marsha Dotson, Zagorski instructed her husband to meet him at 6:00 p.m. on April 23, 1983, at a nearby convenience store called the Spot, which was within walking distance of the trout farm. (DE # 9, Add. 1, Vol. V, pp. 655, 670-671) Blackwell heard Zagorski direct Dotson to come armed, but with no more than two other men. (DE # 9, Add. 1, Vol. Vol. V, pp. 671-672)

On April 23, 1983, Zagorski left the trout farm, taking his belongings with him. (DE # 9, Add. 1, Vol. VI, pp. 700-701) At approximately 5:30 p.m., Blackwell and his girlfriend, Salli Salmon, heard gunshots from the general area where Zagorski had entered the woods near the trout farm. (DE # 9, Add. 1, Vol. VI, p. 720-721, 742-743) According to Blackwell, it was not unusual to hear gunshots in that area of Hickman County because of frequent deer hunting, both in and out of season. (DE # 9, Add. 1, Vol. VI, pp. 728-729)

Johnny Baggett, a resident of Robertson County, discovered the bodies of Dotson and Porter in the woods near his home on May 6, 1983. (DE # 9, Add. 1, Vol. V, p. 579) Although not certain of the exact date, Baggett would testify at trial that he had heard gunshots at around 7:00 or 8:00 p.m. on April 25 or 26, 1983 in the vicinity of where the bodies were found. (DE # 9, Add. 1, Vol. V, pp. 585, 589-590)

A search of the murder scene revealed a scabbard that was later identified as Zagorski's by both Blackwell and Salmon. (DE # 9, Add. 1, Vol. V, p. 602; Vol. VI, pp. 694-695, 733) The

3

search also uncovered a case for "Red Specs" glasses, the type of glasses, according to Blackwell and Salmon, that Zagorski wore.  (DE # 9, Add. 1, Vol. V, pp. 594-595; Vol. VI, pp. 697-698, 733–34)  Six flares, three size "C" Duracel flashlight batteries, and an ink pen also were recovered at the murder scene as a result of the initial search of the murder scene on May 6.  (DE # 9, Add. 1, Vol. V, pp. 594-595)

On April 24, 1983, Zagorski arrived in Ironton, Ohio, where he met up with James Rodney Bruce whom Zagorski had met in Louisiana in 1982.  (DE # 9, Add. 1, Vol. VI, pp. 768-771) Zagorski was driving Porter's Datsun pickup truck.  (DE # 9, Add. 1, Vol. VI, p. 771) Zagorski also had Porter's .357 magnum, coveralls belonging to Dotson, and $25,000 cash.  (DE # 9, Add. 1, Vol. VI, pp. 771-772)  Zagorski initially told Bruce that he had earned the money working offshore, but later said that he earned it working as a mercenary in South America.  (DE # 9, Add. 1, Vol. VI, p. 772) Zagorski also said that he had made $10,000 in Nashville, characterizing the manner in which he made the money as "zip, zip."  (DE # 9, Add. 1, Vol. VI, p. 773)

While in Ohio, Zagorski spent large sums of cash on survival gear, weapons, horses, a four-wheel drive pick-up truck, and a motorcycle.  (DE # 9, Add. 1, Vol. VI, pp. 765-766, 773-777)  Ray Timberlake, an army-surplus dealer in Ohio, testified that Zagorski spent approximately $700 on military goods in his store.  (DE # 9, Add. 1, Vol. VI, pp. 766-767)  Zagorski told Timberlake that he had lost the scabbard to his knife, which Timberlake replaced.  (DE # 9, Add. 1, Vol. VI, pp. 766, 767)  Zagorski also told Bruce that he had lost the scabbard in "Tennessee or South America . . . ." (DE # 9, Add. 1, Vol. VI, pp. 774-775)

On May 6, 1983, Jeff Long, a criminal investigator for the Hickman County District Attorney General's Office, turned over to Detective Ronnie Perry of the Robertson County Sheriff's Office,

a spent .308 cartridge that Long had received from Blackwell two days earlier, on May 4, 1983.[2] (DE # 9, Add. 1, Vol. VI, pp. 747–748)  According to Blackwell, he retrieved the spent .308 cartridge, which had been fired in Zagorski's HK-91, from a "bandito belt" that Zagorski had made for Blackwell's little boy.  (DE # 9, Add. 1, Vol. VI, pp. 693-694)

On May 7, 1983, Detective Perry and other law enforcement officials returned to the murder scene with metal detectors, which had not been used the previous day, and found a spent .308 cartridge on the ground near where the bodies had been found the previous day.  (DE # 9, Add. 1, Vol. V, pp. 605-606; Vol. VII, p. 879)  Thomas Heflin, the state's firearms examiner, would testify that the spent cartridge found at the murder scene and the spent cartridge given to Long by Blackwell matched spent cartridges that were recovered when law enforcement officials test-fired the HK-91.  (DE # 9, Add. 1, Vol. VII, pp. 955-960)

On May 26, 1983, Zagorski was apprehended by Ohio law enforcement officers following a shoot-out, immediately prior to which Zagorski rammed a police car and during which he shot a special deputy five times.  (DE # 9, Add. 1, Vol. VII, pp. 834-836, 839-840)  After being forcibly subdued, Zagorski was overheard to say, "[A]t least I got one of you."  (DE # 9, Add. 1, Vol. VII, p. 840)  At the time he was apprehended, Zagorski was wearing a bullet-proof vest and was armed with a semi-automatic rifle and a shotgun.  (DE # 9, Add. 1, Vol. VII, pp. 840-841, 846)  Zagorsksi, who was advised of his rights at the time he was apprehended, told the arresting officer that he understood his rights.  (DE # 9, Add. 1, Vol. VII, p. 850)  A subsequent search of Zagorski's belongs uncovered $10,000 in cash.  (DE # 9, Add. 1, Vol. VII, p. 852; DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., pp. 36-38)

After hearing about the shoot-out, Steven Boggs, an Ohio resident in whose barn Zagorski

_____

[2]   Hickman County law enforcement officials investigated the disappearance of Dotson and Porter  between the time that they were reported missing in Hickman County and the time that their bodies were discovered in Robertson County.

had been staying, called the Ohio police and informed them that he had personal property that belonged to Zagorski. (DE # 9, Add. 1, Vol. VI, pp. 800-801) This property included Zagorski's HK-91, which the police seized. (DE # 9, Add. 1, Vol. VI, pp. 801-803) Boggs also turned over numerous other items, including a knife, a scabbard that matched the one found at the murder scene, a pair of "Rec Spec" glasses, the same brand name as the case found at the murder scene, a black flashlight that used C-cell batteries, and several C-cell batteries similar to those found at the murder scene. (DE # 9, Add. 1, Vol. VII, pp. 858-859) Ohio law enforcement officials also recovered Porter's Datsun pickup truck and his .357 magnum, as well as Dotson's coveralls, which Dotson had taken with him when he and Porter went to meet Zagorski. (DE # 9, Add. 1, Vol. VII, p. 855)

Zagorski, who had been wounded in the shoot-out, was taken to a nearby hospital in Huntington, West Virginia. (DE # 9, Add. 3, Vol. V, pp. 263-264) Sheriff Ted Emery, Detective Perry, and Detective Stanley Henderson, all of the Robertson County Sheriff's Department, traveled to the hospital in West Virginia to return Zagorski to Tennessee. (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., pp. 32, 67) When the Tennessee law enforcement officials advised Zagorski of his rights, Zagorski signed an "admonition and waiver form" and again stated that he understood his rights. (DE # 9, Add. 1, Feb. 17 Mot. Hear., 1984, pp. 32-35) Although Zagorski said that he did not want to discuss the murders, he gave a statement to Sheriff Emery anyway. (DE # 9, Add. 1, Feb 17, 1984 Mot. Hear., pp. 35, 55-57) The prosecution ultimately agreed not to use this statement at trial.[3] (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., pp. 26-28)

Zagorski was returned to Tennessee, arriving in Robertson County between 9:00 and 10:00 p.m. on May 31, 1983. (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., p. 36) Following his return,

---

[3]     During the course of the interview in West Virginia, Zagorski implicated himself in the drug deal that led to Dotson's and Porter's murders, but not in the actual killings. Zagorski maintained that his role had been limited to providing protection for those involved in the deal. (DE # 182, pp. 60-69)

Zagorski gave varying accounts of his role in the murders.

On June 1, 1983, Zagorski met with Robertson County Assistant District Attorney General Dee Gay ("General Gay"), Sheriff Emery, and Detective Perry. (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., pp. 67-68; Vol. VII., p, 883) General Gay asked Zagorski at that meeting if he understood his rights and told him that he did not have to talk to them if he did not want to. (DE # 9, Add 1, Vol. I, pp. Vol. VII, pp. 883-884) Zagorski said initially that he would provide background information only, but then discussed the murders of his own volition, even though General Gay advised him again that he did not have to say anything until after he spoke to a lawyer. (DE # 9, Add. 1, Vol. I, Feb. 17, 1984 Mot. Hear., pp. 39-51; Vol. VII, pp. 884-886)

Despite General Gay's admonition, Zagorski told General Gay, Sheriff Emery, and Detective Perry that he and another mercenary met Dotson and Porter at the Spot on April 23, 1983. (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., p. 45; Vol. VII, p. 887) As they drove up Interstate 40 in separate vehicles, Zagorski claimed that two other mercenaries in a third vehicle joined them. (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., pp. 45-46; VII, p. 887) After stopping on Interstate 65 in Robertson County, the three mercenaries took Zagorski's rifle, silencer, and web-gear and went into the woods with Dotson and Porter. (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., p. 46; Vol. VII, p. 887) Zagorski stated that he was delegated the task of driving Porter's pickup truck to a welcome center on the Kentucky border to kill any law enforcement officers who might appear. (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., p. 47; Vol. VII, p. 888)

Approximately thirty to forty-five minutes later, the three mercenaries joined Zagorski at the welcome center and returned his rifle and gear. (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., pp. 47; Vol. VII, pl 888) Dotson and Porter were not with them. Zagorski was given $5,000 and Porter's .357 magnum. (DE # 9, Add. 1, Feb 17, 1984 Mot. Hear., p. 47; Vol. VI, p. 888) Zagorski then left in Porter's pickup truck since, according to him, it was not unusual to accept automobiles as part of

a drug deal.  (DE # 9, Add. 1, Vol. II, p. 47; Vol. VII, pp. 888-889)

In statements made to Detective Perry on July 27 and August 1, 1983, Zagorski changed his story, professing that he and two other men had been hired to kill Porter, but that Dotson's death had been a mistake.  (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., pp. 73-74; Vol. VII, p. 894)  In these later statements, Zagorski claimed that the killings occurred in Boiling Springs, just outside of Bucksnort in Humphreys County, and that the bodies were put in plastic bags and driven to Robertson County.  (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., pp. 73-74; Vol. VII, p. 894-895)  Zagorski later told visitors at the jail that he was present at the killings for the sole purpose of "blowing away" FBI agents.  (DE # 9, Add. 1, VII, p. 865)

Zagorski never admitted to killing Dotson and Porter, but he refused to reveal the identities of the men he claimed did.  (DE # 9, Add. 1, Vol. VII, p. 895, 921-922)

### III.  PROCEDURAL BACKGROUND

Defense counsel filed numerous pre-trial motions, including a motion for funds to conduct a private psychiatric evaluation, a motion for funds to hire a private investigator, a motion for funds to hire a ballistics expert, and a motion *in limine* to suppress the statements that Zagorski made on July 1, July 27, and August 1, 1983.  (DE # 9, Add. 3, Ex. 20, pp. 31-46, 56-69, 70; DE # 182, pp. 31, 56, 70, 84)  Zagorski's motions for funds to hire a private investigator and a ballistics expert, as well as his motion *in limine* to suppress Zagorski's statements, all were denied.  (DE # 9, Add. 1, Feb. 13, 1984 Mot. Hear., p. 24; Feb 17, 1984 Mot. Hear., pp. 90, 97; Add. 3, Ex. 20, pp. 102; DE # 182, p. 102)  Zagorski's motion for funds to obtain a private psychiatric evaluation was granted. (DE # 9, Add. 1, Feb. 13, 1984 Mot. Hear., pp. 10-11; Add. 3, Ex. p. 103; DE # 182, p. 103)

Defense counsel retained Dr. Ben Bursten, a forensic psychiatrist, who examined Zagorski approximately a week before trial and confirmed that Zagorski was both competent to stand trial and ineligible for an insanity defense.  (DE # 9, Add. 3, Vol. V, pp. 204-206)

8

Defense counsel also filed a pre-trial motion for discovery and inspection, which included a request, pursuant to *Brady v. Maryland*, for all material "which [are] exculpatory in nature or favorable to the accused or which may lead to exculpatory material."  (DE # 9, Add. 3, Ex. 20 at ¶¶ 5, 8, p. 12; DE # 182, p. 11)  The prosecution did not disclose any exculpatory evidence.  (DE # 157, p. 303, Ex. F)

The evidence presented at trial against Zagorski is addressed in detail, *infra*, in connection with Zagorski's claim that the evidence was insufficient to support his conviction and sentence.  For its part, the defense focused largely on attempting to show that Dotson and Porter had not been killed in Robertson County and, as such, venue was improper.  (DE # 9, Add. 1, Vol. VIII, pp. 974-990)

The jury convicted Zagorski of murder in the first degree for the killings of Dotson and Porter.  (DE # 9, Add. 1, Vol. VIII, p. 1099)  Immediately after the jury returned its guilty verdict, the sentencing phase of Zagorski's trial was held.  (DE # 9, Add. 1, Vol. IX, pp. 1109-1134)  No additional proof was offered by either the State or the defense at sentencing.  (DE # 9, Add. 1, Vol. IX, pp. 1109-1126)

The jury ultimately found that the evidence presented during the guilt phase of the trial also established two aggravating circumstances, *i.e.*, that the murders were committed by Zagorski while he was engaged in committing robbery of the victims and that the murders were especially heinous, atrocious, or cruel, in that they involved torture or depravity of mind.  (DE # 9, Add. 1, Vol. IX, p. 1133)  The jury found no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances and, consequently, sentenced Zagorski to death.  (DE # 9, Add. 1, Vol. IX, pp. 1133-1134)

Zagorski raised thirty-four issues on direct appeal.  (DE # 9, Add. 2, Doc. 2A, pp. 2-7)  On November 25, 1984, the Tennessee Supreme Court affirmed Zagorski's convictions of first degree

murder and his sentence of death. (DE # 9, Add. 2, Doc. 2C) The United States Supreme Court ("the Supreme Court") denied Zagorski's petition for a writ of *certiorari* on June 30, 1986. *Zagorski v. Tennessee*, 478 U.S. 1010 (1986).

On January 29, 1987, Zagorski filed a petition for state post-conviction relief, which he amended on June 30, 1989. (DE # 9, Add. 3, pp. 1-3, 9-22) An evidentiary hearing was held on November 29, 1995 and January 17, 1996, following which Zagorski's petition for state post-conviction relief was denied on May 3, 1996. (DE # 9, Add. 3, pp. 37-57) Zagorski filed a notice of appeal on May 20, 1996. (DE # 9, Add. 3, p. 57) The Tennessee Court of Criminal Appeals ("the Court of Criminal Appeals") affirmed the judgment of the post-conviction court on June 6, 1997. (DE # 9, Add. 3, Doc. 3C)

Zagorski filed an application for permission to appeal the judgment of the post-conviction court (DE # 9, Add. 4, Doc. 4D), in response to which the Tennessee Supreme Court granted Zagorski's application on his claim that defense counsel were ineffective for failing to investigate and present mitigating evidence during the sentencing portion of his trial (DE # 9, Add. 4, Doc. 4D, pp. 28-31). (DE # 9, Add. 4, Doc. 4F) Briefs were filed (DE # 9, Add. 4, Docs. 4G & 4H), following which, on February 1, 1999, the Tennessee Supreme Court affirmed the judgment of the of the Court of Criminal Appeals on this issue. (DE # 9, Add. 4, Doc. 4I) Zagorski's petition for a writ of *certiorari* was subsequently denied by the Supreme Court on October 4, 1999. *Zagorski v. Tennessee*, 528 U.S. 829 (1999).

Proceeding *pro se*, Zagorski filed a petition for federal *habeas corpus* relief pursuant to 28 U.S.C. § 2254 on December 23, 1999. (DE # 1) Counsel was appointed to represent Zagorski on December 23, 1999. (DE # 4) On August 4, 2000, Zagorski amended his petition to assert eighteen claims of constitutional error at both the guilt and penalty phases of his trial. (DE # 16) Thereafter, the respondent filed an answer to the amended petition on August 31, 2000 (DE # 17), and Zagorski

10

a traverse on November 6, 2000 (DE # 24).

On October 1, 2001, Zagorski filed a motion for discovery. (DE # 73) On November 20, 2001, the court granted Zagorski's request for discovery of documentary evidence, including records from the Tennessee Bureau of Investigation (TBI):

> relating to any investigation of any illegal activities (including narcotics trafficking) by . . . James Burton Blackwell; any drug investigations involving interstate drug dealings or transactions in Hickman County, Tennessee between 1980-1985; any information concerning James Burton Blackwell's involvement in investigation for any such agency, including any documentation of any benefit provided to Blackwell . . . .

and records from the Hickman County Sheriff's Department:

> concerning any investigation of illegal purchase, transportation, sale or distribution of narcotics or other illegal drugs by James Burton Blackwell, Sallie Salmon, Eastside Tavern, Buddy Corbitt (or Corbin), Jimmy Porter, and/or Dale Dotson.

(DE # 73) Zagorski's request to depose Sheriff Atkinson was also granted. (DE # 73)

The respondent filed a motion for summary judgment on July 1, 2002, requesting judgment as to all claims raised in Zagorski's amended petition. (DE # 99) Zagorski filed a response to the respondent's motion for summary judgment (DE # 104), to which the respondent replied (DE # 114), and Zagorski filed a surreply (DE # 115).

On April 28, 2003, the court ordered an evidentiary hearing to resolve disputed facts with respect to Zagorski's claim that the state suppressed material evidence regarding state's witness Jimmy Blackwell.[4] (DE # 124) The evidentiary hearing was conducted on July 24 and 25, 2003. (DE # 167) Zagorski filed his post-hearing brief on October 24, 2003 (DE # 158), and the respondent his post-hearing brief on December 4, 2003 (DE # 161). Zagorski filed a reply to the

---

[4] The court's Order permitted the respondent to present evidence and argument at the evidentiary hearing in support of the claim that Zagorski's evidence should have been discovered previously and presented in state court proceedings. (DE # 124)

11

petitioner's post-hearing brief on December 5, 2003.  (DE # 162)

On April 6, 2005, Zagorski filed a motion for full *de novo* review of all claims raised in his habeas petition (DE # 176), to which the respondent has responded (DE # 179), and Zagorski has replied (DE # 180).

## IV.  ANALYSIS

Petitions for federal *habeas corpus* relief filed after April 24, 1996 are subject to the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996) (AEDPA).  *See Martin v. Mitchell*, 280 F.3d 594, 602 (6th Cir. 2002)(citing *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1977).  Title 28 U.S.C. § 2254, as amended by the AEDPA, provides the following with respect to granting a writ of *habeas corpus* to prisoners who are in custody pursuant to a state court judgment:

> (d)      An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "unreasonable application" of clearly established federal law differs from an "incorrect application."  *Williams v. Taylor*, 529 U.S. 362, 365 (2000).  Under the former, "a federal *habeas corpus* court may grant relief if the state court identifies the governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*.  The latter clause is satisfied when a state court "arrives at a conclusion opposite that

reached by [the Supreme] Court on a question of law or . . . decides a case differently than the Court . . . on a set of materially indistinguishable facts." *Id.* at 364-65. Where state courts have made factual determinations regarding issues presented for federal *habeas corpus* review, such determinations are presumed to be correct, and the petitioner has the burden of rebutting that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Miller-el v. Cockrell*, 537 U.S. 322, 324 (2003). Under the AEDPA, the purpose of federal *habeas corpus* review is to "ensure that state court convictions are given effect to the extent possible under the law," not to conduct a federal re-trial. *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### A. Admissibility of Zagorski's Incriminating Statements
(Paragraph 6 of the Amended Petition
(DE # 16, pp. 5-12))

Zagorski argues that the trial court erred in admitting into evidence the statements that he made to law enforcement officials on June 1, July 27, and August 1, 1983. (DE # 16, ¶ III.6, pp. 5-12; DE # 104, ¶ II, pp. 3-46; DE # 115, ¶ 1, pp. 1-2) Zagorski maintains that he did not make a knowing, intelligent, and voluntary waiver of his right to remain silent and his right to have counsel present prior to answering questions. (DE # 16, ¶ III.6, p. 5) The respondent argues that the Tennessee Supreme Court's determination on this issue was neither an unreasonable determination of the facts in view of the evidence presented, nor was it contrary to or an unreasonable application of clearly established federal law.[5] (DE # 17, ¶ IV.B.6), p. 7; DE # 100, ¶ IV.G.1, pp. 22-24; DE # 114, ¶ I.1, pp. 1-5)

Zagorski raised this issue on direct appeal. (DE # 9, Add. 2, Doc. 2A, ¶ 3, pp. 40-45) In affirming the judgment of the trial court, the Tennessee Supreme Court correctly identified the

---

[5]  The respondent argues that some, but not all, of the factual predicates pertaining to this claim are procedurally defaulted for purposes of federal *habeas corpus* review. (DE # 99, ¶ IV.G.1, pp. 24) For reasons explained in detail, *infra* at pp. 16-27, to the extent that Zagorski offers new factual or legal theories not raised on direct appeal in support of this claim, those factual predicates are procedurally defaulted for purposes of *habeas corpus* review.

Supreme Court's opinions in *Smith v. Illinois*, 469 U.S. 91 (1984) and *Edwards v. Arizona*, 451 U.S. 477 (1981) as the standard to apply in determining whether a criminal defendant has made a knowing and intelligent waiver of his right to remain silent and to have an attorney present before answering questions posed to him by law enforcement officials. (DE # 9, Add. 2, Doc. 2C, p. 8)

When a criminal defendant has invoked his right to counsel, a court may admit his responses to further questioning only on finding that: a) he initiated further discussions with law enforcement authorities, and b) he knowingly and intelligently waived the right that he previously had invoked. *Edwards*, 451 U.S. at 485. In its opinion, the Tennessee Supreme Court wrote:

> With [the standard set forth in *Edwards* in mind] as we viewed the evidence, we concluded that the defendant initiated the interrogations, that he was not subject to any coercive action on the part of the state, and that he knowingly and intelligently waived his right to have counsel present during the interrogations. Further, we are of the opinion that even if there had been an *Edwards* violation, error in admitting the statements in evidence was harmless beyond a reasonable doubt in view of the overwhelming evidence of guilt in this case.

(DE # 9, Add. 2, Doc. 2C, p. 9)

Defense counsel filed a pre-trial motion to suppress the statements at issue on February 7, 1984. (DE # 9, Add. 3, Ex. 20, pp. 56-58; DE # 182, p. 56) A hearing was held on the motion on February 17, 1984. (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear., pp. 25-97) The transcript of the hearing shows that the following evidence was adduced at the hearing: 1) Zagorski was advised of his rights under *Miranda* while he was in Ohio, and he executed "an admonition and waiver form" (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear, pp. 32-33); 2) Zagorski was not questioned while en route from Ohio to Tennessee (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear, p. 33); 3) Zagorski told those present at the July 1, 1984 meeting that he had been advised of his rights previously and that he understood those rights (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear, p. 40); 4) advised by General Gay

that he could quit talking at any time, Zagorski agreed to provide background information (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear, p. 41); 5) when Zagorski began to implicate himself in the crimes during the July 1 meeting, General Gay stopped him and advised him that he did not have to say anything without an attorney present, yet Zagorski continued to talk anyway (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear, pp. 44-45); 6) Zagorski initiated contact with Detective Perry that led to Zagorski's offer on July 27, 1984 to confess if he could choose the time and method of execution (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear, pp. 71-73); 7) Zagorski also initiated contact with Detective Perry on August 1, 1983, when he again spoke of his involvement in the murders (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear, pp. 73-74). In addition to the foregoing, evidence was presented at the hearing about the conditions of Zagorski's confinement in the Robertson County Jail, and his state of mind at the time he made the statements at issue. (DE # 9, Add. 1, Feb. 17, 1984 Mot. Hear, pp. 64-65, 79-88) The substance of the testimony at the suppression hearing was raised in Zagorski's brief on direct appeal. (DE # 9, Add. 2, Doc. 2A, ¶3, pp. 40-45)

As previously established, *supra* at p. 13, where state courts have made factual determinations pertaining to issues presented for federal *habeas corpus* review, such determinations are presumed to be correct unless the *habeas* petitioner rebuts that presumption by clear and convincing evidence. The record shows that the Tennessee Supreme Court "viewed the evidence" and made a factual determination that Zagorski "knowingly and intelligently waived his right to have counsel present" because he "initiated the interrogations [and] that he was not subject to any coercive action on the part of the state." (DE # 9, Add. 2, Doc. 2C, pp. 8-9)

Although Zagorski offers extensive argument on this issue in these proceedings, he has not rebutted the presumption of correctness by clear and convincing evidence. In addition, the record supports the conclusion that the Tennessee Supreme Court's determination was in accordance with *Smith* and *Edwards*. Therefore, the Tennessee Supreme Court's determination on this issue was

15

neither contrary to nor an unreasonable application of clearly established federal law.

As reasoned above, this claim is without merit. Therefore, Zagorski is not entitled to federal *habeas corpus* relief on this issue.

### B. Constitutionality of the "Reasonable Doubt" Jury Instruction at Both the Guilt and Sentencing Phases of the Trial (Paragraph 7 of the Amended Petition (DE # 16, p. 12-13))

Zagorski asserts that the "reasonable doubt" jury instruction at both the guilt and sentencing phases of his trial violated his rights under the Sixth, Eighth, and Fourteenth Amendments, because the instruction lessened the prosecution's burden of proof. (DE #16, ¶ III.7, pp. 12-12) The respondent argues that this claim is procedurally defaulted because it was not raised in any state court prior to being raised in the instant proceedings. (DE # 17, ¶ V.7, p. 8; DE # 100, ¶ IV.G.2, pp. 24; DE # 114, ¶ I.2, pp. 5-11) Zagorski, in turn, argues that this claim is not procedurally defaulted. (DE # 24, ¶ II.B, p. 4; DE # 104, ¶ V.A.3, pp. 103-105)

The AEDPA places notable restrictions on a federal court's ability to grant *habeas corpus* relief to state prisoners. First, federal *habeas corpus* courts may only consider claims that a petitioner has previously raised before the state courts. *See* 28 U.S.C. § 2254(b); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002). Claims that have not been raised in state court are deemed unexhausted and ordinarily are dismissed, without prejudice, so that the *habeas* petitioner may pursue them in state court. *Alley*, 307 F.3d at 385 (citing *Rose v. Lundy*, 455 U.S. 509, 518 (1982)). However, if the petitioner is barred from raising an unexhausted claim in state court due to a state procedural rule, then that claim is procedurally defaulted for purposes of federal *habeas corpus* review. *See Coleman v. Thompson*, 501 U.S. 722, 752-753 (1991). A claim also is procedurally defaulted where that claim was presented to the state court, but the court, rather than reaching the merits of the claim, relied on an independent and adequate state ground, such as a state procedural

rule barring review of the claim, in deciding the issue. *Id.* at 734-735.

If a claim is procedurally defaulted, then federal *habeas corpus* review is prohibited unless the petitioner demonstrates both "cause" and "prejudice" for his failure to raise the claim in state court while state court remedies were available, or that a miscarriage of justice will result if the claim is not reviewed. *Alley*, 307 F.3d at 386; *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000). To establish "cause," a petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994). "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel, or that 'some interference by officials' made compliance impracticable," constitutes "cause" under this standard. *Murray*, 477 U.S. at 488 (citations omitted); *see also Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002)("Cause is shown when the factual basis of the claim was 'reasonably unknown' to the defendant's counsel."). To show "prejudice," default of the claim must not merely have created a possibility of prejudice to the defendant, but it must have "worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Jamison*, 291 F.3d at 388 (citing *United States v. Frady*, 456 U.S. 152, 170-171 (1982)). Finally, to demonstrate a "fundamental miscarriage of justice," a petitioner must show that the alleged constitutional violation probably resulted in the conviction of one who actually is innocent. *Murray*, 477 U.S. at 496. This exception applies only in "extraordinary cases," *Id.*, and requires a petitioner to show that he is "actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

"These rules apply both to entirely new legal claims and to new factual bases for relief; for a claim to be considered exhausted, the petitioner must have 'fairly presented' to the state courts the 'substance of his federal habeas corpus claim.'" *Alley*, 307 F.3d at 386 (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982))(internal citations omitted); *see also Wong v. Money*, 142 F.3d 313,

322 (6ᵗʰ Cir. 1998)("[T]he doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal courts.").  "Although 'bits of evidence' which were not before the state courts will not render a claim unexhausted, where a federal *habeas* petitioner presents newly discovered evidence or other evidence not before the state courts such as to place the case in a significantly different posture, the state courts must be given the opportunity to consider the evidence."  *Sampson v. Love*, 782 F.2d 53, 57 (6ᵗʰ Cir. 1986)(quoting *Jones v. Hess*, 681 F.2d 688, 691 (10ᵗʰ Cir. 1982)(internal citations omitted)).

A review of the record shows that Zagorski did not raise his claim regarding the "reasonable doubt" jury instruction on direct appeal when he should have (DE # 9, Add. 2, Doc. 2A, pp. 2-7) or during any other phase of the state proceedings in his case.  It is clear, therefore, that this claim is unexhausted.  The question is whether it is procedurally defaulted as well.

The post-conviction statute in effect in Tennessee at the time of Zagorski's conviction, Tenn. Code Ann. § 40-30-102 (repealed in 1995), provided the following:

> A prisoner in custody under sentence of a court of this state must petition for post-conviction relief under this chapter within three (3) years of the date of the final action of the highest state appellate court to which an appeal is taken or consideration of such petition is barred.

On May 10, 1995, the present Post-Conviction Procedure Act ("the present Post-Conviction Act") replaced the prior Act in its entirety.  *See* 1995 Tenn. Pub. Act 207, §§ 1 and 3.  In passing the present Post-Conviction Act, the Tennessee Legislature provided, *inter alia*:

> This act shall take effect upon becoming a law, the public welfare requiring it and shall govern all petitions for post-conviction relief filed after this date, and any motions which may be filed after this date to reopen petitions for post-conviction relief which were concluded prior to the effective date of this act.

1995 Tenn. Pub. Act 207, § 3.  The Tennessee Supreme Court has determined that the present Post-

18

Conviction Act applies to criminal cases in which judgment became final under the previous Act. *See Carter v State*, 952 S.W.2d 417, 420 (Tenn. 1997).

Under the present Post-Conviction Act, Tennessee's post-conviction statute, Tenn. Code Ann. § 40-30-102 (1995), provides, *inter alia*:

> Except as provided in subsections (b) and (c), a person in custody under a sentence of a court of this state must petition for post-conviction relief under this part within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of such petition shall be barred. The statute of limitations shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file such an action and is a condition upon its exercise.

*Id*. at § (a). The Tennessee post-conviction statute goes on to state that:

> This part contemplates the filing of only one (1) petition for post-conviction relief. In no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment. If a prior petition has been filed which was resolved on the merits by a court of competent jurisdiction, any second or subsequent petition shall be summarily dismissed. A petitioner may move to reopen a post-conviction proceeding that has been concluded, under the limited circumstances set out in § 40-30-117.

*Id*. at § (c). The limited circumstances in Tenn. Code Ann. § 40-30-117 (1995) are that:

> (1) "The claim in the motion is based on a final ruling of an appellate court establishing a constitutional claim that was not recognized as existing at the time of trial. . . ."
>
> (2) "The claim in the motion is based upon new scientific evidence establishing that such petitioner is actually innocent . . . ."
>
> (3) "The claim asserted in the motion seeks relief from a sentence that was enhanced because of a previous conviction and such conviction in the case in which the claim is asserted was not

19

a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid . . . ."

(4)     "It appears the facts underlying the claim, if true, would establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced."

*Id.* at §§ (a)(1)-(a)(4).

Zagorski's conviction became final on June 30, 1986 when the Supreme Court denied his petition for a writ of *certiorari*. Because more than one year has passed since the judgment in Zagorski's case became final, he is time-barred under Tenn. Code Ann. § 40-30-102(a) from filing a petition for post-conviction relief. Moreover, because Zagorski has already filed one post-conviction petition, he may not file another. Finally, none of the "limited circumstances" provided in §§ 40-30-117(a)(1)-(a)(4) apply to this claim. Therefore, the "motion-to-reopen" provision in § 40-30-102(c) is inapplicable.

In addition to the foregoing, Tennessee's waiver rule in effect at the time that he filed his notice of appeal provided the following:

(b)     (1)  A ground for relief is 'waived' if the petitioner knowingly and understandingly failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.

(2)  There is a rebuttable presumption that a ground for relief not raised in any such proceeding which was held was waived.

Tenn. Code Ann. § 40-30-112 (1982). Because Zagorski did not raise this issue on direct appeal when he could have, and should have, and because he has failed to rebut the presumption of waiver, `this claim is waived under Tennessee law.

For the reasons explained above, Zagorski's claim pertaining to the "reasonable doubt" jury

instruction is procedurally defaulted. Although exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine intended to promote comity between the states and the federal government by giving the states the initial opportunity to pass on and correct alleged violations of a prisoner's federal rights. *Granberry*, 481 U.S. at 133. As previously noted, for the court to consider a claim that is procedurally defaulted under state law, the petitioner must demonstrate both "cause" and "prejudice" for failure to raise those claims in state court or that a miscarriage of justice will result if the claims are not reviewed. Although Zagorski addresses "cause" and "prejudice" and manifest injustice with respect to other issues (DE # 115, ¶¶ 2-3, 5, pp. 1-2, 5; DE # 119, ¶¶ I.B and D, pp. 4, 7; ¶ II, pp. 11-12; ¶¶ III.A and C, pp. 13-15, 17-18; DE # 121, ¶¶ I.A-D, pp. 1-11; DE # 123; DE # 158; DE # 158, ¶¶ III.B and C, pp. 34-46), he does not do so in the context of this claim. Rather, he offers the following in support his argument that this claim is not procedurally defaulted.

First, Zagorski argues that this claim is not procedurally defaulted because the Tennessee Supreme Court impliedly addressed it during its plain error review. (DE # 24, ¶ II.B, pp. 4; DE # 104, ¶ V.A.3, pp. 103-104) Notwithstanding Zagorski's argument, the Court of Appeals for the Sixth Circuit ("the Sixth Circuit") has consistently held that a state court's plain-error review does not constitute a waiver of procedural default rules to permit federal *habeas corpus* review of defaulted claims. *See Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004); *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 424 (6th Cir. 2003); *Cooey v. Coyle*, 289 F.3d 882, 897 (6th Cir. 2002); *Seymour*, 224 F.3d at 557; *Paprocki v. Foltz*, 869 F.2d 281, 284-285 (6th Cir. 1989). This argument is without merit.

Zagorski argues next that "the review of the federal claims on direct appeal is not independent of federal law." (DE # 104, ¶ V.A.3, p. 104) According to Zagorski, "there can be no procedural default because the Tennessee Supreme Court . . . considered the merits of the federal claims before concluding that there was 'no reversible error.'" (DE # 104, ¶ V.A.3, p. 104) This

21

an apparent reference to the statement in the Tennessee Supreme Court's opinion on direct appeal that, "after consideration of the several issues and of the entire record, we are of the opinion that no reversible error was committed in the trial . . . ." (DE # 9, Add. 2, Doc. 2C, p. 2). Although Zagorski does not elaborate on this argument, he does cite *Ake v. Oklahoma*, 470 U.S. 68 (1985), *Beam v. Paskett*, 966 F.2d 1563 (9th Cir. 1992)( reversed on other grounds by *Arave v. Beam*, 507 U.S. 1027 (1993)), and *Brasier v. Douglas*, 815 F.2d 64 (10th Cir. 1987). Because *Brasier* was overruled by *Shafer v. Stratton*, 906 F.2d 506 (10th Cir. 1990)(citing *Harris v. Reed*, 489 U.S. 255 (1998)), the following analysis addresses only *Ake* and *Beam*.

In *Ake*, a case on direct appeal rather than a *habeas corpus* action, the Supreme Court wrote that, "when resolution of [a] state procedural law question depends on a federal constitutional ruling . . . the state-law prong of the court's holding is not independent of federal law, and [federal] jurisdiction is not precluded." *Ake*, 470 U.S. at 75. Relying on *Ake*, the Ninth Circuit determined in *Beam* that, if a reviewing court has a statutory duty to review the entire record, then the defendant is deemed to have fairly presented his claim, even if he does not actually raise it. *Beam*, 966 F.2d at 1568-1569. In other words, *Beam* stands for the proposition that, if a reviewing court has a statutory duty to examine the entire record, then the court's affirmance of the defendant's sentence constitutes an implicit rejection of claims of error that fall within its obligatory review – even if the defendant never expressly raised those claims. *Beam*, 966 F.2d at 1567-1570.

Interpreted literally, the Ninth Circuit's holding in *Beam* would mean that procedural default can <u>never</u> occur if a reviewing court has the statutory obligation to review a criminal record in its entirety. After a careful reading of *Ake*, the court finds that there is nothing in *Ake* that supports such a far-reaching *per se* exception to the AEDPA's exhaustion requirement. This conclusion is supported by the Sixth Circuit's holding, discussed *supra* at p. 21-22, that a court's plain-error review does not constitute a blanket waiver of procedural default rules to permit federal *habeas*

22

*corpus* review of defaulted claims, a holding that, if not on point, is certainly analogous.

Assuming for the sake of argument that *Ake* does support a limited general exception to the exhaustion rule where a court has a statutory obligation to review the record, the Supreme Court has determined that, whether a procedural default determination involves the application of federal law in those instances depends on the scope of the statutory obligation. *Stewart v. Smith*, 536 U.S. 856, 858-860 (2002). In other words, where the reviewing court's obligation does not involve reaching the merits of a particular claim, federal law is not involved. *Id*. at p. 859-860.

The law in effect in Tennessee at the time in question provided, *inter alia*, the following with respect to the review of Zagorski's convictions and sentences:

> (a)  Whenever the death penalty is imposed for murder in the first degree and upon the judgment becoming final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Tennessee Supreme Court, which shall have exclusive appellate jurisdiction, provided that the sentence of death shall be automatically reviewed by the Tennessee Supreme Court and said sentence review shall be consolidated for consideration with the direct appeal prayed for. If the defendant has been convicted of first-degree murder and sentenced to death and appeals that conviction and sentence, the record as to guilt and sentence shall be expeditiously filed with the Tennessee Supreme Court . . . .
>
> . . .
>
> (c)  In reviewing the sentence of death for murder in the first degree, the Tennessee Supreme Court shall determine whether:
>
> (1)  The sentence of death was imposed in any arbitrary fashion;
>
> (2)  The evidence supports the jury's findings of a statutory aggravating circumstance or statutory aggravating circumstances;

(3)    The evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance or circumstances so found; and

(4)    The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. . . .

Tenn. Code Ann. 39-2-205 (1982). As shown above, although the Tennessee Supreme Court had a statutory obligation to review Zagorski's death sentence, its obligation was restricted to the four enumerated considerations. Because there was no statutory requirement to review factors apart from the four listed, the Tennessee Supreme Court was under no obligation to review such unrelated issues as the alleged unconstitutionality of jury instructions.

In his final argument, Zagorski maintains that his claim pertaining to the "reasonable doubt" jury instruction cannot be procedurally defaulted because not all similarly situated petitioners have been denied review when their claims were defaulted by statute. (DE # 104, ¶ V.A.3, pp. 104-105) Zagorski cites the following cases in support of his argument: *Carter v. State*, 958 S.W.2d 620 (Tenn. 1997); *Henderson v. State*, 1997 WestLaw 107704 (Tenn. Crim. App.); *Smith v. State*, 1994 WestLaw 330132 (Tenn. Crim. App.); *Pettyjohn v. State*, 885 S.W.2d 364 (Tenn. Crim. App.); *Caldwell v. State*, 1994 WestLaw 716266 (Tenn. Crim. App.) (DE # 104, ¶ V.A.3, p. 105). As shown below, each of these cases is distinguishable from Zagorski's.

In *Carter, Smith, Pettyjohn, and Caldwell*, the petitioners' procedurally defaulted claims pertaining to the "reasonable doubt" jury instruction was heard because, according to the petitioners, the Supreme Court's decision in *Victor v. Nebraska*, 511 U.S. 1 (1994) "set forth a new constitutional rule that should be retroactively applied." *Carter*, 1996 WestLaw at * 5; *Smith*, 1994 WestLaw at *1; *Pettyjohn*, 885 S.W.2d at 365; *Caldwell*, 1994 WestLaw at * 4. The reason why the

24

Tennessee courts agreed to hear these procedurally defaulted "reasonable doubt" jury instruction claims is not present here.

As to *Henderson*, that case was an appeal of right from the judgment of the post-conviction court on Henderson's fifth post-conviction petition. *Henderson*, 1997 WestLaw at * 1. On appeal, the Court of Criminal Appeals held that Henderson's "reasonable doubt" claim was, in fact, waived, but then addressed the claim in an alternate holding. *Henderson*, 1997 WestLaw at * 1.

Notwithstanding Zagorski's argument that *Henderson* is an exception to Tennessee's waiver rule, the Sixth Circuit has held repeatedly that both Tennessee's waiver and exhaustion rules – the procedural rules at issue – are firmly established and regularly enforced. *See Harbison v. Bell*, 308 F.3d 823, 832 (6th Cir. 2005)(statute of limitations); *Hutchison v. Bell*, 303 F.3d 720, 738 (6th Cir. 2002)(one-year statute of limitations under the new post-conviction act); *Cone v. Bell*, 243 F.3d 961, 969 (6th Cir. 2001), *rev'd on other grounds*, 535 U.S. 684 (2002)(waiver); *Cox v. Bell*, 161 F.3d 32-, 331 (6th Cir. 1998)(waiver). More on point, however, is the fact that the Court of Criminal Appeals addressed the issue on the merits as an alternate holding. Under *Harris*, 489 U.S. at 255, a federal *habeas* petitioner is not excused from his "cause and prejudice" burden if the last reasoned state opinion on the claim that explicitly imposed a state court procedural default also discussed the merits of the claim. *Id.* at 264 & n. 10 ("[A] state court need not fear reaching the merits of a federal claim in an *alternative holding*."); *see Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998).

For the reasons explained above, this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

## C. The Constitutionality of the "Malice" Jury Instruction
### (Paragraph 8 of the Amended Petition
### (DE # 16, p. 13))

Zagorski asserts that the jury instruction pertaining to "malice" at the guilt phase of his trial violated his rights under the Sixth, Eighth, and Fourteenth Amendments because the instruction

lessened the prosecution's burden of proof. (DE #16, ¶ III.8, p. 13) The respondent argues that this claim is procedurally defaulted for purposes of federal *habeas corpus* review because it was not raised in any state court prior to being raised in the instant proceedings. (DE # 17, ¶ V.8, p. 12; DE # 100, ¶ IV.G.3, p. 25; DE # 114, ¶ I.3, p. 11) Zagorski contends that this claim is not procedurally defaulted because the Tennessee Supreme Court conducted a plain-error review, that in concluding that there was no reversible error, the Tennessee Supreme Court considered the merits of any federal claim, and because not all similarly situated petitioners have been found to be defaulted on this claim by the state courts. (DE # 24, ¶ II.C, pp. 4-5; DE # 104, ¶ V.A.3, pp. 103-105)

A review of the record shows that Zagorski did not raise his claim pertaining to the "malice" instruction on direct appeal when he should have (DE # 9, Add. 2, Doc. 2A, pp. 2-7) or at any other time during the state proceedings in his case. Because Zagorski's argument with respect to this issue is identical to that pertaining to the "reasonable doubt" jury instruction discussed *supra*, this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

### D. Zagorski's Claim under *Brady v. Maryland* (Paragraph 9 of the Amended Petition (DE # 16, pp. 13-16))

Zagorski argues that the prosecution withheld exculpatory evidence that would have affected the outcome of the guilt and/or the sentencing phases of his trial, thereby violating his rights under the Sixth, Eighth, and Fourteenth Amendments. (DE # 16, ¶ 9, pp. 13-16) Zagorski's *Brady* claim pertains to four requests for disclosure: 1) the August 15, 1983 motion for discovery and inspection filed prior to trial, in which defense counsel specifically moved for disclosure of exculpatory material under *Brady* (DE # 182, Add. 1A, ¶ 9, p. 12; DE # 157, Ex. 23, ¶ 9, p. 2); 2) post-conviction counsels' discovery request sent to General Ray Whitley, District Attorney General for Robertson County ("General Whitley") (DE # 157, Ex. C-D); 3) post-conviction counsels' October 2, 1991

26

discovery letter to the District Attorney General for the 21st Judicial District, Joe Baugh ("General Baugh") (DE # 157, Ex. 19); 4) post-conviction counsels' November 18, 1991 discovery letter to the TBI's Deputy Director, William Holt (DE # 157, Ex. 30).

The specific allegations in the amended petition that comprise Zagorski's claim under *Brady* are as follows:

1) Hickman County Investigator Jeff Long's investigative report containing the names of individuals who had knowledge of the Dotson-Porter murders was not disclosed. (DE # 16, ¶ III.9.a, p. 14; DE # 104, ¶ III.C.b1)(3), p. 61)

2) Evidence was not disclosed that other suspects had a motive to murder Porter, including Buddy Corbitt, from whom Porter allegedly had stolen $25,000 and two diamond rings. (DE # 16, ¶ III.9b, p. 14; DE # 104, ¶ III.C.2.b1)(2) and b(5)2), pp. 62-64)

3) A September 29, 1993 letter written by the Assistant District Attorney General for the 21st Judicial District, Daniel W. Cook, containing information about persons in Houston, Texas with knowledge of the Dotson-Porter murders was not disclosed. (DE # 16, ¶ III.9c, p. 14; DE # 104, ¶ III.C.2b.1)(3), p. 61)

4) Information was not disclosed that the following witnesses received consideration for their testimony: a) Jimmy Blackwell; b) Sallie Salmon; c) Don Peery; d) James Rodney Bruce. (DE # 16, ¶ III.9.d, pp. 14-15; DE # 104, ¶¶ III.C.2.a(a)-(c), b1)(1), and b2), pp. 57, 61-63)

5) Evidence inconsistent with the State's theory of the case in the possession of the TBI was not disclosed. (DE # 16, ¶ III.9.e, p. 15)

6) Evidence was not disclosed pertaining to the credibility/involvement in illegal activities of Jimmy Blackwell, Don Peery, Jimmy Porter, Buddy Corbitt, "and/or the Eastside Tavern," in particular General Baugh's reference to Jimmy Blackwell as the "epitome of a punk drug dealer" who was "not reliable" (DE # 16, ¶ III.9.g, pp. 15-16; DE # 104, ¶¶ III.C.2.a(d)(e) and b.1)(2), pp. 59-60, 61-63)

27

7) The results of an investigation conducted by the Robertson County Sheriff's Department into Zagorski's activities in Louisiana, which revealed that he had no military training or mercenary ties and that he "fantasized a lot" were not disclosed. (DE # 16, ¶ III.9.g, p. 16)

The respondent contends that none of the claims in the amended petition were raised in any state court in the context of the Sixth or Eighth Amendments and, as such, Zagorski's *Brady* claims under the Sixth and Eighth Amendments are procedurally defaulted. (DE # 17, ¶ V.9, p. 12; DE # 100, ¶ IV.G.4, p. 25; DE # 114, ¶ I.4, pp. 12-13) The respondent further maintains that only claims 1) and 3) above were raised in the context of the Fourteenth Amendment, and that claims 2) and 4)-7) are procedurally defaulted in the context of that Amendment. (DE # 17, ¶ V.9, pp. 12-13; DE # 100, ¶ IV.G.4, pp. 25-26; DE # 114, ¶ I.4, pp. 11-13) As to claims 1) and 3) under the Fourteenth Amendment, the respondent argues that the Court of Criminal Appeals' determination of those claims was neither an unreasonable determination in view of the evidence presented, nor contrary to or an unreasonable application of federal law. (DE # 17, ¶ V.9, pp. 12-13; DE # 100, ¶ IV.G.4, pp. 26-27; DE # 114, ¶ I.4, p. 12; DE 121, ¶ I.B, p. 6) Zagorski argues that his *Brady* claims in the amended petition are not procedurally defaulted. (DE # 24, ¶ II.D, pp. 5-6); DE # 104, ¶ III.C.2.c, pp. 68-70; DE # 115, ¶ 2, p. 2; DE # 123, ¶ 3, pp. 2-3)

Additional *Brady* claims that arose subsequent to the amended petition are identified and discussed *infra*. The respondent argues that those *Brady* claims are procedurally defaulted as well. (DE # 161, ¶¶ III, pp. 5-11) Zagorski argues that they are not. (DE # 158, ¶ III.B, pp. 34-41)

Under *Brady v. Maryland*, 373 U.S. 83 (1963), "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. Evidence "favorable to an accused" includes both exculpatory and impeachment evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985)(citing *Giglio v. United States*, 405 U.S. 150, 154 (1972), and the suppression of such evidence may violate due

28

process "irrespective of the good faith or bad faith of the prosecution," *Brady*, 373 U.S. at 87. Moreover, the *Brady* rule encompasses evidence known to both the prosecution and to police officials. *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995). More particularly, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id*. On the other hand, merely establishing that the prosecution knew or should have known of exculpatory evidence unknown to the defense does not, without more, amount to a *Brady* violation. *Id*. at 437.

There are three elements in a true *Brady* violation: 1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; 2) the evidence must have been suppressed by the government, either willfully or inadvertently; 3) prejudice to the defendant must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The third element, *i.e.*, that the defendant must have been prejudiced, is established by showing that the suppressed favorable evidence was "material." Evidence is material, and thus constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *see also Jamison*, 291 F.3d at 385. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id*. In the context of *Brady*, a "reasonable probability" of a different result exists when the unavailability of the suppressed evidence to the defense undermines confidence in the outcome of the trial. *Kyles*, 514 U.S. at 434.

Finally, a determination of materiality under *Brady* does not employ a sufficiency of the evidence test. *Id*. at 434–35. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 434. In examining whether suppressed evidence is "material" for *Brady* purposes, a court must consider the suppressed evidence

29

collectively, not item by item. *Id.* at 437; s*ee Schledwitz v. United States*, 169 F.3d 1003, 1012 (6th Cir. 1999); *see also Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003).

### 1. Procedural Default

Zagorski offers the following in support of his argument that his *Brady* claims are not procedurally defaulted. First, he argues that his *Brady* claim is not subject to procedural default because there is no legitimate basis for imposing a procedural default where the "state unconstitutionally withheld exculpatory evidence . . . ." (DE # 158, ¶ III.B.1, pp. 34–35) Because all *Brady* claims involve withholding evidence favorable to the defendant, Zagorski's argument amounts to a sweeping assertion that the procedural default doctrine is wholly inapplicable to *Brady* claims – an assertion that the Supreme Court opinion in *Banks v. Dretke,* 540 U.S. 668 (2004) implicitly disapproves, and the Sixth Circuit in *Jamison*, cited *supra* at p. 17, explicitly rejects.

In *Banks*, although the petitioner alleged that the state withheld information until a federal *habeas corpus* evidentiary hearing and that a key government witness was an informant, the petitioner nevertheless was required to show "cause and prejudice" to overcome the procedural default resulting from his failure to develop the fact of the witness's informant status during state proceedings. *Banks*, 540 U.S. at 690–91. Relying on *Strickler*, the Supreme Court concluded in *Banks* that the petitioner had demonstrated cause "because the State persisted in hiding [the witness's] informant status and misleadingly represented that it complied in full with its *Brady* disclosure obligations." *Id.* at 693.

Similarly, in *Jamison*, the Sixth Circuit applied the procedural default doctrine to an unexhausted *Brady* claim. With respect to "cause," the Sixth Circuit concluded that the factual basis of the procedurally defaulted *Brady* claim was "reasonably unknown" to defense counsel, thereby establishing "cause" to excuse procedural default because the state "failed to evaluate the case materials for required *Brady* disclosures . . . [and] further affirmatively represented to the

30

defense that no favorable evidence existed." *Jamison*, 291 F.3d at 388. The Sixth Circuit determined that, under these circumstances, the state "cannot now argue that it was unreasonable for defense counsel not to have caught it suppressing evidence."[6] *Id.*

*Banks* and *Jamison* stand for the general proposition that, although withholding evidence does not immunize a *Brady* claim from procedural default, "cause" to excuse procedural default exists "when the reason for his failure to develop facts in state-court was the State's suppression of the relevant evidence." *Id.*; *see also Hutchison*, 303 F.3d at 742 (where the petitioner could not show that his failure to present his *Brady* claims in state court was due to suppression rather than his own neglect, the petitioner did not show "cause" to excuse procedural default). Accordingly, the court rejects Zagorski's argument that the prosecution's failure to disclose favorable evidence despite Zagorski's request is, in and of itself, sufficient to establish "cause" to excuse procedural default.

The court likewise rejects Zagorski's second argument, asserted by way of footnote, that ineffective assistance of both appellate and post-conviction counsel provides "cause" for any alleged failure to raise his *Brady* claim on direct appeal or in post-conviction proceedings. (DE # 104, p. 70 n. 23) Ineffective assistance of counsel, as defined by *Strickland*, *infra* at p. 104, may establish "cause" to excuse procedural default. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 488. However, "[t]o constitute cause, that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted." *Burroughs v.*

---

[6]    The Sixth Circuit distinguished *Jamison* from cases that hold that "no relief is required, despite a *Brady* violation by the prosecution, if the information was available to the defense via reasonable inquiry," on the ground that those cases do not involve official interference. *Jamison*, 291 F.3d at 388 n. 3; *see also Harbison,* 308 F.3d at 823 (rejecting the petitioner's claim that "cause" was established by the state's failure to provide police files containing evidence that formed the basis of the petitioner's *Brady* claim, because, unlike the case in *Banks*, there was "no evidence of such prosecutorial concealment and misrepresentation," and because the police files could have been requested within a reasonable time). Thus, even where the prosecution violates *Brady* by failing to provide material information to the defense, there is no showing of "cause" for failure to present the related *Brady* claim in state court, where there is no official interference making the presentation impractical and the information was readily available in state proceedings.

31

*Makowski*, 411 F.3d 665 (2005). In *Murray*, the Supreme Court explained that the doctrine of exhaustion "requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." 477 U.S. at 488–89; *see also Jones v. Toombs*, 125 F.3d 945, 947 (6th Cir. 1997).

The record shows that Zagorski has not raised an ineffective assistance claim in the context of *Brady* in any state court. (DE # 9, Add. 4, Doc. 4A, pp. i-ii) Perhaps in recognition of that oversight, Zagorski asserts that the ineffectiveness of post-conviction counsel in failing to raise the current *Brady* claim independently establishes "cause," and that Zagorski's constitutional right to effective counsel should be extended to state post-conviction proceedings. (DE # 104, p. 70, n. 23) However, the law on this point is clear – there is no constitutional right to effective counsel in state post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551 (1987).

In his third argument, Zagorski maintains that this is a case of official interference and, as such, the State's actions in suppressing material evidence, and misleading defense counsel regarding the existence of exculpatory evidence, establishes "cause" for failure to present the substance of his *Brady* claims to the state courts. (DE # 158, ¶ III.B.2.a.1)-2), pp. 38–40) As the Supreme Court stated in *Banks*:

> Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows "cause" when the reason for the failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the "cause and prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes.

*Id*. at 691. In other words, the procedural default "cause-and-prejudice" test "parallel[s] two of the three components of the alleged *Brady* violation itself." *Banks,* 540 U.S. at 691 (quoting *Strickler*, 527 U.S. at 282). This argument will be addressed in the analysis that follows to the extent that it

is relevant.

In his fourth argument, also asserted by way of footnote, Zagorski contends that counsels' investigation and the resulting development of facts relevant to his *Brady* claim involving Blackwell, *i.e.*, TBI reports and documents from the federal public defender's office, could only have occurred as a result of the discovery process during the instant proceedings.  (DE # 104, p. 69, n.22)  Thus, according to Zagorski, the factual basis of these *Brady* claims was not reasonably available to Zagorski in state court proceedings.  (DE # 104, p. 69, n.22)

The court agrees with Zagorski's premise insofar as an order of this court was required to produce exculpatory evidence that had not been disclosed.  However, the court is of the view that the doctrine of comity between the states and the federal government, which gives the states the initial opportunity to pass on and correct alleged violations of a prisoner's federal rights, is more than mere window dressing.  The question here is whether Zagorski's *Brady* claims that are grounded in TBI reports, including reports from the Tennessee Department of Safety ("the Department of Safety"), of which the TBI is part, are procedurally defaulted.

The law is well established that defendant/petitioner may reasonably rely on the state's representation that it has disclosed all *Brady* evidence and that, once the state confirms this representation, the defendant/petitioner is under no further duty to investigate additional materials. *See Banks*, 640 U.S. at 692-694.  The key here is whether it was "confirmed" by the Department of Safety/TBI on post-conviction that there was no exculpatory evidence in their possession.

Former post-conviction co-counsel Sam Felker testified on cross-examination at the *habeas corpus* evidentiary hearing that he did not recall having received a response from the TBI, that he found no such response in the post-conviction file, and that he did not recall asking the court to subpoena TBI records.  (DE # 157, pp. 360-361)  Felker testified that, had such follow-up actions taken place, there would have been a record of those actions in the post-conviction file.  (DE # 157,

33

p. 362)  Because Felker testified that there were no such records in the file, and because he testified that such records would be in the file had any follow-up action been taken, the court finds that post-conviction counsel did not follow up on the TBI's failure to respond.

Given that it is the affirmative duty of the state to disclose exculpatory evidence, the court concludes, without deciding, that post-conviction counsel were not required to subpoena the TBI records requested.  However, the doctrine of comity is too important to conclude that no follow-up is required where a request for disclosure under *Brady* has been made, but no response has been received.  In the absence of any response at all, a strong case can be made that post-conviction counsel had a duty to investigate whether the lack of a response was due to an administrative oversight on the TBI's part, or whether the TBI's silence was intended as its confirmation that there was no evidence/information to disclosed.

Because the TBI did not confirm that there was no exculpatory evidence in its possession, and because post-conviction counsel made no effort to inquire into the TBI's failure to respond to their disclosure request, the court finds that Zagorski has failed to establish "cause" to excuse procedural default as to those *Brady* claims that rely on the Department of Safety/TBI documents that were disclosed during the course of these proceedings.  Accordingly, Zagorski's *Brady* claims that rely on the Department of Safety/TBI documents at issue are procedurally defaulted for purposes of federal *habeas corpus* review.  The issue of procedural default as it pertains to documents disclosed by the federal public defender's office will be addressed as required in the analysis that follows.

Finally, citing Rule 28 § 6(c)(7), Tenn. R. Sup. Ct., Zagorski argues that the "state did not affirmatively disclose any *Brady* materials, even though such disclosure is required by post-conviction discovery rules which require disclosure of information required by the state or federal

34

constitution.' Tenn. S. Cr. R. 28 § 6(c)(7)." (DE # 119, pp. 16-17) According to Zagorski, "[t]his too, precludes a finding that . . . Zagorski failed to develop his claims." (DE # 119, p. 17)

It is undisputed that Zagorski made a pre-trial request for all *Brady* material.[7] (DE # 157, p. 185 and Ex. 23) The respondent admits that none of the documents allegedly from the prosecution's file were turned over to the defense at the time of trial, because the prosecutors did not consider any of the information contained in the files to be exculpatory. (DE # 157, p. 185) With respect to any potentially impeaching material in the file, Generals Whitley and Gay both testified that, at the time of Zagorski's trial, they did not consider impeachment evidence to fall within the dictates of *Brady*. (DE # 157, pp. 181–84, 238–39) Despite this blatantly erroneous view of *Brady*, the respondent essentially contends that any lack of disclosure at trial was compensated for through its maintenance of an open-file policy during state post-conviction proceedings and that, as a result, the petitioner was required to develop any related *Brady* claims during those proceedings.

Zagorski does not dispute that post-conviction counsel had access to the prosecution's files during state post-conviction proceedings. Indeed, post-conviction co-counsel, Joe Welborn, testified that he went to the District Attorney's office to view the file. While he could not remember whether he decided which portions of the file to copy or whether he had the entire file copied, Welborn testified that it was his usual practice to copy the entire file and review it later. (DE # 157, pp. 377–78) Significantly, Welborn did not remember seeing some of the prosecution's notes and other investigative material in the file. (DE # 157, p. 391) Post-conviction co-counsel Sam Felker also testified that, though "there were some documents from Mr. Whitley's file which we attempted to

_____

[7] In his pretrial Motion for Discovery and Inspection, Zagorski specifically requested a copy of the prior criminal record of any state witness whom the state intended to call and "all material now known to the government, or which may become known, or which through due diligence may be learned from the investigating officers or the witnesses in the case, which is exculpatory in nature or favorable to the accused or which may lead to exculpatory material," including the "reports of any investigations carried out by the Tennessee Bureau of Criminal Identification or the local police, or of law enforcement agencies other than Tennessee authorities." (DE # 157, Ex. 23,t ¶¶ 5, 9, p. 2)

35

use at the post-conviction hearing to state a *Brady* claim . . . some of the documents I have seen here today were not part of what were given to us, and so the claim was not successful." (DE # 157, pp. 367–68) While the State has represented that all of the materials at issue were provided in the prosecutor's file during post-conviction proceedings, those files have not been made part of the record in these proceedings and, as a result, the court cannot verify whether this was indeed the case.

The Sixth Circuit previously resolved a similar dispute in favor of the petitioner. *See Jamison*, 291 F.3d at 380. In *Jamison*, the petitioner was given permission to conduct discovery as part of a federal *habeas corpus* proceeding, during which discovery, 35 documents from the State's police file came to light that the petitioner claimed should have been given to him prior to trial. *Id.* at 384–85. In *Jamison*, the State argued that, because the entire police file was inspected by the public defender during state post-conviction proceedings, the petitioner could not establish cause for failure to present his *Brady* claim to a state court. *Id.* at 386. The Sixth Circuit, however, rejected this claim because the State had not successfully made the police file part of the record. *Id.* at 387 ("Throughout the hearing, Ohio did not introduce any evidence relating to the 'complete file.' Ohio did not offer or authenticate any police file information."). In light of the Sixth Circuit's ruling in *Jamison*, as well as the testimony from post-conviction counsel that documents from the District Attorney's file were revealed for the first time during the instant proceedings, the court resolves the dispute in favor of Zagorski and finds that the materials at issue were not reasonably available to post-conviction counsel during state post-conviction proceedings.

Even assuming for the sake of argument that all of the materials at issue were in the file, the State affirmatively identified only one piece of evidence as "important in the post-conviction relief process" before disclosing the file to post-conviction counsel. (DE # 157, p. 169) The evidence identified was a note that stated, "Tony Rigsby had and is involved with Soveorski [*sic*] case, when

36

he got arrested Tony took the money and dope and split." (DE # 157, Ex. 24) Although General Gay did not identify this document as *Brady* material, he did, in disclosing the document, think that post-conviction counsel "could claim it to be withheld because it clearly wasn't turned over to anybody." (DE # 157, p. 197) Because it is reasonable that post-conviction counsel would have relied on "the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials," *Strickler*, 527 U.S. at 284, and because, given the State's limited disclosure, it was especially unlikely that post-conviction counsel would have suspected that additional favorable evidence existed in the file, the court finds that Zagorski has established cause for the failure to present claims arising from Exhibit 18 and Exhibits 26 through 29, including the claim, based on Exhibit 28, that the government allowed Blackwell to get away with selling 25 pounds of marijuana in June of 1983 in consideration for his help in the Zagorski case.

With respect to Exhibit 28, although Blackwell may have benefitted collaterally from the government's failure to investigate further or to seek to verify the information relayed to General Whitley regarding Blackwell's suspected sale of 25 pounds of marijuana while on probation in June of 1983,[8] the note containing the information that "Blackwell had sold 25 pounds the week before" fails to establish the existence of any "deal" between the government and Blackwell that would have given Blackwell an incentive to testify in a certain manner during Zagorski's trial. That no such deal existed is confirmed by General Whitley's testimony that Blackwell neither requested nor received, from his office or any other District Attorney's office, any form of consideration in exchange for his testimony, whether in the form of monetary compensation, a reduction in charges, or non-prosecution (DE # 157, pp. 272–74), and General Gay's testimony that Blackwell neither requested

---

[8] Whether Blackwell actually benefitted from the government's failure to investigate the information contained in Exhibit 29 is questionable in light of Whitley's testimony that he was not sure how reliable the information was and that, to him, it was information that was just "floating out there." (DE # 157, p. 260)

nor received any sort of consideration for his testimony (DE # 157, p. 218).[9]  General Baugh also testified that he was not aware of any charges pending or being considered to be brought against Blackwell from the time of the murders until the petitioner's trial and that he had no knowledge of any deals offered to Blackwell in exchange for his testimony or cooperation in the Zagorski matter. (DE # 157, p. 94)

The petitioner's failure to establish that Blackwell was an informant who received consideration from the State compels the court to conclude that the State did not fail to disclose or otherwise withhold such evidence from the defense.  Because the court finds that the State did not suppress evidence regarding Blackwell's alleged informant status or his receipt of consideration relating to Petitioner's case, the court likewise finds that the petitioner cannot demonstrate "cause" based on a theory that the State's suppression of the evidence prohibited him from raising the claim in state court proceedings.

Notwithstanding the foregoing findings, because the court granted an evidentiary hearing on this issue, the court will nevertheless address the merits of Zagorski's Brady-related claims.  Any exceptions to the court's determinations above, or requirement to expand on those determinations, will be addressed on a case-by case basis in the analysis that follows.

### 2. Analysis on the Merits

The following analysis is divided into four parts: first, analysis of those *Brady* claims set forth in the amended petition; second, analysis of those *Brady* claims that arose subsequent to the amended petition; third, analysis of the cumulative effect that Zagorski's *Brady* claims would have had on the verdict; fourth, analysis of Zagorski's argument in the alternative, *i.e.*, that if his

---

[9]     General Gay's letter to Blackwell, thanking him for his cooperation and providing information regarding the *per diem* reimbursement for expenses associated with his cooperation, does not establish the existence of a deal between Blackwell and the state.  (DE # 157, Ex. 25)  Furthermore, the minimal *per diem* reimbursement outlined in General Gay's letter is statutorily mandated.  (DE # 157, p. 273)

allegations do not give rise to a *Brady* claim, then defense counsel provided ineffective assistance because they failed to investigate and present exculpatory evidence at trial.

### a. Claims in the Amended Petition

### (1) Failure to Disclose Jeff Long's Investigative Report Containing Names of Others with Knowledge of the Murders (DE # 16, ¶ III.9.a, p. 14)

Zagorski alleges that a report prepared by Hickman County investigator, Jeff Long, containing names of individuals with knowledge of the Dotson-Porter murders was not disclosed to the defense. (DE # 16, ¶ III.9.a, p. 14) This claim was raised on appeal from the judgment of the post-conviction court. (DE # 9, Add. 4, Doc. 4A, pp. 49, 51)

The report at issue was entered into evidence at the post-conviction evidentiary hearing. (DE # 9, Add. 3, Ex. 24) At that hearing, defense co-counsel, the late Judge James E. Walton ("Judge Walton"), was questioned regarding whether the prosecution had disclosed the report prior to trial (DE # 9, Add. 3, Vol. V, pp. 153-159), to which Judge Walton replied that it had not (DE # 9, Add. 3, Vol. V, pp. 158-159). Although Judge Walton was asked about the report, apart from establishing that the prosecution did not disclose it, no other testimony was adduced at the hearing. (DE # 9, Add. 3, Vol. V, pp. 153-159)

On appeal from the judgment of the post-conviction court, the Court of Criminal Appeals identified *Brady* as controlling in those instances when it is alleged that exculpatory evidence has been withheld from the defense. (DE # 9, Add. 4, Doc. 4C, p. 29-30) Citing *Bagley*, 473 U.S. at 667, the Court of Criminal Appeals correctly identified the three-part test required to prevail on a *Brady* claim, *i.e.*, whether the prosecution suppressed the evidence, whether the evidence was favorable to the accused, and whether the evidence was material. (DE # 9, Add. 4, Doc. 4C, p. 29-30) Citing *Kyles*, 514 U.S. at 419, the Court of Criminal Appeals correctly defined evidence as

39

material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would be different," *i.e.* that failure to disclose the evidence at issue would "undermine confidence in the outcome of the trial." (DE # 9, Add. 4, Doc. 4C, p. 30-31)

In reviewing this claim, along with Daniel W. Cook's September 29, 1983 letter to Jeff Long, discussed *infra* at pp. 47-50, the Court of Criminal Appeals wrote:

> [I]t is regrettable that defense counsel was unaware of these documents. As stated in petitioner's brief, these documents 'contained names as well as other information which would have been useful to Zagorski's trial counsel in investigating the murders.' However, the crucial issue is whether these documents are 'favorable' and 'material.' There was no testimony at the post-conviction hearing that these documents would have led to 'favorable' information. Furthermore, in order for petitioner to get relief there must be a reasonable probability that, had this evidence been disclosed to the defense, the result of the proceeding would have been different. The evidence does not preponderate against the trial court's finding that this material would not have affected the outcome of the trial. In short, there is no showing that the failure to disclose this information 'undermined confidence in the outcome of the trial.'

(DE # 9, Add. 4, Doc. 4C, p. 31)(internal citations omitted) The evidentiary basis on which the Court of Criminal Appeals made its determination on this issue is consistent with the evidence adduced at the post-conviction evidentiary hearing, *i.e.*, "[t]here was no testimony at the post-conviction hearing that these documents led or would have led to 'favorable' information." (DE # 9, Add. 4, Doc. 4C, p. 31)

The claim as it is set forth in Zagorski's amended *habeas corpus* petition is quoted below:

> In the course of investigating the case, Hickman County Investigator Jeff Long prepared an investigative report, which was not provided to the defense. That report contained names of various individuals with knowledge of the murders in this case.

(DE # 16, ¶ 9.a, p. 14)(internal references to the record omitted) In his response to the respondent's motion for summary judgment, Zagorski asserts that "state authorities withheld exculpatory

40

evidence . . . favorable to . . . Zagorski on the questions of guilt and sentence, including . . . [a]n investigative report authored by Jeff Long . . . ." (DE # 104, ¶ III.C.2.b.1)(4), p. 61) Apart from this single statement, Zagorski does not mention this claim further in any of the other pleadings in this action.

The report was mentioned on cross-examination at the *habeas corpus* evidentiary hearing. However, its author, Jeff Long, merely used it to refresh his recollection on the issue of Blackwell's involvement in the Dotson-Porter conspiracy to purchase marijuana. (DE # 157, pp. 427-428) The questioning had nothing to do with other individuals who might have had knowledge of the murders and/or the consequences of the defense not knowing about the report at trial. (DE # 157, pp. 427-428) Moreover, a copy of the report was not even entered as an exhibit in these proceedings.

As previously established, where, as here, a state court makes factual findings, those factual determinations are entitled to a presumption of correctness unless the petitioner establishes by clear and convincing evidence that the state court's determination is not entitled to that presumption. Apart from repeating this claim as it appears in the amended petition in his response to the respondent's motion for summary judgment, Zagorski has not presented, developed, or argued this claim in subsequent proceedings before this court. Having failed to present any evidence and/or supporting argument regarding this claim, Zagorski has failed to overcome the presumption of correctness as to the Court of Criminal Appeals' determination on this issue.

In addition to its determination being entitled to the presumption of correctness, the Court of Criminal Appeals correctly stated the three-part test required to establish a *Brady* claim. In that regard, as previously noted, the Court of Criminal Appeals determined that there was "no testimony . . . that these documents led or would have led to 'favorable' information,' or that this document would have "affected the outcome of the trial," *i.e.*, that failure to disclose "this information

41

'undermines confidence in the outcome of the trial.'" (DE # 9, Add. 4, Doc. 4C, p. 31)  The Court of Criminal Appeals' legal conclusion on this issue is amply supported by the record.  Accordingly, the court concludes that the Court of Criminal Appeals' ruling was neither contrary to nor an improper application of federal law.

In addition to the foregoing, this claim is without merit in the context of the instant proceedings for another reason.  As already noted, Zagorski has not presented, developed, or argued this claim in subsequent briefs in this court.  Consequently, the court deems this claim to be waived.  *See Spirko v. Mitchell*, 368 F.3d 603, 612 (6th Cir. 2004)(concluding that, in a capital case, "issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"(internal quotation marks omitted); *Hutchison*, 303 F.3d at 748 n. 7 (in a capital case, claims that "have not been adequate[ly] briefed . . . [are] waived.")

For the reasons explained above, Zagorski is not entitled to *habeas corpus* relief on the grounds alleged.

(2)  Failure to Disclose Evidence of Other Suspects with a
Motive to Kill Dotson and Porter
(DE # 16, ¶ III.9b, p. 14)

Zagorski alleges that evidence was suppressed of others who had a motive to kill Porter.  (DE # 16, ¶ III.9b, p. 14)  In his amended petition, Zagorski identifies Buddy Corbitt as the only other potential suspect.  (DE # 16, ¶ III.9b, p. 14)  In his response to the respondent's motion for summary judgment, Zagorski expands his claim to allege that:

> [S]tate authorities withheld exculpatory evidence which was favorable to . . . Zagorski on the question of guilt and sentence, including . . . that the killings were committed or orchestrated by persons other than Zagorski, including Buddy Corbitt, a man named Langford, and Tony Rigsby . . . .

(DE # 104, ¶ III.C.2.b(2), p. 61)  Zagorski further expands this claim when, in his response to the

42

respondent's motion for summary judgment, he refers to the:

> September 29, 1983, letter from District Attorney General J. Kenneth
> Atkins to Jeff Long detailing the involvement of persons in Texas in
> the killings . . . .[10]

(DE # 104, ¶ III.C.2.b(3))  From the pleadings in this action, the court concludes that the following

comprise Zagorski's list of "other" suspects: Corbitt, Langford, Rigsby, and "persons" in Texas.


### (a)  The Corbitt-Langford Connection

The thrust of this part of Zagorski's claim is embodied in three notes introduced at the

*habeas corpus* evidentiary hearing as Ex. 18, 26, and 27, collectively referred to in the context of

this claim as the "Corbitt-Langford notes."

In his amended petition, Zagorski asserts that Porter had stolen $ 25,000 and two diamond

rings from Corbitt and that Corbitt had threatened to kill Porter as a result.  (DE # 16, ¶ III.9.b, p.

14)  In his response to the respondent's motion for summary judgment, Zagorski asserts further that

the prosecution withheld information that Corbitt had put out a $10,000 contract on Porter, and that

he had paid Langford $1,700 to do the job.  (DE # 104, ¶ III.C.2.b, pp. 63-64)  Elsewhere in his

response, Zagorski asserts that:

> [W]ithout the withheld evidence, the jury was erroneously led to
> believe . . . that Ed Zagorski alone planned the killings and
> committed the killings; that no one else was involved or had a motive
> to commit the offense . . . .  Buddy Corbett had motive and reason to
> kill Dotson and Porter, who were heavily involved in drug
> trafficking.  He put out a contract on Dotson and paid Langford to kill
> him.

(DE # 104, ¶ III.C.2.b, p. 64)  Zagorski does not mention this claim anywhere else in the pleadings

---

[10]     The letter at issue was sent in the name of J. Kenneth Atkins, District Attorney General for the 21st Judicial District,
signed by direction by Daniel W. Cook, Assistant District Attorney General.  The letter is referred to hereafter as having
been sent by Cook rather than Atkins.

in these proceedings.

Testimony at the *habeas corpus* evidentiary hearing established that all three of the notes were found in General Whitley's file.  (DE # 157, pp. 31, 40, 166, 176-177, 278)  Two of the notes, Ex. 18 and Ex. 26, were addressed at the hearing in terms of who wrote the notes, who was present when the notes were written, the substance of the notes, and the circumstances under which the notes were written.  (DE # 157, pp. 31-34, 38-40, 166-167, 171-175, 235-239, 278)  As to the third note, Ex. 27, apart from being established that the prosecution did not disclose it, little more than the contents of the note were addressed.  (DE # 157, pp. 41, 176, 188-189, 243-245, 310)

It is clear that the prosecution suppressed the Corbitt-Langford notes at trial within the meaning of *Brady*.  The Corbitt-Langford notes also are facially favorable to Zagorski.  As to the 'materiality' element under *Brady*, as previously established, *supra* at p. 30, evidence is 'material' if the failure to disclose it undermines the confidence in the verdict.  Although Zagorski does not say so specifically, it appears from the foregoing excerpts from the pleadings that his argument is that the Corbitt-Langford notes would have created 'reasonable doubt' in the jury's mind as to his guilt, the inference being that such 'reasonable doubt' is sufficient to undermine confidence in their verdict.  Notwithstanding Zagorski's apparent view to the contrary, given the overwhelming circumstantial evidence against Zagorski, the prosecution's failure to disclose the Corbitt-Langford notes, whether viewed in isolation or collectively, as discussed *infra* at pp. 92-99, is insufficient to undermine confidence in the jury's verdict.  Accordingly, the court finds that the Corbitt-Langford notes are not material.

As reasoned above, Zagorski has failed to establish that he is entitled to federal *habeas corpus* relief under *Brady* because the prosecution did not disclose the Corbitt-Langford notes.

(b)  The Rigsby Note

44

Zagorski alleges for the first time that Rigsby had a motive to murder Dotson and Porter in his response to the respondent's motion for summary judgment.  (DE # 104, ¶ III.C.2.b(2), pp. 61, 64)  The note itself (DE # 157, Ex. 24)  is quoted below in its entirety.

> D.G.A. Tony Rigsby had and is involved in the Sogerski [*sic*] case.
> When he got arrested tony took the money & dope & split.  That's all
> I can tell you.  Can't say any names but his.

(DE # 157, Ex. 24)

In his response to the respondent's motion for summary judgment, Zagorski asserts that the Rigsby note "demonstrate[s] that the killings were committed or orchestrated by persons other than Zagorski, including . . . Tony Rigsby . . . ."  (DE # 104, ¶ III.C.2.b(2), p. 61)  Zagorski's only other reference to the Rigsby note in his response is his allegation that "Tony Rigsby was involved" in the murders, and that without the evidence, "the jury was erroneously let to believe . . . that Ed Zagorski alone planned the killings and committed the killings . . . ."  (DE # 104, ¶ III.C.2.b, p. 64)

Testimony at the *habeas corpus* evidentiary hearing established that the Rigsby note was found in General Whitley's file on post-conviction.  (DE # 157, pp. 168, 195-196, 226, 278)  The Rigsby note itself was introduced at the *habeas corpus* evidentiary hearing through the testimony of General Gay.  (DE # 157, pp. 167-170)  General Gay explained the note as follows:

> I'm familiar with the subject of this note.  And like I told you, I had
> talked to somebody that frequently complained about Tony Rigsby.
> And, you know, just speculating, I just assumed probably that it's
> from that source.

(DE # 157, p. 168)

> I know the Tony Rigsby situation.  I know the lady that would call
> me about him frequently.

(DE # 157, p. 196)  When asked by the court whether he would have disclosed the Rigsby note to defense counsel, General Gay replied, "No, no," reasoning that:

[T]his is just information that I don't consider the truth. I had dealings with Tony Rigsby. It says 'Tony Rigsby had and is involved with the Soreski [*sic*] case. When he got arrested Tony took the money.' Well, the proof – our evidence is clear that Zagorski had all the money in Ohio, by talking to Mr. Bruce and others up there.

And the money that he spent, it was very obvious to me, that the – Zagorski was the only one that had the money. He took the dope; there was no dope. And from what I know about Tony Rigsby, there was no association with anyone in Robertson County, especially Mr. Rigsby, with Mr. Zagorski.

(DE # 157, pp. 198-199)

The Rigsby note was addressed further during the testimony of former defense co-counsel, Larry Wilks. (DE # 157, pp. 302-335). (DE # 157, pp. 302-335) Wilks testified that he had not seen the Rigsby note prior to trial. (DE # 157, p. 305) One of Zagorski's post-conviction attorneys, Joe Welborne, also testified at the *habeas corpus* evidentiary hearing. However, apart from Welborne's testifying that he did not recall the prosecution identifying any *Brady* materials (DE # 157, p. 378), and that he did not remember the Rigsby note in particular (DE # 157, p. 391), the Rigsby note was not mentioned further at the hearing. (DE # 157, pp. 375-391)

In his post-hearing brief, Zagorski again refers to the "handwritten notes concerning Tony Rigsby's alleged involvement in the Porter/Dotson slayings . . . ." (DE # 158, ¶ I.G.(2), p. 17) Beyond this single statement, however, Zagorski does not mention the Rigsby note further. (DE # 158, ¶ I.G, pp. 15-19)

Once again, it is clear that the prosecution suppressed the Rigsby note at trial within the meaning of *Brady*. Here too, the Rigsby note also is facially favorable to Zagorski. However, for reasons previously explained, *supra* at p. 45, the Rigsby note is not material. Accordingly, Zagorski has failed to establish that he is entitled to federal *habeas corpus* relief under *Brady* because the prosecution did not disclose the Rigsby note.

46

For reasons discussed *infra*, the September 29, 1983 letter that forms the basis of this claim does not give rise to a claim under *Brady*.  Consequently, this claim is without merit.

### (3)  Failure to Disclose the September 29, 1993 Letter About Persons in Houston, Texas With Knowledge of the Murders (DE # 16, ¶ III.9c, p. 14)

Zagorski alleges in this claim that Daniel W. Cook,[11] Assistant District Attorney General for the 21st Judicial District, wrote a letter on September 29, 1983 ("the September 29 letter") to Hickman County investigator, Jeff Long, with information that persons in Houston, Texas had knowledge of the Dotson-Porter murders.  (DE # 16, ¶ III.9.c, p. 14)  In that letter, General Cook wrote that a female undercover officer, whose operative name was "Marsha," provided the following information:

> 'Marsha' advised us that Pam Crews' father, who lives outside of Houston, Texas . . . has some knowledge concerning the death of Jimmy Porter and Dale Dotson. 'Marsha' has advised that Pam Crews had been contacted by individuals in Texas, and had been offered the job of killing someone, for a substantial sum of money.  She indicated that [her father] turned the job down, however, she feels certain that it is the Jimmy Porter-Dale Dotson circumstances.

(DE # 9, Add. 3, Ex. 26; DE # 104, Ex. 36)

This claim was raised on post-conviction (DE # 9, Add. 4, Doc. 4A, pp. 49-50), and the letter entered into evidence at the post-conviction hearing (DE # 9, Add. 3, Ex. 26).  At that hearing, Judge Walton was questioned regarding whether he had received the information contained in the September 29 letter, to which he replied that he had not.  (DE # 9, Add. 3, Vol. V, pp. 166-168) Judge Walton testified that the defense would "have been very interested" in the information, that

---

[11]    The letter was signed "by" General Cook on behalf of J. Kenneth Atkins, District Attorney General for the 21st Judicial District.  As the actual signatory, the letter is attributed herein to General Cook.

47

the information "would have been very helpful," and that the defense would have "tried to contact the persons named . . . to obtain . . . information . . . perhaps even inquired of the state if they had other information." (DE # 9, Add. 3, Vol. V, p. 167)

Testimony at the post-conviction evidentiary hearing established that the letter was forwarded by General Baugh to General Whitley under a cover letter dated October 31, 1991 – approximately eight years after the Zagorski trial. (DE # 9, Add. 3, Vol. V, pp. 253-254) Although defense co-counsel Wilks testified at the post-conviction evidentiary hearing that he did not "dispute" that the letter recovered was sent to General Whitley on October 31, 1991, he did "not accept the premise this material was not available to General Whitley." (DE # 9, Add. 3, p. 254)

This claim was considered by the Court of Criminal Appeals on appeal from the judgment of the post-conviction court along with Jeff Long's report, discussed *supra* at pp. 39-43. In its opinion, the Court of Criminal Appeals characterized the contents of the September 29 letter as follows:

> The letter stated that the father of a local resident had been contacted by individuals in Texas and was 'offered the job of killing someone, for a substantial sum of money.' The local resident indicated that her father turned the job down; however, she felt certain that it was 'the Jimmy Porter - Dale Dotson circumstance.'

(DE # 9, Add. 4, Doc. 4C, pp. 29-30) The Court of Criminal Appeals went on to find that the September 29 letter "was not given to the prosecuting District Attorney's office . . . until [8] years after the trial." (DE # 9, Add. 4, Doc. 4C, pp. 29-30) Finally, in determining that there was no *Brady* violation, the Court of Criminal Appeals concluded, as it did in the instance of Jeff Long's report, *supra* at pp. 39-43, *i.e.*, that there was no testimony that the letter led, or would have led, to information favorable to Zagorski or that the contents of the letter were material.

In addition to the claim as it is set forth in his amended petition (DE # 16, ¶ III.9c, p. 14),

48

Zagorski mentions the September 29 letter in his response to the respondent's motion for summary judgment as follows:

> [S]tate authorities withheld exculpatory evidence which was favorable to . . . Zagorski on the questions of guilt and sentence, including . . . [the] September 29, 1983, letter from District Attorney General J. Kenneth Atkins [*sic*] Jeff Long detailing the involvement of persons in Texas in the killings.

(DE # 104, ¶ III.C.2.b, p. 61)  In his response, Zagorski states that "state authorities withheld exculpatory evidence . . . favorable to . . . Zagorski on the questions of guilt and sentence, including . . . a September 29, 1983 letter . . . to Jeff Long detailing the involvement of persons in Texas in the killings . . . ."  (DE # 104, ¶ III.C.2.b.1)(4), p. 61)  Although Zagorski argues at length elsewhere in his response about evidence that was not made available to the defense, he does not do so in the context of the September 29 letter.  (DE # 104, ¶ III.C.2.b.2), pp. 61-68)  Zagorski does not mention this claim in any of the other pleadings in this action, nor did he raise the issue during the *habeas corpus* evidentiary hearing.

As shown above, Zagorski has failed to present, develop, or argue this claim before this court.  Therefore, for reasons previously explained, *supra* at pp. 42-43, the court finds that this claim is waived.

Even if this claim were not waived, the court finds that Zagorski is not entitled to *habeas corpus* relief on the grounds alleged.  First, in the absence of any evidence or argument developed in the instant proceedings, Zagorski has not established by clear and convincing evidence, or otherwise, that the Court of Criminal Appeals' factual determinations on this issue are not entitled to the presumption of correctness.  Therefore, the court finds that the Court of Criminal Appeals' factual determinations on this issue are entitled to the presumption of correctness.

Next, the court finds that Zagorski has not established that the September 29 letter was

suppressed. Although Judge Walton testified at the post-conviction hearing that he did "not accept the premise that this material was not available to General Whitley," no evidence was adduced on post-conviction from which to conclude that General Whitley was aware of the letter before it was mailed to him nearly eight years after the fact, nor was any such evidence adduced at the *habeas corpus* evidentiary hearing to that effect.

For the reasons stated above, the court finds that the Court of Criminal Appeals' determination on this issue was neither inconsistent with nor contrary to federal law. Therefore, Zagorski is not entitled to *habeas corpus* relief on the grounds alleged.

### (4) Failure to Disclose Information That Witnesses May Have Received Consideration for Their Testimony
### (DE # 16, ¶ III.9.d, pp. 14-15)

In this claim, Zagorski alleges that James Blackwell, Sallie Salmon, Don Peery, and James Bruce received consideration for their testimony that was not revealed to the defense. (DE # 16, ¶ 9.d.1)-4), pp. 14-15)

### (a) Sallie Salmon and James Rodney Bruce

Zagorski asserts in his amended petition that Salmon received preferential treatment on drug charges that were brought against her "after her testimony" against Zagorski, and that Bruce, who had charges pending against him in Louisiana, was "allowed to retain various property of Zagorski's." (DE # 16, ¶ 9.d.2) and d.4), p. 15)

This claim was not raised in any state court prior to being raised in these proceedings. Therefore, it falls to Zagorski to show "cause and prejudice" for the default. However, Zagorski makes no effort to demonstrate "cause and prejudice" with respect to this claim. Therefore, the court finds that it is procedurally defaulted for purposes of *habeas corpus* review.

Notwithstanding that this claim is procedurally defaulted, the court notes – in the alternative

– that there was testimony at the *habeas corpus* evidentiary hearing about Salmon's receiving consideration for her testimony, but only in the context of General Gay's July 21, 1983 letter to her, in which General Gay advised Salmon that she was entitled to *per diem* and a mileage allowance for her appearances, a payment provided for by state statute. (DE # 157, pp., 171, 216-217, 243, 305, Ex. 25) General Gay's letter was found in the prosecution's file on post-conviction. (DE # 157, 171)

Apart from addressing General Gay's letter at the *habeas corpus* evidentiary hearing, Zagorski did not further develop the substance of this claim against Salmon, either in his pleadings or during the hearing. As to Zagorski's claim that Bruce was permitted to retain various property of Zagorski's (DE # 16, ¶ III.9.d.4, p. 15), here too Zagorski, did not develop this claim further in the pleadings, nor was it addressed during the *habeas corpus* evidentiary hearing. For reasons previously explained, *supra* at pp. 42-43, Zagorski's claims that Salmon and Bruce received consideration for their testimony against him are waived.

Despite procedural default and waiver, the court has reviewed the entire record and independently finds that there is no evidence that either Salmon or Bruce received consideration for their testimony against Zagorski. Moreover, there is nothing in the record to support the conclusion that the State's failure to disclose evidence pertaining to Salmon and Bruce, if there was a failure to disclose, amounted to a *Brady* violation. Therefore, the court finds that Zagorski's allegations pertaining to Salmon and Bruce do not give rise to a claim under *Brady*. Consequently, Zagorski is not entitled to *habeas corpus* relief on the grounds alleged.

(b) Don Peery

In his amended petition, Zagorski alleges that Peery "may have received consideration for [his] testimony" against Zagorski, "including favorable disposition of possible or pending charges

51

. . . ." (DE # 16, ¶ 9.d, p. 14)  Specifically, Zagorski alleges that Peery:

> was apparently selling drugs with Porter out of Porter's bar in
> Dickson (in which Peery was a partner at one time), who faced drug
> conspiracy charges . . . but apparently was never charged . . . .

(DE # 16, ¶ 9.d.3), p. 15)  The contents of the note on which this claim is based, hereinafter referred

to as the Peery note, is as follows:

> Don Perry [*sic*] – saw Porter w/$30,000 has money on deal is [*sic*]
> Johnny Guire – money Blackwell – had sold 25 lbs wk before
> Trouble getting  touch with people.  Sheriff called Bill Holt to find
> witnesses [*sic*] Tues. At 1:00 witnesses trying [*sic*] to clean [*sic*] up

(DE # 157, Ex. 29)  In his response to the respondent's motion for summary judgment, Zagorski

asserts that:

> [B]ecause the prosecution withheld evidence, the jury did not learn
> that . . . prosecution witness Don Peery was . . . a liar.  Peery told Ed
> Zagorski's jury that Porter showed him a large amount of money
> prior to Porter's death, yet Peery claimed that he had no idea why
> Porter had that money.  Withheld evidence, however, demonstrates
> that Peery was deeply involved in the drug deal and knew exactly
> why Porter was carrying around thousands of dollars.  Indeed, Peery
> himself contributed $15,000 to the money Porter was carrying.
> Further, Peery received significant consideration for his testimony,
> as he was never charged with any offense – despite authorities['']
> clear knowledge that Peery was heavily involved in the large drug
> deal in this case.

(DE # 104, ¶ III.C.2.b, p. 63)(internal references to the record omitted)

It was established at the *habeas corpus* evidentiary hearing that the Peery note was in the

possession of the prosecution at the time of Zagorski's trial (DE # 157, pp. 166, 178) and that the

prosecution did not disclose it to the defense (DE # 157, pp. 247).  The Peery note, however, was

provided  in response to Zagorski's discovery request on post-conviction.  (DE # 157, pp. 227-228,

278, 306)

Although there was general testimony about the Peery note at the *habeas corpus* evidentiary

52

hearing, *i.e.*, who wrote it, when and where it was found, its contents, what action the prosecution took in response to the information in the note, etc. (DE # 157, pp. 178-179, 208, 246, 258-261, 279-280), none of the evidence adduced at the hearing pertained to Peery himself. On the contrary, where testimony at the hearing addressed the Peery note, the testimony was about Blackwell, who also was mentioned in the note. (DE # 157, pp. 179, 203-204, 279-280, 318-319)

In his post-hearing brief, Zagorski identifies the Peery note as one of thirteen exhibits to his *habeas corpus* petition that were not provided by the prosecution to the defense at the time of trial. (DE # 158, ¶ I.G, p. 16) The only other place that the Peery note is mentioned in Zagorski's post-hearing brief is where the prosecution is faulted for post-conviction counsels' failure to "remember" the Peery note because the prosecution failed to specifically identify it as *Brady* material. (DE # 158, ¶ I.G, pp. 21-22) Here again, however, Zagorski addressed the Peery note solely in the context of Blackwell. (DE # 158, ¶ I.G, pp. 21-22)

The only specific reference to the record in the pleadings in these proceedings is to the testimony of Sheriff Emery, Sheriff of Robertson County at the time of the murders, who testified at the post-conviction hearing about the sources of the money for the Zagorski-Dotson-Porter drug deal. (DE # 16, ¶ III.9.d.3 15), p. 15; DE # 104, ¶ III.C.2.b, p. 63) Sheriff Emery's testimony about Peery was as follows:

> Q  Now, did you find out where Porter and Dotson got the money for this deal with Mr. Zagorski?
>
> A  Yes and no. It's exactly which one gave it to him or how he got it. When we began questioning on this, we immediately ran into a wall because they were afraid of being indicted in a drug conspiracy charge.
>
> THE COURT: Who is "they"?

THE WITNESS: One was Don Peery that we had on the case, but he would never admit that he actually gave money but he would testify that they did have 30 to $35,000. And it was a matter we were looking at a homicide case, and these people there is no evidence had anything to do with going to the actual meeting or anything else, but we know that the money came out of the Dickson area to Porter for this transaction. In fact, someone came looking when he didn't show back up. It was obvious to us that it was their money. But as far as being able to prove that or make them tell us, there was no way to do it.

Q Did you discuss this part of your investigation with the defense attorneys?

A Yes, sir.

(DE # 9, Add. 3, Vol. V, pp. 274-275)

Although the Peery note is facially favorable, Zagorski has not established that the evidence was not disclosed. More particularly, while the prosecution may not have disclosed the "piece of paper" on which the note was written, it is clear from Sheriff Emery's testimony that he discussed with defense counsel Peery's probable role in the Zagorski-Dotson-Porter drug deal. Zagorski has offered no evidence to contradict Sheriff Emery's testimony. Therefore, the court accredits Sheriff's testimony at the post-conviction evidentiary hearing and finds that the evidence at issue was not suppressed.

Even if it were determined that failure to disclose the "piece of paper" on which the Peery evidence was written amounted to suppression within the meaning of *Brady*, Zagorski cannot establish that he was prejudiced because the "piece of paper" itself was not provided to the defense. More particularly, because Sheriff Emery discussed Peery's probable involvement in the Zagorski-Dotson-Porter drug deal with defense counsel, Zagorski cannot show that failure to provide the note itself is sufficient to undermine confidence in the outcome of the trial. In other words, even if the Peery note were suppressed within the meaning of *Brady*, Zagorski cannot show that the note itself

54

was material.

As reasoned above, Zagorski has failed to establish that the prosecution's failure to disclose the Peery note to the defense constitutes a violation under *Brady*. Consequently, Zagorski is not entitled to *habeas corpus* relief on the grounds alleged.

(c) Jimmy Blackwell

In his amended complaint, Zagorski alleges that Blackwell, who was on probation for a previous drug charge, was involved in selling drugs before and after his testimony at trial, that his probation was not revoked, nor was he charged for any drug offense. (DE # 16, ¶ III.9.d.1), pp. 15-16) Zagorski also alleges that "serious drug charges" were dropped against Blackwell both before and after the Dotson-Porter murders. (DE # 16, ¶ III.9d.1), p. 15)

In his response to the respondent's motion for summary judgment, Zagorski asserts that Blackwell received:

> favorable consideration from the authorities for telling his story against . . . Zagorski at trial, including the reduction of charges in exchange for his testimony against Zagorski.

(DE # 104, ¶ III.C.2.a, p. 57) In his response to the respondent's motion for summary judgment, Zagorski refers the court to a three-page excerpt of a transcript of proceedings from the September 6, 1986 hearing on Blackwell's petition for a suspended sentence in Hickman County Case No. 8510293F. (DE # 104, Ex. 24) In particular, Zagorski draws the court's attention to Assistant District Attorney General Schwendimann's ("General Schwendimann") statement that Blackwell "was given a considerable break" because he had been informed by Tennessee Alcohol Beverage Commission Agent Ernest Thacker ("ABC Agent Thacker") that "Blackwell had turned in a big interstate drug dealer, and I took that into account when I made the offer to Mr. Blackwell." (DE # 104, Ex. 24, p. 3)

55

Elsewhere in his response to the respondent's motion for summary judgment, Zagorski alleges that law enforcement officials treated Blackwell:

> leniently in return for his testimony against . . . Zagorski. (Exhibit 24, Transcript of the Petition for Suspended Sentence Hearing in State Sheriff Atkinson Blackwell, No. 8510293-F, at 3; See Exhibit 37, 7/21/83 Letter From Dee D. Gay to Sally Salmon/Jim Blackwell), and they had cut deals with him in the past in 1982 (See Exhibit 28, Blackwell Presentence Report: drug charges in 1982 were dropped).

(DE # 104, ¶ III.C.2.a, p. 62)  Finally, in his post-hearing brief, Zagorski asserts that: 1) Blackwell had an aggravated assault and felony drug charge dropped against him despite "clear" evidence against him (DE #158, ¶ I.D, pp. 9-11); 2) while on a suspended sentence at the time of the Porter-Dotson murders, law enforcement officials did not seek to vacate his suspended sentence despite "information" that he had violated the terms of his release (DE # 158, ¶ III.E, pp. 11-13); 3) when facing numerous drug and liquor charges in 1985, Blackwell received assistance from Sheriff Atkinson in seeking a suspended sentence (DE # 158, ¶ III.H, pp. 19-21).

The foregoing distill into the following discreet claims: 1) special consideration given to Blackwell prior to the Dotson-Porter murders in Hickman County cases 819206F, 819207F, and 819208F; 2) failure of law enforcement officials in Hickman County to vacate Blackwell's suspended sentence in case 819207F, still in force at the time of the Dotson-Porter murders, and/or to prosecute him on drug charges based on his involvement in the drug conspiracy that resulted in the Porter-Dotson murders; 3) General Gay's July 21, 1983 letter to Blackwell thanking him for his cooperation in the Zagorski case and advising him that he was entitled to *per diem* and a mileage allowance for his appearances; 4) special treatment in Hickman County cases 8510289F, 8510290F, 8510291F, 8510292F, 851093F, and 851094F, brought between September 13 and October 23, 1984; 5) efforts by Sheriff Atkinson in 1986 in support of Blackwell's petition to be transferred from the Tennessee Department of Correction (TDOC) to the Hickman County jail to serve the remainder

of his sentence in case 8510293F.

[1] Special Consideration in Cases 819206F,
819207F, and 819208F

Blackwell was the defendant in three companion cases brought against him in 1981. He was permitted in 1982 to enter a plea of *nolo contendere* in case 819206F, a reckless endangerment case brought against him after he tried to run over a law enforcement officer, and in case 819208F, in which he was charged with felony possession and felony possession with the intent to sell a controlled substance. (DE # 157, Ex. 1,3) On August 13, 1982, a jury found Blackwell guilty of misdemeanor possession in case 819207F, also a felony possession case, and sentenced him to eleven months and twenty-nine days. (DE # 157, Ex. 2) On November 14, 1982, the trial court suspended Blackwell's sentence except for thirty days. (DE # 157, Ex 2) According to Zagorski, the manner in which these cases were adjudicated should have been disclosed at trial.

[a] Procedural Default

This claim was not raised in state court prior to being raised in the instant proceedings. Although not clear from the record, it appears that the cases on which this claim relies were discovered during the course of the instant proceedings. The thrust of Zagorski's procedural default argument is that, by not disclosing the information relevant to this claim when it was required to do so, the State's alleged failure to disclose constitutes "cause" and/or "prejudice" to excuse procedural default. (DE # 104, ¶ III.C.2.c, pp. 68-70; DE # 158, ¶ III.B, pp. 34-41)

The record shows that Generals Whitley and Baugh provided their files to post-conviction counsel. Those files, as previously discussed, contained several notes that pertained to Jimmy Blackwell's drug dealings. The record also shows that Marsha Dotson testified at trial that Blackwell, to whom she referred as "Diamond Jim," had previously dealt drugs with Zagorski, that he was one of the original members of the Zagorski-Dotson-Porter drug deal, that he was supposed

57

to have received 50 pounds of the marijuana from the deal, but that he backed out of the deal because he did not have the money. (DE # 9, Add. 1 pp. 663-665, 668-669) Marsha Dotson's testimony contradicted Blackwell's testimony that Zagorski offered to sell him 50 pounds of marijuana, but that he declined twice because he was on probation from an earlier drug conviction and did not want to run afoul of the law again. (DE # 9, Add. 1, pp. 701-702) The record also shows that defense counsel tried at trial to implicate Blackwell in the Zagorski-Dotson-Porter drug deal. Specifically, Judge Walton questioned Blackwell about his prior drug dealings with Zagorski in Louisiana, about his involvement in the Zagorski-Dotson-Porter drug deal, and about whether he had been threatened with arrest in either Hickman or Dickson County for his involvement in the drug deal that led to the deaths of Dotson and Porter. (DE # 9, Add. 1, pp. 725-728)

At the *habeas corpus* evidentiary hearing, former defense co-counsel Wilks testified that Zagorski had knowledge of Blackwell's prior drug dealings and that Zagorski had advised defense counsel of those dealings. (DE # 157, 327) Wilks testified further that he knew that Blackwell was on probation from a prior drug conviction, that Blackwell had been involved in similar criminal activity before the murders, and that Blackwell was untrustworthy. (DE # 157, pp. 307, 334) At the *habeas corpus* evidentiary hearing, former post-conviction counsel Felker testified that post-conviction counsel made no effort to investigate Blackwell's criminal background, even though they had misgivings about Blackwell's trustworthiness and even though they were aware of his prior criminal history. (DE # 157, pp. 370-371)

From the foregoing, the court concludes that defense counsel, who also represented Zagorski on direct appeal, and post-conviction counsel were on notice of Blackwell's criminal background, including his potential involvement in the Zagorski-Dotson-Porter drug deal. The court finds that, had counsel made a reasonable inquiry based on their suspicions and the information in their

58

possession, they would have discovered Hickman County case 819207F, which they now maintain constitutes proof that Blackwell received special consideration for his role in Zagorski's conviction. "Cause" is a factor that is external to the defense and/or the defendant. *Jamison*, 291 F.3d at 386. The failure of counsel on direct appeal and/or post-conviction to exercise due diligence does not constitute an "external" factor.

Zagorski's procedural default argument is that not disclosing the cases that form the basis of this claim constitutes "cause" and/or "prejudice" to excuse procedural default. Assuming for the sake of argument that the law enforcement officials involved in Zagorski's case had a duty to disclose these three cases, the Sixth Circuit has held that, where a criminal defendant knew, or should have known, that exculpatory evidence is readily available from another source, there is no *Brady* violation if the party on whom the disclosure request is served does not provide the evidence. *See Spirko*, 368 F.3d at 610-611; *United States v. Delgado*, 350 F.3d 520, 527 (6th Cir. 2003); *United States v. Cottage,* 307 F.3d 494, 499-500 (6th Cir.2002); *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000); *United States v. Corrado,* 227 F.3d 528, 538 (6th Cir.2000); *Workman v. Bell*, 178 F.3d 759, 766 (6th Cir. 1998); *United States v. Mullins,* 22 F.3d 1365, 1371 (6th Cir.1994); *United States v. Clark,* 928 F.2d 733, 738 (6th Cir.1991). The "other" source from which the information at issue was available was the Hickman County courts. In other words, had defense and/or post-conviction counsel pursued the not-inconsiderable evidence available to them about Blackwell's criminal history, they would have discovered the cases at issue in the Hickman County courts. Thus, because the cases that provide the basis of this claim were available from the courts in Hickman County, Zagorski cannot establish "cause" and/or "prejudice" to excuse procedural default because state law enforcement officials involved in Zagorski's case did not disclose them.

As reasoned above, the court finds that this claim is procedurally defaulted for purposes of

59

federal *habeas corpus* review. However, even if it were determined that defense and/or post-conviction counsel had no obligation to search for the cases at issue in the Hickman County courts, as shown below, failure to disclose cases 819206F, 819207F, and 819208F did not amount to a violation of *Brady*.


[b] Alternative Analysis on the Merits

1 Robertson County Law Enforcement Officials

General Whitley testified at the *habeas corpus* evidentiary hearing that he did not turn over any materials pertaining to these three cases to defense counsel, or any other Hickman County cases involving Blackwell, because he did not possess any Hickman County files on these cases or any others. (DE # 157, pp. 280-281) General Gay testified that he too knew nothing about these cases. (DE # 157, pp. 212-213) General Baugh confirmed that he did not provide copies of his files on these three cases to Robertson County prosecutors. (DE # 157, p. 71)

Although the Sixth Circuit does not appear to have addressed this issue, several of its sister circuits have held that prosecutors have no duty to undertake "fishing expeditions" in other jurisdictions to discover potential exculpatory evidence to disclose to a criminal defendant. *See United States v. Avelino*, 136 F.3d 249, 255 (2nd Cir. 1998)("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a 'monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'")(citation omitted); *see also Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002)(possession by one governmental entity not imputed to another unless resources have been pooled in the prosecution); *United States v. Merlino*,

349 F.3d 144, 154 (3rd Cir. 2003)(no *Brady* violation because no constructive possession where the evidence at issue was in the possession of another state agency not involved in the prosecution); *United States v. Hawkins*, 78 F.3d 348, 351 (8th Cir. 1996)(no *Brady* violation where the evidence at issue was in possession of a prosecutor in another state).

Based on the persuasive authority from the Sixth Circuit's sister circuits, the court finds that the Robertson County prosecutors did not violate *Brady* by not disclosing documentary evidence that was not in their possession and about which they had no constructive knowledge. Accordingly, Zagorski is not entitled to *habeas corpus* relief on these grounds.

<u>2</u>  Hickman County Law Enforcement Officials

The certificate of service attached to the motion for discovery and inspection filed prior to trial shows that the motion was "delivered to the Honorable Ray Whitley, District Attorney General, at his office . . . ."  (DE # 157, Ex. 23)  There is no mention in the motion, or certificate of service, that discovery was sought from law enforcement officials in Hickman County.  (DE # 157, Ex. 23)  Neither can it be established from the record that such a request was made by other means.

Hickman County's involvement in the criminal proceedings against Zagorski basically ended when the bodies were discovered in Robertson County.  It is entirely reasonable, therefore, to conclude that officials in Hickman County would have viewed the matter closed for their purposes after that time.

The Hickman County cases involving Blackwell were not part of the Hickman County investigation that resulted in Zagorski's arrest and trial.  Hickman County law enforcement officials had no duty under *Brady* to engage in an open-ended search of Blackwell's unrelated criminal past for the purpose of providing unsolicited evidence to the defense for a case being prosecuted in another county, particularly given that Blackwell was a witness and not the defendant in that action.

61

Even if Hickman County law enforcement officials could be viewed as remiss for not researching Blackwell's record of prior drug offenses of their own volition, each of the cases at issue was adjudicated in 1982, well prior to the Dotson-Porter murders in April 1983. A reasonable juror would not, therefore, have believed that Blackwell received consideration in these cases for the evidence that he provided against Zagorski before the events involving Zagorski had even occurred. In other words, because the proceedings in those cases had no effect on the outcome of Zagorski's trial, prejudicial or otherwise, any favorable treatment that Blackwell may have received was not material.

As reasoned above, that Hickman County law enforcement officials did not disclose the proceedings in cases 819206F, 819207F, and 819208F does not constitute a *Brady* violation. Accordingly, Zagorski is not entitled to *habeas corpus* relief on these grounds.

### [2]  Failure to Vacate Blackwell's Suspended Sentence in case 819207F and to Prosecute Him on Drug Conspiracy Charges

Blackwell was on a suspended sentence in case 819207F at the time of the Dotson-Porter murders. Blackwell's suspended sentence was not vacated, nor was he tried on drug-related charges for his involvement in the drug deal that led to the murders of Dotson and Porter. According to Zagorski, the failure of Hickman County law enforcement officials to act in that regard constituted consideration for his testimony against Zagorski that was not disclosed.

### [a]  Procedural Default

This claim was not raised in state court prior to being raised in the instant proceedings. The thrust of Zagorski's argument is, once again, that, by not disclosing the information relevant to this claim when it was required to do so, the State's alleged action constitutes "cause" and/or "prejudice" to excuse procedural default. (DE # 104, ¶ III.C.2.c, pp. 68-70; DE # 158, ¶ III.B, pp. 34-41)

As previously established, *supra* at pp. 58-59, defense and/or post-conviction counsel were suspicious of Blackwell's testimony and possessed evidence that not only suggested that he was involved in the drug deal that led to the murders of Dotson and Porter, but that he had a prior history of dealing drugs. In that regard, the following exchange took place between Judge Walton and Blackwell at Zagorski's trial:

> Q. Have you ever told Marsha Dotson that you were going to buy half of this marijuana deal until Friday, the day before they left on Saturday?
>
> A It was offered to me twice, and I accepted it neither time.
>
> Q Mr. Blackwell, did you tell Marsha Dotson that?
>
> A No.
>
> Q Mr. Blackwell, have you not been threatened by arrest in this matter yourself by authorities in Dickson and Hickman County?
>
> A I don't know what matter, you know, what you're talking about.

(DE # 9, Add. 1, Vol. VI, p. 727) As previously noted, *supra* at pp. 58-59, defense counsel were aware that Blackwell was on probation from a prior drug conviction and, at the very least, if he were involved in the Zagorski-Dotson-Porter drug deal, his suspended sentence was subject to being vacated. He also was subject to being charged and tried on drug-related offenses involving Zagorski, Dotson, and Porter. For the reasons previously stated, *supra* at pp. 58-60, the court finds that this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

### [b] Alternative Analysis on the Merits

#### 1 Robertson County Law Enforcement Officials

The decision to vacate Blackwell's suspended sentence and/or to try him on drug conspiracy

charges in connection with the Zagorski-Dotson Porter drug deal was a matter within Hickman County's jurisdiction. For reasons previously explained, *supra* at pp. 61-62, Robertson County law enforcement officials had no obligation under *Brady* to conduct a search of Hickman County records to determine whether Blackwell's suspended sentence had been vacated and/or whether he had been charged and tried in connection with the Zagorski-Dotson-Porter drug deal. Accordingly, Zagorski is not entitled to *habeas corpus* relief on these grounds.

2 Hickman County Law Enforcement Officials

The analysis here is identical with that previously provided, *supra* at pp. 62-63. Accordingly, Zagorski is not entitled to *habeas corpus* relief on this claim.

[3] General Gay's July 21, 1983
Letter to Blackwell

In his July 21, 1983 letter to Blackwell (DE # 104, Ex. 37), General Gay thanked Blackwell for his "cooperation and assistance" in the Zagorski case and forwarded two forms to complete so that Blackwell could "be reimbursed to some extent for [his] expenses," because he was "entitled to a per diem allowance of $40 for each of the two trips that [he] made for court appearances, plus $.20 for each mile traveled," for a total of $149.60.

At the *habeas corpus* evidentiary hearing, former defense co-counsel Wilks testified that this letter was not disclosed at trial. (DE # 157, p. 307) Testimony at the hearing established, however, that the letter was in the files that General Whitley turned over on post-conviction. (DE # 157, pp. 171, 278) General Whitley subsequently testified that the payment referred to in General Gay's letter was required by statute. (DE # 157, pp. 273-274)

Since no evidence has been offered to the contrary, the court finds that not only were the *per diem* and mileage allowances referred to in the letter not favorable to Zagorski, the fact that defense counsel did not have the letter prior to trial does not undermine confidence in the outcome of the

64

trial. Accordingly, the court finds that failure to disclose this letter at trial does not constitute a *Brady* violation and, as such, Zagorski is not entitled to *habeas corpus* relief on the grounds alleged.

### [4] Special Consideration in Cases 8510288F, 8510289F, 8510290F, 8510291F, 8510292F, 8510293F, and 8510294F

In the cases identified above (DE # 157, Ex. 4-9, 11), all brought between September 13 and October 23, 1984 for offenses committed between September 13 and November 14, 1984, the record shows that Blackwell pled guilty to five charges of simple possession, and was sentenced to one year in the Hickman County workhouse, the sentences to run consecutively. In case 8510293F, Blackwell pled guilty to one count of felonious sale of marijuana and received a three-year sentence in the Tennessee Department of Correction (TDOC) to be run consecutively with a federal sentence that he was serving. (DE # 104, Ex. 28, DE # 157, pp.468-469, Ex. B, p. 2) Zagorski alleges that the proceedings in these cases show that Blackwell continued to be compensated for his testimony well after the trial was over.

#### [a] Procedural Default

This claim was not raised in state court prior to being raised in the instant proceedings. Although not clear from the record, it appears that the cases on which this claim relies were discovered during the course of the instant proceedings. The thrust of Zagorski's procedural default argument is that, by not disclosing the information relevant to this claim when it was required to do so, the State's alleged failure to disclose constitutes "cause" and/or "prejudice" to excuse procedural default. (DE # 104, ¶ III.C.2.c, pp. 68-70; DE # 158, ¶ III.B, pp. 34-41) For reasons previously

65

explained, *supra* at pp. 58-60, this claim is procedurally defaulted.

### [b]  Alternative Analysis on the Merits

### 1  Robertson County and Hickman County
### Law Enforcement Officials

For reasons previously explained, *supra* at pp. 61-62, 64, there was no *Brady* violation because Robertson County and Hickman County law enforcement officials did not disclose information pertaining to these cases. Although the court's analysis regarding Robertson and Hickman County law enforcement officials pertains to all officials in those counties, because Zagorski makes specific allegations against General Schwendimann and Sheriff Atkinson, the court will address those claims separately.

### 2  Assistant Attorney General
### Schwendimann

Judgment was entered against Blackwell in case 8510293F on April 15, 1986, the indictment having been returned against him in that case on October 24, 1984. (DE # 157, Ex. 9, Judgment) Blackwell was sentenced to three years in TDOC as a standard offender at a 30 percent service rate. (DE # 157, Ex. 9, Judgment)

At a hearing on Blackwell's petition to suspend his sentence in case 8510293F, held on September 6, 1986, General Schwendimann argued before the court that:

> . . . I want to emphasis [*sic*] that Mr. Blackwell entered a guilty plea, that the Department of Corrections sentence was voluntary on his part, that was part of the guilty plea, the state thought that his sentence should appropriately be served in the Department of Corrections.  He was given a ***considerable break***, in the state's opinion, because of the fact that Mr. Thacker informed me that Mr. Blackwell had turned in a big interstate drug dealer, and I took that into account when I made the offer to Mr. Blackwell. . . . [T]he state would never, under any circumstances, have made the recommendation that it did to the court in this case had it known that he was going to try to get his sentence transferred back to Hickman

66

County or to get any further reduction in the sentence.

(DE # 157, Ex. B, pp. 3-4)(emphasis added) The highlighted text above is the text to which Zagorski refers in his post-hearing brief as evidence that Blackwell continued to be compensated for his testimony. (DE # 158, ¶ I.H, p. 20)

The judgment entered against Blackwell in case 8510293F was entered more than two years after Zagorski's trial. Therefore, there is no way that the judgment in that case, or the disposition of the companion cases, could have been disclosed at the time of trial. The question then becomes whether the "considerable break" that Blackwell received in case 8510293F is evidence of an earlier deal that should have been disclosed.

General Baugh testified at the *habeas corpus* evidentiary hearing that there were no deals with Blackwell. (DE # 157, p. 94-45) Generals Whitley and Gay also testified that Blackwell never asked for, nor received, any special consideration such as assistance pertaining to pending or future offenses. (DE # 157, pp. 218, 272-273)

Affirmative evidence was adduced at the *habeas corpus* hearing that the sentence that Blackwell received in case 8510293F had nothing to do with his role in Zagorski's conviction. Specifically, General Schwendimann testified that he had no idea that Blackwell provided assistance in Zagorski's case and that Blackwell's role in Zagorski's case played no part in the proceedings in case 8510293F. (DE # 157, p. 471) Moreover, General Schwendimann testified that the plea agreement was entered into with Blackwell based on ABC Agent Thacker's recommendation for a favorable sentence, a recommendation that was made based on Blackwell's assistance to Agent Thacker in prior drug cases. (DE # 157, p. 481) General Schwendimann testified further that, in his view, a guilty plea with a shorter sentence was preferable to going to trial because the witnesses against Blackwell were suspect. (DE # 157, pp. 481, 488).

67

Zagorski has offered no evidence in his pleadings that he received special consideration in the adjudication of these cases because of a deal involving his testimony against Zagorski. Zagorski did not introduce any evidence at the *habeas corpus* evidentiary hearing to that effect, nor did he introduce any evidence that contradicted the testimony of Generals Whitley, Baugh and Schwendimann. Therefore, the court accredits General Schwendimann's explanation regarding why Blackwell was permitted to enter a plea agreement in case 8510923F.

Because Blackwell entered the plea agreement in case 8510923F for reasons other than those alleged, Zagorski has failed to establish that the disposition of these cases amounted to consideration for his testimony in exchange from an earlier deal that should have been disclosed at trial. Accordingly, the court finds that there was no *Brady* violation and, as such, Zagorski is not entitled to *habeas corpus* relief on the grounds alleged.

<u>3</u> Sheriff Atkinson

In his post-hearing brief, Zagorski argues that Sheriff Atkinson "went out of his way to help Blackwell serve his reduced sentence in the 'friendly confines' of the Hickman County Jail." (DE # 158, ¶ I.H, p. 20) Zagorski's allegation against Sheriff Atkinson pertains to the same September 6, 1986 hearing on Zagorski's petition in case 8510293F discussed above. (DE # 157, Ex. B

At the September 1986 hearing, Sheriff Atkinson interrupted the proceedings as the court was asking the State for its final recommendation on Blackwell's petition. (DE # 157, Ex. B. P. 79) The thrust of Sheriff Atkinson's unsworn statements in those proceedings was that Blackwell should be permitted to serve his sentence in the Hickman County jail because of the assistance that he provided during the missing persons investigation into the disappearance of Dotson and Porter. (DE # 158, Ex. B, pp. 79-82)

The hearing at issue occurred more than two and one-half hears after Zagorski's trial.

68

Therefore, there is no way that Sheriff Atkinson's testimony could have been disclosed at the time of trial. Thus, to support a claim under *Brady* on the grounds alleged, Zagorski must establish that there was a deal involving Sheriff Atkinson for Blackwell's testimony against Zagorski that should have been disclosed at the time of trial.

The record shows that, despite Sheriff Atkinson's attempt to intervene on Blackwell's behalf, Sheriff Atkinson's recommendation was denied. (DE # 157, Ex. B, p. 87) The court is of the view that Sheriff Atkinson's failed effort on behalf of Blackwell falls well short of the proof necessary to establish that there was a deal between Sheriff Atkinson and Blackwell. Moreover, the court finds that a reasonable juror would not conclude that Sheriff Atkinson's failed effort on Blackwell's behalf constituted proof of an earlier deal.

As reasoned above, the court finds that there was no *Brady* violation for not disclosing Sheriff's Atkinson's attempted intervention on Zagorski's behalf. Accordingly, Zagorski is not entitled to *habeas corpus* relief on the grounds alleged.

### (5) Failure to Disclose Evidence in the Possession of the TBI That Was Inconsistent with the State's Theory of the Case (DE # 16, ¶ III.9.e, p. 15)

In his amended complaint, Zagorski asserts – without elaboration – that his rights under *Brady* were violated because the TBI did not produce reports in its possession that he alleges were inconsistent with the prosecution's theory of the case. At issue are two TBI reports that were introduced into evidence at the *habeas corpus* evidentiary hearing, the first dated September 8, 1981 (DE # 157, Ex. 13) and the second dated December 22, 1981 (DE # 157, Ex. 14). Exhibit 13 provides the results of tests performed on the contents of two plastic bags and confirming the contents of one to be 24.4 grams of marijuana and the other 2.4 grams of lidocaine. Exhibit 14 provides the results of tests performed on a variety of unknown substances among which the report

69

confirms the presence of 473.3 grams of marijuana. Both exhibits pertain to Blackwell's history of drug dealing.

It was established at the *habeas corpus* evidentiary hearing that neither document was found in the prosecutor's files on post-conviction (DE # 157, p. 186-187), and General Whitley confirmed that he did not disclose these documents because he did not have them. (DE # 157, p. 248) Although General Baugh was asked about the second report, Ex. 14, he testified that it pertained to a case that was prior to his having been elected District Attorney General. (DE # 157, p. 2) General Baugh was not asked about the first document, Ex. 13.

General Whitley had not requested these drug analyses for purposes of the Zagorski case or for any other purpose. He had no obligation under *Brady* to request of the TBI copies of any drug analysis reports they had relating to even a central witness to be used in a prosecution that was totally unrelated to the TBI reports at issue. Therefore, Zagorski is not entitled to *habeas corpus* relief on the grounds alleged.

> (6) Failure to Disclose Evidence Pertaining to the Credibility/Involvement in
> Illegal Activities of Jimmy Blackwell, Don Peery, Jimmy Porter,
> Buddy Corbitt, "And/or the Eastside Tavern"
> (DE # 16, ¶ III.9.f, pp. 15-16)

In his amended petition, Zagorski claims that there was evidence in possession of law enforcement authorities, including General Baugh, the TBI and/or the FBI, that pertained to the lack of credibility and involvement in illegal activities of Blackwell, Peery, Porter, Corbitt, and/or the Eastside Tavern.[12]  (DE # 16, ¶ III.9.f, pp. 15-16)

---

[12]    In his amended petition, Zagorski asserts that this claim "includ[es] but [is] not limited to, any investigations of such persons or entities." (DE # 16, ¶ III.9.f, pp. 15-16)  Such vague expressions are inconsistent with Rule 2(c), Rules – Section 2254 Cases, which provides that "[t]he petition must . . . specify all the grounds for relief available to the petitioner . . . [and] state the facts supporting each ground . . . ." *Id*. at § (c)(1)-(2). The court is not required to conjure up unpled factual allegations implied by such vague expressions, nor will it read into such open-ended claims that additional claims exist.

(a)  Jimmy Blackwell

[1] Failure to Disclose That Blackwell Was a Major
Drug Dealer in Hickman County

This claim is based on the prosecution's failure to disclose the following: 1) General Whitley's note to himself that General Baugh described Blackwell as the "epitome of a punk drug dealer" and that he was "not reliable" (DE # 157, Ex. 28); 2) two Department of Safety reports, the first  pertaining to Blackwell's attempt to purchase marijuana (DE # 157, Ex. 15) and the second pertaining to Blackwell's father's suspicion that Blackwell was dealing drugs (DE # 157, Ex. 16); 3) a note referring to Blackwell as "boss man" (DE # 104, Ex. 36, Ex. A, p. 7); 4) General  Whitley's note to himself that Blackwell had sold 25 pounds of marijuana the week before (DE # 157, Ex. 29).

[a]  The Note Characterizing Blackwell as the
"Epitome of a Punk Drug Dealer"

The record shows that this claim was not raised in any state court prior to being raised in the instant proceedings.  However, as previously established, *supra* at pp. 35-38, Zagorski has established "cause" to excuse procedural default.

The record shows that General Whitley's note reflecting General Baugh's evaluation of Blackwell as the "epitome of a punk drug dealer" and "not reliable," Ex. 28, was not disclosed to the defense at the time of trial (DE # 157, pp. 244-245, 305-306) but was provided to post-conviction counsel during those proceedings (DE # 157, pp. 40, 227, 278).  However, apart from asserting in the pleadings that the note was not disclosed (DE # 104, ¶ III.C.2.b, pp. 61-62, DE 158, ¶¶ I.E, G, pp. 12, 18), Zagorski says little else about it.  Additionally, at the *habeas corpus* evidentiary hearing, although the note was discussed in terms of its content, who wrote it, when it was discovered and by whom, no evidence was adduced to show that failure to disclose the note prejudiced Zagorski.  (DE # 157, pp. 40-42, 165, 177, 227, 244-245, 278, 305-306)

71

It is clear that the prosecution suppressed the note within the meaning of *Brady*. The note also is facially favorable to Zagorski. As to the 'materiality,' however, as previously established, *supra* at p. 30, evidence is 'material' if the failure to disclose it undermines the confidence in the verdict.

Although Zagorski does not say so specifically, it appears that Zagorski's theory is that this note would have created 'reasonable doubt' in the jury's mind as to his guilt,[13] the inference being that such 'reasonable doubt' is sufficient to undermine confidence in their verdict. Notwithstanding Zagorski's apparent theory, given the overwhelming circumstantial evidence against Zagorski, the prosecution's failure to disclose this particular note, whether viewed in isolation or collectively, as discussed *infra* at pp. 92-99, is insufficient to undermine confidence in the jury's verdict. Accordingly, the court finds this note was not material and, as such, there is no *Brady* violation based on the prosecution's failure to disclose this note.

[b]  The Two Department of Safety Notes [14]

The record shows that the two Department of Safety reports at issue, Ex. 15 and 16, were not disclosed to the defense (DE # 157, pp. 304), nor were they disclosed on post-conviction (DE # 157, p. 339-340). At the *habeas corpus* evidentiary hearing, General Whitley testified that he had never seen the reports before. (DE # 157, pp. 248) General Baugh testified that he neither recalled having seen the reports nor having provided them to the Robertson County prosecutors. (DE # 157, p. 69-70)

As previously established, the certificate of service attached to the motion for discovery and

---

[13]  In and of itself, the note, of course, is not admissible evidence. Whether the defense would have found a way to introduce Baugh's opinion into evidence is pure speculation, for Zagorski has not proffered argument on this point.

[14]  For reasons previously explained, *supra* at pp. 33-35, Zagorski's claim pertaining to the two Department of Safety reports is procedurally defaulted for purposes of federal *habeas corpus* review, and Zagorski has failed to establish cause to excuse the procedural default.

72

inspection filed prior to trial shows that the motion was "delivered to the Honorable Ray Whitley, District Attorney General, at his office . . . ."  (DE # 157, Ex. 23)  There is no mention in the motion, or certificate of service, that discovery was sought from the Department of Safety.  (DE # 157, Ex. 23)  Neither can it be established from the record that such a request was made by other means.

As previously established, *supra* at pp. 61-62, law enforcement officials are not required to conduct open-ended searches outside of their jurisdiction for the purpose of uncovering exculpatory evidence. As the court also has previously noted, *Brady* does not require clairvoyance.  Thus, absent a request for discovery, the Department of Safety cannot be expected to have divined the requirement to disclose these reports to Zagorski's defense team.  For these reasons, there is no *Brady* violation because these reports were not disclosed at trial.

### [c]  The Note Referring to Blackwell as the "Boss Man"

As to the note in which Blackwell is characterized as the "boss man," apart from stating that Blackwell "was a major drug dealer, known as 'boss man,' who had sold twenty-five pounds of marijuana the week before Dotson and Porter were killed" (DE # 104, ¶ III.C.2, p. 62), the note was not mentioned again in the pleadings before this court or during the *habeas corpus* evidentiary hearings.  For reasons previously explained, *supra* at pp. 42-43, this claim is waived.

### [d]  The Note with the Entry That Blackwell Had Sold 25 Pounds of Marijuana the Week Before

This claim was not raised in any state court prior to being raised in the instant proceedings. However, for reasons previously explained, *supra* at pp. 35-38, because this note was suppressed within the meaning of *Brady*, Zagorski has established "cause" to excuse the procedural default.

The record shows that the note at issue was not disclosed to defense counsel, but was included in the prosecution's file turned over to post-conviction counsel.  (DE # 157, pp. 178, 227-228, 247, 278)  As previously established, *supra* at pp. 58-59, both defense and post-conviction

73

counsel had considerable evidence that should have prompted a closer look at Blackwell. However, at the *habeas corpus* evidentiary hearing, defense co-counsel Wilks testified that the defense made no effort to check any files on Blackwell, nor did he recall even having spoken about Blackwell with any of the district attorneys general involved in Zagorski's case. (DE # 157, p. 328) Nevertheless, at the *habeas corpus* evidentiary hearing, Wilks testified that, had this note been disclosed prior to trial, defense counsel would have "talked to anybody and everybody that we could find to try to find out what the significance of this information was and whether it would help us defend Ed Zagorski." (DE # 157, p. 319)

While Zagorski has established "cause," the evidence contained in Ex. 29 does not prove that Blackwell lied about his involvement in the drug transaction at issue or his involvement in drugs at the time of Zagorski's trial. Unsubstantiated and unverified information from an undisclosed source that "Blackwell had sold 25 pounds the week before" simply fails to establish that Blackwell actually sold 25 pounds of marijuana while he was on probation. At best, the information contained in Ex. 29 establishes that the prosecution knew that Blackwell *may have* dealt in twenty-five pounds of marijuana while he was on probation.

However, evidence in the prosecution's files related to the "suspected" wrongdoing of a witness must be made known to the defendant if it is favorable to the accused and is material to the question of his guilt or innocence. *See United States v. Phibbs* 999 F.2d 1053, 1089 (6th Cir. 1993) (citing *Bagley,* 473 U.S. at 676) ("The Supreme Court, in construing the government's obligations under *Brady v. Maryland* and its offspring, has drawn no distinction between such evidence and that pertaining to proven or admitted criminal behavior.").

Thus, the evidence, if admissible, might have been used by the defense at trial to discredit

Blackwell's testimony as to his *reason* for not participating in the drug transaction at issue in Zagorski's trial, or to further question Blackwell regarding the extent of his drug dealings around the time of the murder and Zagorski's trial, as trial counsel was permitted to do with respect to Blackwell's other alleged drug dealings.[15]  (DE # 9, Add. 1, Vol. VI, p. 709)  The materiality of the evidence, in this regard, while be further assessed below.

[2] Failure to Disclose That Blackwell Set up
the Drug Deal Involving Zagorski,
Dotson, and Porter

In his amended petition, Zagorski alleges that it was not disclosed that Blackwell set up the Zagorski-Dotson-Porter drug deal.  (DE # 16, ¶ III.9.d.1, p. 14)  In his response to the respondent's motion for summary judgment, Zagorski asserts that three handwritten notes attached as exhibits show that "Blackwell himself had set up the drug deal for which Dotson and Porter gathered the money."  (DE # 104, ¶ III.C.2.b.2)(3), p. 62; Ex. 36, Ex. A)  Only those notes attached at pages 5 and 7 of Ex. A make reference to Blackwell.  The first is General Whitley's note in which he writes: "Blackwell – had sold 25 lbs wk before."  (DE # 104, Ex. 36, Ex. A, p. 5)  The second note contains the statement: "Blackwell –  'boss man.'"  (DE # 104, Ex. 36, Ex. A., p. 7)

There are no factual allegations in the amended petition to support this claim.  Apart from the single statement in his response to the respondent's motion for summary judgment that "Blackwell himself set up the drug deal for which Dotson and Porter gathered the money," Zagorski provides no argument, citation to relevant authority, or references to the record to support this claim, nor does he do so anywhere else in the pleadings in this court.  This claim also was not raised during the *habeas corpus* evidentiary hearing.  Finally, there is nothing in the notes

---

[15]    On the cross-examination of Blackwell, defense counsel inquired as to whether he had ever done any drug deals with Zagorski before and whether he had ever been to Louisiana and done drug deals there.  (DE # 9, Add. 1, Vol. VI, p. 709)

themselves that support Zagorski's claim.  For reasons previously explained, *supra* at pp. 42-43, Zagorski is deemed to have waived this claim.

### [3]   Failure to Disclose that Blackwell Assisted
### Authorities in Drug Investigations

Zagorski alleges in his amended petition that it was not disclosed that Blackwell assisted law enforcement officials in drug investigations.  (DE # 16, ¶ III.9.1.1), p. 15)  In his response to the respondent's motion for summary judgment, Zagorski asserts that it was not disclosed that "Blackwell regularly worked for authorities who performed investigations into illegal drug trafficking."[16]  (DE # 104, ¶ III.C.2.b.2)(4), p. 61)  Blackwell refers to "Exhibit 24, Transcript of the Petition for Suspended Sentence Hearing in State v. Blackwell, No. 8510293-F, at 9, 64)" in the context of this claim.  Although there are no pages 9 and 64 as part of Ex. 24, this is the same document to which Zagorski previously cited as evidence that Blackwell was given consideration for his testimony.  Absent any argument to the contrary, the court construes the reference to pertain to Zagorski's previous allegation that Blackwell received consideration for his testimony.  However, as previously determined, *supra* at pp. 55-70, this claim is without merit.

### [4]   Failure to Disclose that Dotson and Porter Were Killed as
### a Result of an Investigation into Drug Trafficking
### in Which Blackwell Was Involved

In his response to the respondent's motion for summary judgment, Zagorski asserts that it was not disclosed that Dotson and Porter were killed as a result of an investigation into drug trafficking in which Blackwell was involved.[17]  (DE # 104, ¶ III.C.2.b.5), p. 62)  This claim pertains

---

[16]   For reasons previously explained, *supra* at pp. 58-60, 63-64, this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

[17]   For reasons previously explained, *supra* at pp. 58-60, 63-64, this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

to a letter written by Blackwell to his appointed federal public defender in an unrelated case well after the Zagorski trial.  (DE # 104, ¶ III.C.2.b.2)(5), p. 62; DE # 157, Ex. 31)  In that letter, discussed more fully, *infra* at pp. 83-84, Blackwell writes, "<u>There has been two men</u> already killed over this!"  (DE # 157, Ex. 31)(underline in the original)

Assuming, without deciding, that the two men to whom Blackwell refers are Dotson and Porter, apart from the naked allegation that "Dotson and Porter were killed as a result of an investigation into a drug network . . . ," Zagorski provides no argument, citation to relevant authority, or references to the record in support of this claim in any of the pleadings in this court.  There also was no reference to this claim in the *habeas corpus* evidentiary hearing.  For reasons previously explained, *supra* at pp. 42-43, Zagorski is deemed to have waived this claim.

### (b)  Don Peery

This claim was addressed previously, *supra* at pp. 52-55, and was found to be without merit.

### (c)  Jimmy Porter

Zagorski alleges that evidence was not disclosed that Dotson and Porter were heavily involved in drug trafficking.  (DE # 18, ¶ III.9.f, p. 15)  In his response to the respondent's motion for summary judgment, Zagorski asserts that Dotson and Porter were not:

> unwitting dupes tricked into gathering a large amount of money and lured into the woods so Ed Zagorski could kill them and take the money they had collected.  Rather, Dotson and Porter . . . regularly traveled to other states where they would buy a large amount of marijuana and transport it back to Tennessee in rented cars.

(DE # 104, ¶ III.C.2.b, p. 63)  Zagorski refers to two hand-written notes attached as part of Ex. 36, Ex. A to his response.  The two notes are quoted below in their entirety:

> 5-6-83     2:00 pm.
>
> Kenneth Atkins reported that he had received info that Dale Dotson had been going to Norman La. [illegible] & bring marijuana back.

77

Dotson would fly from Nashville airport & rent a Hertz rental car in La. & haul the marijuana back in it.

. . .

5-9-83

Marsha Dotson

Dale Dotson & a man that lived in Nashville that was originally in Florida flew down to close to Naples Florida & picked up 180 pounds of marijuana. Dale drove back in a rental car. The man has now moved back to Florida.

February, 1983 – Dale Dotson flew down the area of Naples Florida. Phil and Larry Luffman [*sic*] drove down & met Dale. Dale flew back. Phil was busted at a Liquor Store in Dickson for selling pills in a liquor store to an undercover agent. Marsha didn't know how much marijuana they got. Dale had the connection for the marijuana & Phil & Larry had the money.

(DE # 140, Ex. 36., Ex. A, pp. 2-3)

The two notes on which Zagorski relies do not mention Porter.[18] Nor can it be inferred from the notes that the man who "lived in Nashville" – who "was originally in Florida" – was Porter because the note says that 'the man' "moved back to florida." Moreover, apart from his allegation in his amended petition, and the single statement in his response to the respondent's motion for summary judgment, the claim is not addressed in subsequent pleadings in this court. This claim also was not raised during the *habeas corpus* evidentiary hearing, nor were the notes themselves introduced into evidence. For reasons previously explained, *supra* at pp. 42-43, this claim is waived.

Waiver aside, Zagorski has failed to provide any evidence that, apart from the drug deal in which he was murdered, Porter was deeply involved in drug trafficking. Having failed to show that the allegedly suppressed notes were favorable him, or that he was prejudiced because the notes were

---

[18] Although the two notes mention Dotson, Zagorski's claim is couched solely in terms of Porter. The court cannot construe a claim based on facts that are not alleged.

not disclosed, there is no violation of *Brady*. Accordingly, Zagorski is not entitled to *habeas corpus* relief on the grounds alleged.

### (d) Buddy Corbitt

This claim was previously addressed, *supra* at pp. 43-45, and found to be without merit.

### (e) "[T]he Eastside Tavern"

In his amended petition, Zagorski alleges that evidence was not disclosed pertaining to the credibility/involvement in drug trafficking of the Eastside Tavern.[19] DE # 16, ¶ III.C.9.f, pp. 15-16) Zagorski has failed to present, develop, or argue the factual predicate of this claim in subsequent briefs in this court. Nor was it raised during the *habeas corpus* evidentiary hearing. Consequently, for reasons previously explained, *supra* at pp. 42-43, this claim is waived.

### (7) Failure to Disclose the Results of an Investigation Conducted by the Robertson County Sheriff's Department into Zagorski's Activities in Louisiana (DE # 16, ¶ III.9.g, p. 16)

The thrust of this claim is that the results were never disclosed of a Robertson County Sheriff's Department investigation that revealed that Zagorski was not really a mercenary, that he had no military training, and that he "fantasized a lot." Absent any information to the contrary, the court assumes that, because the report at issue is a Robertson County report, it was found in the files that General Whitley turned over on post-conviction. For this reason, the court concludes that, for reasons previously explained, *supra* at pp. 35-38, cause has been demonstrated to excuse procedural default.

Apart from the basic allegation in his amended petition, Zagorski has failed to present,

---

[19] Apart from the basic allegation in his amended petition, Zagorski does not provide any factual allegations, citation to relevant authority, or references to the record pertaining to this claim in any of the subsequent pleadings in the court. Neither was this issue raised at the *habeas corpus* evidentiary hearing. For these reasons, and because this claim was not raised in state court prior to being raised in these proceedings, the court finds that this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

79

develop, or argue this claim during subsequent briefs in this court. Moreover, the substance of the claim was not addressed at the *habeas corpus* evidentiary hearing, nor was the report itself introduced into evidence. For reasons previously explained, *supra* at pp. 42-43, this claim is waived.

Disregarding waiver for the sake of argument, the record shows that Sheriff Emery testified at the post-conviction evidentiary hearing that the report at issue did, in fact, provide the information alleged. (DE # 9, Add. III, Vol. III, pp. 261-262) However, when asked if the report had been shared with defense counsel, Sheriff Emery testified that it had. (DE # 9, Add. III, p. 262) Because no evidence has been presented to contradict Sheriff Emery's testimony that he disclosed the contents of the report, the court accredits his testimony to that effect.

Based on Sheriff Emery's testimony, the court finds that the evidence at issue was not suppressed within the meaning of *Brady*. Accordingly, Zagorski is not entitled to *habeas corpus* relief on the grounds alleged.

### b. Claims Arising Subsequent to the Amended Petition

#### (1) Failure to Disclose That Blackwell Was an Informant Who Worked for Sheriff Atkinson
#### (DE # 158, ¶ I.A, p. 2-4)

Zagorski asserts that Blackwell was an informant working for Sheriff Atkinson and, as such, failure to disclose that relationship prior to trial constituted a *Brady* violation.

#### (a) Procedural Default

This claim was not raised in state court prior to being raised in the instant proceedings. For reasons previously explained, *supra* at pp. 16-21, this claim is procedurally defaulted. Therefore, it falls to Zagorski to demonstrate cause and prejudice to excuse the default.

The existence of an agreement or an understanding establishing that Blackwell was an informant, or that he received consideration for his testimony, in Zagorski's case would be relevant

80

to Blackwell's credibility and, therefore, would constitute evidence favorable to Zagorski under *Brady*. As previously established, *supra* at pp. 55-70, Blackwell did not receive consideration for the evidence that he provided. Thus, the only remaining question is whether he was an informant.

As discussed *infra*, the court finds that Blackwell was not an informant in the Zagorski case because there was no exculpatory evidence to that effect to suppress. Because Zagorski cannot establish that the reason for his failure to develop these facts in state court was due to the suppression of relevant evidence, he fails to demonstrate "cause" to excuse procedural default. Having failed to demonstrate "cause," the court finds that this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

(b) Alternative Analysis on the Merits

In support of his argument that Blackwell worked as an informant for Sheriff Atkinson, Zagorski relies on General Baugh's testimony that Sheriff Atkinson had a reputation for maintaining a network of secret informants and Hickman County Investigator Jeff Long's confirmation of that testimony. (DE # 157, pp. 47–48, 425) However, General Baugh testified that informants were not always kept secret and that:

> we came to know later more about them because when I became DA [in 1982], I would require that he tell me about the people – how he got into the case.

(DE # 157, p. 48) General Baugh testified further that, after he was elected District Attorney General of the 21st Judicial District in 1982, he would not make a deal with a defendant based on Sheriff Atkinson's recommendation, unless Sheriff Atkinson revealed why that individual deserved a deal. (DE # 157, p. 49) Thus, by the time of the Dotson-Porter murders in 1983, and Zagorski's trial in 1984, Sheriff Atkinson's ability to keep the identities of his informants secret had been limited. (DE # 157, p. 49) Finally, General Baugh testified that Blackwell never worked for his

81

office as an informant and that he could not recall any cases that were brought as a result of information provided by him, a period of time that included the Dotson-Porter murders. (DE # 157, p. 95)

The only evidence that suggests that Blackwell might have been part of Sheriff Atkinson's network of informants is a statement attributed to Blackwell that he made to his attorney, Richard Moore, in a separate matter nearly two years after Zagorski's trial. A November 21, 1985 memorandum written by Moore reveals that Blackwell told him that he had "worked for" Sheriff Atkinson "on the Zagorski case." (DE # 157, Ex. 32) The court finds that the information in this memorandum is unreliable because it is full of self-serving statements attributed to Blackwell, which Blackwell had a motive to make because he was facing criminal charges at the time. This memorandum, which is otherwise not corroborated, does not contain sufficient indicia of reliability to conclude that Blackwell was a government informant in the Zagorski case.

In addition to the foregoing, the statements that Sheriff Atkinson made in the September 6, 1986 petition for a suspended sentence, discussed *supra* at pp. 69-70, do not substantiate or corroborate Zagorski's allegation that Blackwell was an informant in his case. Sheriff Atkinson simply related to the court in those proceedings that, three days after Dotson and Porter were reported missing, Sheriff Atkinson spoke to Blackwell who, in turn, provided him with useful information regarding Zagorski, *i.e.*, that Sheriff Atkinson had arrested Zagorski before. (DE # 157, Ex. B, pp. 80–82) Sheriff Atkinson told the court that, "I feel like that [Blackwell] really did help me and the state on that [Zagorski] case, and that was back before any of these charges on him." *Id.* at p. 82. Such casual statements of appreciation do not establish that Blackwell worked as an

82

"informant" for Sheriff Atkinson.[20]

Zagorski's reliance on Blackwell's March 6, 1991 letter to his appointed federal public defender in a later unrelated case (DE # 157, Ex 31) is likewise misplaced. In that letter, Blackwell describes his work as an informant and advises his attorney that, if the information in his letter were disclosed, Blackwell's life would be in danger. Blackwell elaborates by writing that "there has been two men already killed over this."

In the court's view, Blackwell's March 6 letter could as easily support the conclusion that Blackwell was not an informant for Sheriff Atkinson. Specifically, Blackwell does not mention Sheriff Atkinson, or any work that he allegedly did for him, nor does he mention the Zagorski case. Given that Blackwell wrote this letter for the purpose of obtaining leniency in a federal criminal prosecution, *i.e.*, "I am telling you this hoping it will help in my Rule 35 to the Judge." (DE # 157, Ex. 31)(underline in the original), it is the court's view that Blackwell would have included such favorable information in his letter.

Finally, that Blackwell may have served as an informant in unrelated cases before and/or after Zagorski was convicted does not establish that he worked as an informant in Zagorski's case.[21]

---

[20]    The court notes that, despite the fact that Zagorski's request to depose Sheriff Atkinson was granted (DE # 81), and despite Sheriff Atkinson's availability during the *habeas corpus* evidentiary hearing, Zagorski has elected not to question Sheriff Atkinson directly on the issue of Blackwell's alleged informant status, explicit or understood.

[21]    Although not set forth as a separate *Brady* claim, Zagorski alleges in the context of this claim that "Blackwell gave statements that were inconsistent with his later testimony, and that such statements were never disclosed to defense counsel. (DE # 158, ¶ I.A, pp. 3, 27) Because Zagorski claims that failure to disclose these allegedly inconsistent statements to defense counsel violates *Brady*, the court will address the allegation here for the sake of completeness.
    In support of this claim, Zagorski points to the statements made by Sheriff Atkinson at the 1986 hearing on Blackwell's petition for suspended sentence. At the hearing, Sheriff Atkinson stated that, after Dotson and Porter were reported missing, he talked to Blackwell and, "the first time he told me that he didn't know much about it, he knew the two boys that were missing and what few things that he had heard." (DE # 157, Ex. B, p. 80) When Sheriff Atkinson was later conducting a search near the trout farm, he went back to Blackwell a second time and told him that he believed that Porter and Dotson had been murdered and that he believed Blackwell could tell him something that would help him with the investigation of the murder. (DE # 157, Ex. B, pp. 80–81) Blackwell apparently then gave Sheriff Atkinson information which later helped Atkinson identify Zagorski as a suspect. Blackwell informed Sheriff Atkinson that, although he "didn't know the man's name . . . ," the man had "a real funny name." Blackwell also told Atkinson that he had arrested the man before and informed Sheriff Atkinson of the circumstances of that arrest, including the fact that

83

As reasoned above, Zagorski has failed to establish that Blackwell was working as an informant in Zagorski's case. Because Zagorski has failed to show that Blackwell was an informant, he has failed to establish that there was a violation under *Brady*. Accordingly, Zagorski is not entitled to federal *habeas corpus* relief on the grounds alleged.

### (2) Failure to Disclose That Blackwell Murdered Harry McKinney as Well as Dotson and Porter, and that He Paid Off Sheriff Atkinson in Both Instances to Avoid Prosecution (DE # 158, ¶¶ I.B-C, pp. 5-9)

Zagorski alleges that Blackwell killed a man named Harry McKinney in 1976, as well as Dotson and Porter in 1983, and that he paid Sheriff Atkinson in both instances to avoid prosecution. (DE # 158, ¶¶ I.B-C, pp. 5-9)

### (a) Procedural Default

This claim was not raised in state court prior to being raised in the instant proceedings. For reasons previously explained, *supra* at pp. 16-21, this claim is procedurally defaulted. Therefore, it falls to Zagorski to demonstrate cause and prejudice to excuse the default.

Whether this claim is procedurally defaulted turns on the testimony of Roger Farley, a long-time acquaintance of Blackwell's. Specifically, Farley, who was to testify at the *habeas corpus* evidentiary hearing that Blackwell had confessed all three murders to him, and that Blackwell had paid Sheriff Atkinson in each instance to avoid prosecution, refused to testify after Sheriff Atkinson allegedly intimidated him while waiting outside the court.

---

the man was from Louisiana. (DE # 157, Ex. B, p. 81) Blackwell also told Sheriff Atkinson that Zagorski was going by a different name. *Id.*

None of this information is inconsistent with what Blackwell later testified to at trial. It also is not clear what the "few things [Blackwell] had heard" and disclosed to Sheriff Atkinson upon his initial visit were. At best, Sheriff Atkinson's statement reveals that, when Dotson and Porter initially went missing, Blackwell did not volunteer all of the information that he had concerning Zagorski. However, it also reveals that Blackwell, after learning that the initial missing-persons investigation had turned into a murder investigation and that the police suspected foul play, cooperated with law enforcement officials and was forthcoming with the additional information. There is no evidence that the government suppressed evidence that Blackwell lied to Sheriff Atkinson during the course of the investigation or otherwise changed his story at trial.

Zagorski argues that he could not have presented this claim in state court because Sheriff Atkinson intimidated Farley outside of the courtroom during the *habeas corpus* evidentiary hearing and that such intimidation constitutes "official interference" that overcomes any procedural default. (DE # 158 at p.37, n. 26)  More particularly, Zagorski maintains that, because of Sheriff Atkinson's alleged intimidation in 2003 at the *habeas corpus* evidentiary hearing,  Farley would not have been available during state court proceedings during the period 1983 through 1997 because he was afraid to get involved.

Notwithstanding Zagorski's argument that Farley would not have been available during state court proceedings because of Sheriff Atkinson's alleged intimidation, the record shows that Farley previously relayed all of the relevant information to counsel in these proceedings prior to Sheriff Atkinson's alleged intimidation.  (DE # 157, pp. 141, 407-409)  There is no reason to believe, therefore, that Farley would not have done the same if approached during state court proceedings. Moreover, even following the alleged intimidation by Sheriff Atkinson, Farley willingly testified at the *habeas corpus* evidentiary hearing that Blackwell had confessed the murders to him.  (DE # 157, pp. 149-151)

After an FBI investigation conducted at the request of this court into the alleged intimidation of Farley, the Office of the United States Attorney reported the following:

> The Federal Bureau of Investigation conducted an investigation of the matter you referred to this office concerning allegations of former Sheriff Frank Atkinson intim[idated] Roger Dale Farley prior to Mr. Farley's testimony before you in a capital habeas corpus matter. Please be advised this office has closed its file concerning these allegations.

(DE # 164)  The court concludes from this report that there was no evidence, or at least insufficient evidence, upon which to prosecute Sheriff Atkinson for intimidating Farley prior to his testimony before this court.  Furthermore, Zagorski has not submitted an affidavit in lieu of Farley's testimony,

85

nor has he presented any evidence of official interference that took place during state court proceedings.

For reasons explained above, the court finds that Sheriff Atkinson's alleged intimidation of Farley during the *habeas corpus* evidentiary hearing does not establish "cause" for Zagorski's failure to develop this claim in state court prior to raising it in these proceedings. Because Zagorski has failed to show "cause" for his failure to raise this claim in state court, this claim is procedurally defaulted for the purposes of federal *habeas corpus* review.

(b) Alternative Analysis on the Merits

Zagorski argues that evidence was suppressed that Blackwell killed a man named Harry McKinney in 1976 using, as Zagorski describes it, a *modus operandi* similar to the one used in the Dotson-Porter murders. Zagorski alleges that Blackwell paid Sheriff Atkinson to avoid prosecution in that case. Zagorski also alleges that Blackwell killed Dotson and Porter and that he paid Sheriff Atkinson to avoid prosecution for those murders as well.

The court turns its attention first to Zagorski's claim that the *modus operandi* in the Dotson-Porter killings was similar to that in the McKinney murder. In his post-hearing brief, Zagorski asserts:

> Like the victims in this case, Harry McKinney had been shot in the head, had his pants pulled down to his ankles, and was dumped in the woods.

(DE # 158, ¶ I.B.1, p. 5)(internal references omitted) As evidence of the similarity of these three crimes, Zagorksi entered two newspaper articles about the McKinney murders into evidence at the *habeas corpus* evidentiary hearing. (DE # 157, Ex. 101-102)

The newspaper articles report that McKinney was murdered in the woods and dragged approximately 200 feet to where he was later found. Evidence in Zagorski's case established that

Dotson and Porter were murdered in the woods in Robertson County and left to die where they fell. (DE # 9, Add. 1, Vol. V, pp. 585-586. 589. 604. 610) Both Dotson and Porter were shot in the abdomen and chest (DE # 9, Add. 1, Vol. V, pp. 632-634), not in the head as McKinney was and as Zagorski asserts that Dotson and Porter were as well. The newspapers reported that McKinney's trousers and underclothes were found around his ankles. Porter's trousers were found unzipped (DE # 157, Add. 1, Vol. V, p. 596), and testimony established that both Dotson and Porter had been drinking heavily prior to their deaths (DE # 9, Add. 1, Vol. V, pp. 641-643). Finally, Dotson's and Porter's throats had been cut (DE # 9, Add. 1, Vol. V, pp. 637-638, 640-641), whereas nothing has been proffered establishing that McKinney suffered a similar wound.

Three similarities can be drawn from the foregoing: 1) all of the victims were shot at least once; 2) all of the victims were found in the woods; 3) the trousers of two of the three victims were not up and/or zipped. In the court's view, such minor coincidences do not constitute a 'similar' *modus operandi* as Zagorski argues.

Proceeding to the claim itself, Zagorski relies in part on the testimony of Farley who testified at the *habeas corpus* evidentiary hearing that Blackwell told him a year or two after McKinney's murder that he had killed a man in 1976. (DE # 157, p. 149) When asked what Blackwell told him, Farley testified that Blackwell "[t]old [him] the man was found at the end of the road with his pants down to his knees; he was shot in the head or ankles. . . ," just as the newspapers reported at the time. (DE # 157, p. 149) Farley testified further that Blackwell told him that he also shot Dotson and Porter.[22] (DE # 157, p. 150) On cross-examination, however, Farley admitted that Blackwell was known to exaggerate. (DE # 157, pp. 152-153)

Zagorski also refers to the testimony at the *habeas corpus* evidentiary hearing of Roger

---

[22] It must be remembered that Blackwell was deceased by the time of the evidentiary hearing before this court and, therefore, unable (even were he willing) to substantiate this claim.

Livengood, a former Lieutenant with the Centerville Police Department in Hickman County. In 1976, then-lieutenant Livengood received information from an undisclosed informant that Blackwell was seen coming out of a logging road where McKinney's body was later found. (DE # 157, pp. 130, 132) Livengood testified, however, that another man had been arrested and convicted for McKinney's murder and that Blackwell was a suspect only because he had been seen in the area. (DE # 157, p. 138) As for Blackwell's role in the Dotson-Porter murders, Generals Whitley and Gay, as well as former defense co-counsel Wilks, all testified at the *habeas corpus* evidentiary hearing that they never considered Blackwell a suspect. (DE # 157, pp. 204, 272)

Based on the foregoing, the court finds that there is no evidence that Blackwell was a suspect in either the McKinney murder or the Dotson-Porter murders. However, even assuming that Blackwell was involved in one or both of the murders, there is no evidence that law enforcement officials knew of that involvement, that they suppressed the information, or that they in any way interfered with the ability of defense counsel to investigate these allegations.

There also is no viable evidence to support Zagorski's claim that Blackwell paid off Sheriff Atkinson to avoid prosecution for either the McKinney or the Dotson-Porter murders. Counsel represented to the court that Farley, had he not been intimidated by Sheriff Atkinson outside of the federal habeas evidentiary hearing, would have testified that he was present at two meetings, one at the time of the McKinney murder and the other at the time of the Porter-Dotson murders, where Blackwell paid the sheriff $5,000 and that Farley's "feeling for the reason for the payment [was] so [that] they would not investigate or prosecute the murder." (DE # 157, p. 141)

Even taking this offer of proof as true, the court finds it insufficient to establish that Sheriff Atkinson considered Blackwell a suspect or that he knew of Blackwell's alleged involvement in the murders at issue. Moreover, Farley's "feeling" does not persuade the court that the money he

allegedly saw Blackwell pay to Sheriff Atkinson was exchanged for the purpose of avoiding prosecution for these murders. Farley's "feeling" about why Blackwell allegedly paid Sheriff Atkinson $5,000 also is speculation and, therefore, insufficient to support the conclusion that Sheriff Atkinson either suspected, or knew of, Blackwell's alleged involvement in either one or both of the murders.

For the reasons explained above, Zagorski has failed to show that evidence of Blackwell's alleged involvement in either the McKinney and/or the Dotson-Porter murders was suppressed. Accordingly, there is no *Brady* claim and, as such, Zagorski is not entitled to *federal habeas* corpus relief on the grounds alleged.

(3)  Failure to Disclose That Blackwell Was a Major Drug
Dealer in Hickman County and Paid Sheriff
Atkinson to Avoid Prosecution
(DE # 158, ¶ I.B-C, pp. 5-9)

Zagorski contends next that Blackwell was protected by Sheriff Atkinson and, as a result, he was allowed to distribute large amounts of marijuana in Hickman County without fear of prosecution. (DE # 158, ¶ I.B-C, pp. 510)

(a)  Procedural Default

For reasons previously explained, *supra* at pp. 58-60, 63-64, this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

(b)  Alternative Analysis on the Merits

Zagorski once again relies upon testimony attributed to Farley that, on several occasions during the 1980s, Sheriff Atkinson stopped Farley and Blackwell, found marijuana in their possession, but let them go. (DE # 157, pp. 408–409) On one such occasion, Farley and Blackwell allegedly were carrying as much as thirty pounds of marijuana in their vehicle. (DE # 157, p. 408)

Notwithstanding Zagorski's allegation to the contrary, apart from Farley's testimony to that

89

effect at the *habeas corpus* evidentiary hearing, the record is devoid of any evidence presented in these proceedings that the events alleged actually occurred, much less that they occurred prior to or during the time of Zagorski's trial. Because, Zagorski has failed to show that evidence of such occurrences were suppressed, he cannot support a claim under *Brady*. Consequently, Zagorski is not entitled to federal *habeas corpus* relief on the grounds alleged.

(4) Failure to Disclose Department of Safety Documents That
Established That Blackwell Was an Established Drug
Dealer in Hickman County
(DE # 158, ¶ I.G, p. 18)

In his post-hearing brief, Zagorski asserts that the following three Department of Safety/TBI documents were not disclosed to defense counsel: 1) a TBI laboratory report on suspected controlled substances in Hickman County case 819207F (DE # 157, Ex. 13): 2) a Department of Safety report pertaining to Blackwell's attempt to purchase drugs (DE # 157, Ex. 15); 3) a Department of Safety report that Blackwell's father suspected that his son was dealing drugs (DE # 157, Ex. 16) These reports, and one other Department of Safety report dated February 1, 1978 that identified Blackwell's supplier (DE # 157, Ex. 17), were introduced into evidence at the *habeas corpus* evidentiary hearing.[23]

Zagorski's claim pertaining to Ex. 13 was previously addressed, *supra* at pp, 70-71, and found to be without merit. Zagorski's claims pertaining to Ex. 15 and Ex. 16 also were previously addressed, *supra* at pp. 73-74, and they, too, were found to be without merit. Analysis of Ex. 17 is identical with that for Ex. 13, Ex. 15, and Ex. 16. Thus, Zagorski's claim based on Ex. 17 is without merit as well. Because there is no *Brady* violation associated with these exhibits, Zagorski is not entitled to *habeas corpus* relief on the grounds alleged.

---

[23] For reasons, previously stated, *supra* at pp. 33-35, Zagorski's *Brady* claims that rely on Department of Safety/TBI documents are procedurally defaulted for purposes of federal *habeas corpus* review.

90

In making a final determination of Zagorski's *Brady* claim, the court is required to determine whether the favorable evidence determined to have been suppressed is "material."  *See Kyles*, 514 U.S. at 434; *Schledwitz*, 169 F.3d at 1012; *Castleberry*, 349 F.3d at 291.  If the court finds that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," then the evidence is "material" and, thus, constitutional error results from its suppression.  *Bagley*, 473 U.S. at 682.  To establish a reasonable probability of a different result, a defendant "need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."  *Kyles*, 514 U.S. at 434–35; *see also Strickler*, 527 U.S. at 290.  Rather, the appropriate question is whether, in the absence of the undisclosed evidence, the petitioner received a fair trial, understood as "a trial resulting in a verdict worthy of confidence."  *Kyles*, 514 U.S. at 434.  In answering this question, the court must examine whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id*. at 435.  Therefore, the "omission must be evaluated in the context of the entire record."  *United States v. Agurs*, 427 U.S. 97, 112 (1976).  The following analysis assumes, for the sake of completeness, that all of Zagorski's *Brady* claims should have been resolved in his favor.

Evidence in support of the verdicts against Zagorski include the following: 1) Zagorski implicated himself in the Dotson-Porter murders in three separate statements; 2) Zagorski made arrangements for the delivery of the alleged drugs; 3)  Zagorski coordinated the details of the drug buy with Dotson, *i.e.*, the purchase price, when and where the transaction was to take place; 4) Zagorski coordinated when and where he and Dotson were to meet; 5) Zagorski, who had no money while he was in Tennessee, engaged in a huge shopping spree in Ohio after the murders, buying

thousands of dollars worth of vehicles, animals, equipment, weapons – and still had $10,000 in his possession when he was apprehended; 6) Zagorski was apprehended in Ohio in possession of Porter's Datsun pickup truck; 7) Zagorski was apprehended in Ohio in possession of clothing that Dotson had taken with him to meet Zagorski; 8) Zagorski was apprehended in Ohio in possession of Dotson's hunting light; 9) Zagorski was apprehended in Ohio in possession of Porter's .357 magnum handgun; 10) Ray Timberlake, the assistant manager of a war surplus store in Ohio, and Rodney Bruce, also of Ohio, both testified that Zagorski told them that he lost the scabbard for his knife; 11) the scabbard for Zagorski's knife, a glasses case with the brand name "Red Specs" that corresponded to the brand of prescription glasses that Zagorski was known to wear, and other items of personal property identified as belonging to Zagorski, were found at the murder scene; 12) the spent .308 cartridge found at the murder scene was determined by independent means to match spent .308 cartridges recovered from the controlled test-firing of Zagorski's HK-91 by law enforcement officials; 13) Martha Beasley, who met Zagorski at the trout farm, testified that Zagorski showed her how to cut a person's throat; and finally 14), the dramatic shootout in Ohio supported the conclusion that Zagorski had fled Tennessee to avoid prosecution for the murders of Dotson and Porter. The Tennessee Supreme Court characterized this evidence as "overwhelming evidence of guilt." (DE # 9, add. 2, Doc. 2C, p. 9)

The evidence to which Zagorski refers in the context of his *Brady* claim falls into two broad categories: that which pertains to Jimmy Blackwell and others with a motive to have committed the murders – and everything else. In the court's opinion, the evidence that comprises the latter category, when viewed collectively, is insufficient to undermine the confidence in the outcome of Zagorski's trial. That determination made, the court now adds the favorable suppressed evidence pertaining to Blackwell and those with a motive to commit the murders – Buddy Corbitt and

unnamed persons from Texas.

(1)  Jimmy Blackwell

It is undisputed that Blackwell's testimony was highly prejudicial to Zagorski.  Though his testimony at trial was helpful to the defense inasmuch as it supported Zagorski's primary defense of improper venue,[24]  Blackwell's role in the case was substantially more valuable to the prosecution.  In addition to testifying about the drug deal arrangements, including the time and place of the transaction and Zagorski's role as the instigator of the deal (DE # 9, Add. 1, Vol. 1, pp. 699-702), Blackwell also identified as Zagorski's several pieces of physical evidence connected to the crime and/or found at the crime scene, including Zagorski's HK-91, his knife, his prescription "Red Spec" glasses, his flashlight, and the scabbard (DE # 9, Add. 1, Vol. VI, pp. 692, 694-698).  Blackwell also furnished a spent .308 cartridge later determined to have been fired from Zagorski's HK-91 and from the murder weapon.  (DE # 9, Add. 1, Vol. VI, pp. 693-694, 703-704)  Blackwell also testified as to Zagorski's prior drug dealings, work as a mercenary, and general character.  (DE # 9, Add. 1, Vol. VI, pp. 690-691, 699, 701-702)  Specifically, Blackwell testified that Zagorski had told him that "it ain't what you make; it's what you take"– a comment relied upon by the prosecutor in his closing arguments during the guilt phase of Petitioner's trial.  (DE # 9, Add. 1, Vol. VI, p. 691; Vol. VIII, p. 1008)

Although Blackwell was certainly a valuable state witness, the bulk of his testimony was cumulative, in that it was substantially similar to that provided by Marsha Dotson, the wife of victim Dale Dotson.  (DE # 9, Add. 1, Vol. V, pp. 649-650)  Marsha Dotson took the stand before

---

[24]  On cross-examination, Blackwell testified that he heard gunshots from the general area behind the trout farm at approximately 5:30 p.m. on the date that Dotson and Porter were last seen alive. (DE # 9, Add. 1, Vol. VI, pp. 720-721) Blackwell testified on re-direct that it was not unusual to hear gunshots in that area of Hickman County because of frequent deer hunting.  (DE # 9, Add. 1, Vol. VI, p. 728) On re-cross, Blackwell conceded that it was not deer season when he heard the shots (DE # 9, Add. 1, Vol. VI, p. 728) but on further direct examination he testified that people often hunt deer out of season in Hickman County (DE # 9, Add. 1, Vol. VI, p. 729).

93

Blackwell and testified to the particulars of the marijuana deal between her husband and Zagorski, including the time and place that the transaction was to take place, thereby placing Zagorski with the victims on the last day that the victims were seen alive. (DE # 9, Add. 1, Vol. V, pp. 651-655) Indeed, in closing arguments, the prosecution relied upon *her* testimony, as opposed to Blackwell's, in arguing these facts to the jury. (DE # 9, Add. 1, Vol. VIII, pp. 1006-1007) Additionally, Marsha Dotson identified the murder weapon as Zagorski's, stating that she had seen him with it on five or six occasions and that he had used it for target practice at the trout farm, and identified personal effects found in Zagorski's possession at the time of his apprehension in Ohio as her husband's. (DE # 9, Add. 1, Vol. V, pp. 652, 657-659) Finally, like Blackwell, Marsha Dotson presented harmful testimony regarding Zagorski's prior drug dealings (that implicated Blackwell as well) and his alleged work as a mercenary. (DE # 9, Add. 1, Vol. V, pp. 649, 663-669) Of particular harm to the defense was her testimony that Zagorski told her that he had worked as a mercenary in El Salvador and that it didn't bother him to kill people because it was his job. (DE # 9, Add. 1, Vol. V, pp. 649-650, 665-669)

The only significant testimony provided by Blackwell that was not also provided by Marsha Dotson was his identification of the scabbard as belonging to Zagorski. However, in addition to the corroborating identification provided by Sallie Salmon, the state introduced evidence that Zagorski twice admitted to having lost his scabbard and that he replaced it while he was in Ohio shortly after leaving Nashville.[25]

With respect to the spent .308 cartridges provided by Blackwell to investigators, the court finds that Zagorski vastly overstates the importance of this evidence, given that a spent cartridge was

---

[25]    Martha Beasley, who met Zagorski at the trout farm in April of 1983, also identified the knife that corresponded to the type of scabbard found at the crime scene as that carried by Zagorski. As previously noted, Zagorski showed Beasley "how you could cut people's throats with it." (DE # 9, Add. 1, Vol. VII, pp. 863–864)

found at the crime scene. While the state's firearms examiner testified that the spent cartridge found at the crime scene and the spent .308 cartridge given to Long by Blackwell were fired from the same weapon, the more damning testimony was that ballistics tests revealed that the spent cartridge found at the crime scene and those independently fired from the HK-91 recovered when Zagorski was apprehended were fired from the same weapon.[26] Thus, contrary to Zagorski's assertions, the state's evidence linking Zagorski and his gun to the Dotson-Porter murders did not rest solely on evidence or testimony provided by Blackwell.

Furthermore, the court's examination of the record reveals that, even without the suppressed impeachment evidence relating to Blackwell, his credibility was significantly impeached at trial. Concerning his involvement in the drug deal at issue, Marsha Dotson presented testimony that Blackwell, instead of Porter, was originally involved in the deal, but that, a day or two before the transaction was to occur, Blackwell backed out. (DE # 9, Add. 1, Vol. V, pp. 655, 668) During cross-examination, Blackwell testified that he "backed out on two different occasions," clarifying his testimony to mean that the deal had been "offered to [him] twice" but that he "accepted it neither time." (DE # 9, Add. 1, Vol. V, pp. 726-727) Defense counsel seized on Blackwell's apparent lack of credibility in closing argument, posing the hypothetical question to the jury, "Who on this jury

---

[26] Perhaps in recognition of this fact, Zagorski asserts that the withheld evidence creates "serious possibilities that incriminating evidence had been planted" by Blackwell. (DE # 158, p. 29) According to Zagorski, the withheld evidence would give the jury reason to believe that the shell found at the crime scene was placed there by Blackwell in an attempt to pin the murders on Zagorski. This assertion, however, is wholly speculation and entirely without merit. To begin, the court previously has rejected the basis of Zagorski's assertion that Blackwell had reason to frame Zagorski – namely that Blackwell committed the McKinney murder under similar circumstances paid off Atkinson to avoid prosecution for both the McKinney and the Dotson-Porter murders, and was working for Atkinson as an informant. Furthermore, the jury heard, and rejected, testimony and argument regarding the alleged "planting" of these shells. An expert witness for the defense presented testimony that he fired six rounds with Petitioner's HK 91 .308 rifle and that all cartridge shells ejected approximately forty feet from the gun. Defense counsel relied upon this testimony in closing argument, advancing a theory that the location of the cartridge shell found at the crime scene was suspect. (DE # 9, Add. 1, Vol. VIII, pp. 1039–1040) Defense counsel could not have, and thus did not, argue that Blackwell was the culprit behind the suspect location of the shell. Additional evidence that Blackwell was a drug dealer, was found unreliable by the prosecution, and had a suspect relationship with Atkinson does not qualify as probative support for such a theory.

believes Jimmy Blackwell? Diamond Jim. Do you believe that Mr. Blackwell was not part and parcel of a marijuana deal until he couldn't get up the money?" (DE # 9, Add. 1, Vol. VIII, p. 1031) The successful impeachment of Blackwell at trial is further evidenced by the fact that the prosecution told the jury in rebuttal:

> I'm not here to ask you to like or endorse Jimmy Blackwell. I'm here to ask you to judge his testimony along with all the rest of the testimony, all the other evidence, the facts that you have to consider. I ask you to judge his testimony fairly. Whatever your endorsement of his testimony is, that's fine.

(DE # 9, Add. 1, Vol. VIII, p. 1056) The prosecution did not rely on Blackwell's testimony in its argument at sentencing. (DE # 9, Add. 1, Vol. VIII, pp. 1109-1113, 1120-1126)

With respect to Blackwell's prior drug dealings, Blackwell had only one conviction at the time of trial, *i.e.*, a conviction for possession of marijuana, information that defense counsel made known to the jury. (DE # 9, Add. 1, Vol. VI, p. 704) Marsha Dotson also testified that Blackwell was the one who introduced her to Zagorski and that Blackwell told her that he and Zagorski had participated in drug deals together in the past. (DE # 9, Add. 1, Vol V, pp. 662-663) On cross-examination, Blackwell was further questioned with respect to his suspected drug dealings with Zagorski, but he denied any participation. (DE # 9, Add. 1, Vol. VI, p. 709) Evidence regarding Blackwell's suspected involvement with drugs in 1975, 1976, 1979, and 1982 would have been merely cumulative to this line of questioning. *See United States v. Phibbs*, 999 F.2d 1053, 1087–88 (6th Cir. 1993)(holding that the suppression of the "suspected" wrongdoing of a witness did not affect the outcome of the trial if the evidence was cumulative impeachment evidence); *see also Jamison v. Collins*, 100 F. Supp. 2d 647, 694–95, *aff'd on appeal*, 291 F.3d 380 (6th Cir. 2002); *Tankleff v. Senkowski*, 135 F.3d 235, 251 (2d Cir. 1998)("When a witness's credibility has already been substantially called into question in the same respects by other evidence, additional

96

impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim.").

(2) Buddy Corbitt

The additional favorable evidence suppressed by the state consists of evidence pertaining to other individuals who had a motive to kill one of the victims, Porter. Had the state not suppressed the prosecution-authored notes relating to Buddy Corbett, the jury would have learned that, about one year prior to the Porter-Dotson killings, Corbett put out a $10,000 contract to have Porter killed. (DE # 157, Ex. 18, 27) According to the suppressed documents, Corbett had a motive to kill Porter because Porter had stolen a large amount of money and two diamond rings from him and had left him in Texas.[27] However, the jury also would have heard that the man Corbett hired to kill Porter, Joe Langford, was paid only $1,700 and that he took the money "and laughed it off." (DE # 157, Ex. 18)

(3) Other Potential Suspects From Texas

While further evidence from the letter written by General Cook to Jeff Long on September 29, 1983, addressed *supra* at pp. 47-50, could have been used by the defense to demonstrate that Corbett may have made additional attempts to hire individuals to kill Porter, or that someone else from Texas had a separate motive to kill one of the victims, there is absolutely no indication as to when these attempts were made or by whom. In addition, the fact that the *daughter* of the person who was actually "offered the job of killing someone, for a substantial sum of money" was "certain it is the Porter-Dotson circumstance" is hardly probative. (DE # 104, Ex. 36) Only if evidence relating to another suspect is persuasive, can it constitute "material" evidence under *Brady*. *See Miller v. Angliker*, 848 F.2d 1312, 1323 (2d Cir. 1988); *see also Jamison*, at 390–91 (finding

---

[27]   According to prosecution notes, Corbett refused to verify this information or to answer any questions posed to him by the Sheriff about his alleged attempt to have Porter killed. (DE # 157, Ex. 26)

97

evidence relating to another suspect material under *Brady* because "enough factors coincided with respect to [the suspect]," while emphasizing that "we do not do not hold that the state must turn over every last suspect considered in the course of an investigation").

(4) Conclusion

As reasoned above, and elsewhere herein, the court finds that, even if all of the evidence that comprises Zagorski's *Brady* claim had been available to defense counsel at the time of trial, that evidence, even when viewed cumulatively, is not sufficient to undermine confidence in Zagorski's conviction and sentence of death. Accordingly, Zagorski is not entitled to federal *habeas corpus* relief under *Brady*.

d. Ineffective Assistance of Counsel For Failure to Investigate<br>and Present Exculpatory Evidence<br>(DE # 104, ¶ III.C.2.a, pp. 56-60)

In his response to the respondent's motion for summary judgment, Zagorski argues that, if the court determines that there is no *Brady* violation, then defense counsel were ineffective for failing to investigate and present exculpatory evidence. (DE # 104, ¶ III.C.2., p. 56)

(1) Procedural Default

The record shows that the only ineffective assistance claims raised by Zagorski were on appeal from the judgment of the post-conviction court on the dual issues of defense counsels' failure to suppress Zagorski's incriminating statements and their failure to present mitigation proof at sentencing. (DE # 9, Add. 4, Doc. 4A, p. I) Zagorski argues that procedural default is excused because the prosecution failed to disclose the necessary exculpatory documents. (DE # 104, ¶ III.C.2.c, pp. 68-70)

It is undisputed that post-conviction counsel received the files of Generals Whitley and Baugh. Moreover, it has been established during these proceedings that many of the documents

98

introduced into evidence were found in those files and that those documents, in turn, led counsel in the instant action to formulate Zagorski's multi-faceted *Brady* claim. Based on the record, including these proceedings, the court concludes that there was sufficient evidence available to post-conviction counsel to warrant raising a claim that defense counsels' representation was deficient because they were not more aggressive in investigating and presenting exculpatory evidence. In other words, there is no factor here that constitutes a substantial reason for the default that is "external" to the petitioner. Because Zagorski has failed to establish 'cause,' this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

### (2) Alternative Analysis on the Merits

The standard for ineffective assistance of counsel is set forth, *infra* at p. 104. Assuming for the sake of argument that defense counsels' representation was deficient for not being more aggressive in investigating and presenting exculpatory evidence, because Zagorski has failed to show that he is entitled to relief under *Brady*, he cannot establish that he was prejudiced by defense counsels' failure to research and present the evidence that forms the basis of Zagorski's *Brady* claim. In other words, Zagorski has not shown that, but for the evidence being unavailable, there exists a reasonable probability that the results of the trial would have been different. Because Zagorski has not satisfied both halves of the two-part *Strickland* test, *infra* at p. 104, he has not shown that defense counsel provided ineffective assistance. Neither can Zagorski support a claim that post-conviction counsel rendered ineffective assistance. As previously established, *supra* at pp. 32-33, Zagorski has no constitutional right to effective assistance of counsel in state post-conviction proceedings.

As explained, above, Zagorski has failed to establish that he received ineffective assistance of counsel because defense counsel did not do more to investigate and present exculpatory evidence

99

at trial.  Accordingly, Zagorski is not entitled to federal *habeas corpus* relief on these grounds.

### E.  Ineffective Assistance of Counsel at Trial and on Direct Appeal
### (Paragraph 10 of the Amended Petition
### (DE # 16, pp. 16-18))

Zagorski asserts that defense counsel provided ineffective assistance both at trial and on direct appeal in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments.  (DE #16, ¶ III.10, pp. 16-19)  The respondent argues that this claim is procedurally defaulted for purposes of federal *habeas corpus* review of Zagorski's claim under the Eighth Amendment, as well as for many of the factual predicates pertaining to this claim under the Sixth and Eighth Amendments.  (DE # 17, ¶ V.10, pp.13-15; DE # 100, ¶ IV.G.5, pp. 27-29; DE # 114, ¶ I.5, pp. 13-14)  Zagorski contends that those aspects of this claim that the respondent characterizes as procedurally defaulted are not.  (DE # 24, ¶ II.E, pp. 6-7; DE # 104, ¶ III.C.2.c, pp. 68-70; DE # 115, pp. 2-3)

### 1.  Procedural Default

In his amended petition, Zagorski alleges that counsel were ineffective at trial and on appeal because they did not fully investigate and present:

> 1) evidence pertaining to his mental state in support of the defense's motion to suppress inculpatory statements that he made to law enforcement officials (DE # 16, ¶ III.10.a, p. 16);
>
> 2) forensic evidence to challenge the state's theory as to the origin of the spent .308 cartridge found at the scene of the crime (DE # 16, ¶ III.10.b.1), pp. 16-17);*
>
> 3) pathology evidence to challenge the State's theory as to the time and manner of the victims' deaths (DE # 16, ¶ III.10.b.2), p. 17);*
>
> 4) serology evidence to show the blood on Zagorski's knife was not the victims' (DE # 16, ¶ III.10.b.3, p. 17);*

100

<ol start="5">
<li>evidence to show that items found at the scene of the crime could not have been Zagorski's and/or that they could not have been left at the scene at the time of the murders (DE # 16, ¶ III.10.b.4), p. 17);*</li>
</ol>

<ol start="6">
<li>evidence to support the defense's theory that the murders did not occur in Robertson County (DE # 16, p. III.10.b.5), p. 17)*</li>
</ol>

<ol start="7">
<li>evidence of other suspects including Buddy Corbitt (DE # 16, p. III.10.c, p. 17-18);* and</li>
</ol>

<ol start="8">
<li>evidence pertaining to Jimmy Blackwell's background (DE # 16, p. ¶ III.10.d, p. 18).*</li>
</ol>

In addition to Zagorski's claim under the Eighth Amendment, the respondent argues that those claims with an asterisk (*) above are procedurally defaulted. (DE # 17, ¶ V.10, pp. 13-15; DE # 100, ¶ IV.G.5, pp. 27-29)

On appeal as of right from the judgment of the post-conviction court, Zagorski raised two ineffective assistance claims: 1) that defense counsel were ineffective in failing to present mitigation proof at sentencing; 2) that defense counsel were ineffective in the manner in which they handled the effort to suppress Zagorski's incriminating statements. (DE # 9, Add. 4, Doc. 4A, pp. 1, 28-45) There is no mention of the ineffective assistance claims indicated above by asterisks in Zagorski's brief on appeal, nor does the Court of Criminal Appeals address these claims anywhere in its opinion. (DE # 9, Add. 4, Doc. 4C, pp. 15-25) Neither did Zagorski raise these issues in his application for permission to appeal to the Tennessee Supreme Court on post-conviction, nor did he mention them in his subsequent brief in that court. (DE # 9, Add 4, Docs. 4D, 4G) Finally, having granted Zagorski's application for permission to appeal, the Tennessee Supreme Court does

not address these claims anywhere in its subsequent opinion.[28]  (DE # 9, Add. 4, Doc. 4I)

Zagorski disagrees that the claims marked with asterisks are procedurally defaulted and links the "cause" half of the two-part "cause-and-prejudice" test to his *Brady* claim, *supra* at pp. 27-101.  (DE # 104, ¶ III.C.2.c, pp. 68-70)  A plain reading of those claims marked by an asterisk shows, however, that only 7) and 8) are related to Zagorski's *Brady* claim.  For reasons previously explained, not only are claims  7) and 8) procedurally defaulted, any ineffective assistance claim grounded in Zagorski's *Brady* claim is without merit as well.

As to the remaining claims marked with asterisks, Zagorski's very general argument that "[t]he post-conviction record is replete with evidence establishing that counsel's deficient performance. . . ." (DE # 115, ¶ 3, pp. 2-3) is equally unavailing.  The court assumes, for the sake of discussion, that all of the remaining claims marked with asterisks fall within the ambit of this argument.  However, for a claim to be considered exhausted, "the habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim."  *Anderson*, 459 U.S. at 6 (quoting *Picard v. Connor*, 404 U.S. 270, 275, 277-78 (1971)); *see also Alley*, 307 F.3d at 386 (citing *Wong*, 142 F.3d at 322 ("the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court."))  As previously noted, Zagorski raised only two ineffective assistance claims on post-conviction – that pertaining to defense counsels' failure to present mitigation proof at sentencing and that pertaining to the way defense counsel handled the effort to suppress Zagorski's incriminating statements.  Because none of the remaining claims marked with asterisks fall under the same theory as the two exhausted ineffective assistance claims, this argument has no merit.

---

[28]  With the promulgation of Rule 39, Tenn. Sup. Ct. Rules, review by the Tennessee Supreme Court is no longer required for a federal *habeas* petitioner to satisfy the federal *habeas corpus* exhaustion requirement.  *Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003).  However, a petitioner still is required to raise each claim brought in a federal *habeas corpus* action in the Court of Criminal Appeals.  The change to Rule 39 is applied retroactively.  *Id.*

As reasoned above, Zagorski's claim under the Eighth Amendment, as well as those claims highlighted with asterisks, are procedurally defaulted for purposes of federal *habeas corpus* review. Therefore, only claim 1), *supra* at p. 101, remains to be analyzed.

### 2. Defense Counsels' Failure to Investigate and Present Evidence Pertaining to Zagorski's State of Mind at the Hearing to Suppress His Incriminating Statements

To prevail on a claim of ineffective assistance of counsel, a *habeas* petitioner must show deficient performance and prejudice. *See Bell v. Cone*, 535 U.S. 685 , 694-95 (2002). Trial counsels' performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000). In determining whether an attorney performed in an objectively unreasonable manner, courts employ "highly deferential" scrutiny. *Id*. at 689. To satisfy the prejudice requirement, an ineffective assistance claimant "must show that there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996)(quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992)(*en banc*), *cert. denied*, 508 U.S. 975 (1993)).

The record shows that the Court of Criminal Appeals addressed this issue on appeal from the judgment of the post-conviction court and identified *Strickland* as controlling where a criminal defendant alleges ineffective assistance of counsel. (DE # 9, Add. 4, Doc. 4C, pp. 15-16) The record also shows that the Court of Criminal Appeals identified the appropriate standard for ineffective assistance, *i.e.*, "a reasonable probability that, but for counsel's error, the result of the

proceeding would have been different." (DE # 9, Add. 4, Doc. 4C, pp. 15-17)  However, rather than addressing the two-part test under *Strickland* directly, the Court of Criminal Appeals deferred to the Tennessee Supreme Court's determination on direct appeal that "any error in admitting the statements was harmless error in view of the overwhelming evidence of guilt . . . ." (DE # 9, Add. 2, Doc. 2C, p. 9; Add. 4, Doc. 4C, p. 17)  The clear inference to be drawn from the Court of Criminal Appeals' opinion is that, because admitting the statements at issue into evidence was harmless beyond a reasonable doubt, Zagorski could not establish that he was prejudiced by defense counsels' failure to have the statements at issue suppressed.  (DE # 9, Add. 4, Doc. 4C, p. 17)

Although the Tennessee Supreme Court's determination was made in the context of trial court error, its harmless error analysis clearly is germane to Zagorski's ineffective assistance claim. Specifically, the Tennessee Supreme Court's harmless error analysis and any analysis regarding prejudice under *Strickland* go hand-in-hand.  In other words, if the admission of the statements at issue into evidence was "harmless beyond a reasonable doubt," a higher standard than *Strickland's* "reasonable probability" standard, then Zagorski cannot prove that he was prejudiced because his statements were admitted into evidence. Because Zagorski cannot show that he was prejudiced by the admission of the incriminating statements, he cannot establish both parts of the two-part test under *Strickland* and, as such, he cannot establish ineffective assistance of counsel.

As discussed previously, *supra* at pp. 13-16, Zagorski's claim that the trial court erred in not suppressing the incriminating statements that he made to law enforcement officials is without merit. Central to the court's determination on that previous issue was the Tennessee Supreme Court's harmless error analysis which was based on the "overwhelming evidence of guilt" against Zagorski. The court concludes that the "overwhelming evidence of guilt" against Zagorski was included, by inference, in the Court of Criminal Appeals' determination of this issue.

As previously established, *supra* at p. 13, factual determinations made by state courts are entitled to a presumption of correctness absent clear and convincing evidence to the contrary. Although Zagorski argues at length that defense counsels' representation was deficient with respect to this claim (DE # 16, ¶ III.10, p. 16; DE # III.B, pp. 53-54; DE # 115, ¶ 3, pp. 2-3), he has failed to establish by clear and convincing evidence that the Court of Criminal Appeals' determination on this issue, relying as it does on the Tennessee Supreme Court's opinion on direct appeal, is not entitled to the presumption of correctness. Moreover, given that Zagorski cannot establish both halves of the two-part test under *Strickland*, the court finds that the Court of Criminal Appeals' determination of this issue also was neither contrary to nor an unreasonable application of clearly established federal law.

As reasoned above, Zagorski's surviving ineffective assistance claim is without merit. Consequently, he is not entitled to *habeas corpus* relief on this claim.

### F. Unconstitutional Jury Instruction That Relieved the Prosecution of Having to Prove Venue (Paragraph 11 of the Amended Petition (DE # 16, pp. 18-19))

Zagorski asserts that the jury instruction pertaining to "venue" at the guilt phase of his trial violated his rights under the Fourteenth Amendment because the instruction lessened the prosecution's burden of proof. (DE #16, ¶ III.11, pp. 18-19) The respondent argues that this claim is procedurally defaulted for purposes of federal *habeas corpus* review because it was not raised in any state court prior to being raised in the instant proceedings. (DE # 17, ¶ V.11, p. 15; DE # 100, ¶ IV.G.6, p. 29; DE # 114, ¶ I.6, pp. 11-18) Zagorski contends that this claim is not procedurally defaulted for the following reasons: 1) in concluding that there was no reversible error, the Tennessee Supreme Court considered the merits of any federal claim; 2) the Tennessee Supreme Court conducted a plain error review; 3) because venue was improper, he is "actually innocent."

(DE # 24, ¶ II.K, pp.10-11; DE # 104, ¶ V.B.2.c, pp. 109-111)

A review of the record shows that Zagorski did not raise his claim pertaining to the "venue" instruction on direct appeal when he should have (DE # 9, Add. 2, Doc. 2A, pp. 2-7) or at any other time prior to raising it in these proceedings. Because Zagorski's first two arguments with respect to this issue are identical to those pertaining to his "reasonable doubt" and "malice" jury instruction claims, *supra* at pp. 16-27, those arguments are without merit. As to Zagorski's "actual innocence" argument, as previously established, *supra* at p. 18, the "actual innocence" exception to procedural default pertains to just that – actual innocence, not technical innocence. Zagorski has not established in these proceedings that he is "actually innocent" of murdering Dotson and Porter. *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)("The miscarriage of justice exception is concerned with actual as compared to legal innocence."). Accordingly, this argument is without merit as well.

For reasons explained above, this claim is procedurally defaulted for purposes of federal *habeas corpus* relief.

### G. Trial Court Error in Excluding Opinion Testimony as to Where the Crimes Were Committed (Paragraph 12 of the Amended Petition (DE # 16, pp. 19-20))

Zagorski asserts that the trial court erred in not permitting lay testimony regarding where Sheriff Atkinson and Marsha Dotson believed that the crimes were committed, implying that evidence was planted at the murder scene, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments. (DE # 16, ¶ III.12, pp. 19-20)

The respondent argued initially that Zagorski's claim, including his allegation that evidence was planted at the murder scene, and his claim under the Sixth and Eighth Amendments, were procedurally defaulted. (DE # 17, ¶ V.12, pp. 15-16; DE # 100, IV.G.7, pp. 29-30) Subsequently, the respondent argued that the entire claim was procedurally defaulted because Zagorski had not

raised this claim in state court in the context of an evidentiary error, rather than as a constitutional violation.  (DE # 114, ¶ I.7, pp. 18-19)  In any event, the respondent's view is that, to the extent that this claim was exhausted in state court, the Tennessee Supreme Court's determination of this issue was not an unreasonable determination of the facts in view of the evidence, nor was it contrary to or an unreasonable application of clearly established federal law.  (DE # 17,  ¶ V.12, pp. 15-16; DE # 100, IV.G.7, p. 30; DE # 114, ¶ I.7, pp. 18-19)  Zagorski argues, in turn, that no part of this claim is procedurally defaulted.  (DE # 24, ¶ II.G, p. 8; DE # 104, ¶ V.B.2.c, pp. 109-111)

In his brief in the Tennessee Supreme Court on direct appeal, Zagorski advanced the following legal analysis with respect to this claim:

> State v. Wiseman, 643 S.W.2d 354 (Tenn. Crim. App. 1982) states that as a general proposition the ordinary witness may testify only about facts about which he has first hand knowledge, and avoid stating mere personal opinions.  Paine, Tennessee Law of Evidence, Section 168 confirms this view but also states that the courts have not promulgated an inflexible view.

> Also, an expert can clearly state his opinions to the jury and can do so even as to an ultimate fact which is to be decided by the jury.  See Paine at Section 177 and City of Columbia v. CFW Construction Company, 57 S.W.2d 734 (Tenn. 1977).

> In the instant case, the defendant submits upon the foregoing authority that Mr. Atkinson's testimony as to venue was admissible in light of his many years of experience as an investigator and Sheriff for Hickman County and upon his personal investigation in this case.  Also, the defendant would submit that Mrs. Dotson is eligible to give her opinion in light of her particular involvement in this case.

(DE # 9, Add. 2, Doc. 2A, pp. 52-53)  Apart from referring to the Tennessee Rules of Evidence and citing two Tennessee cases, Zagorski does not argue that excluding this evidence constituted a violation of his federal constitutional rights.

*Habeas corpus* review is not a broad exercise of supervisory power but is limited to issues

of constitutional error. *See Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir. 1979). To be eligible for federal *habeas corpus* relief, a state prisoner first must fully and fairly present his claim – in the context of federal law – to the state courts. *See Picard*, 404 U.S. at 275. Merely raising an issue as a matter of state law or procedure does not satisfy the exhaustion requirement. *See Riggins v. McMackin*, 935 F.2d 790, 792-793 (6th Cir. 1991). "Where a petitioner has not fully and fairly presented a federal claim to the state's highest court . . . a federal court ordinarily will not consider the merits of that claim unless the petitioner can show cause and prejudice . . . ." *Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir. 2001). For the reasons stated above, the court concludes that this claim is procedurally defaulted because Zagorski raised it on state evidentiary grounds, not in the context of a federal constitutional claim.

Zagorski offers three arguments in support of his position that this claim is not procedurally defaulted for purposes of federal *habeas corpus* review. The first two arguments, *i.e.*, that the Tennessee Supreme Court both considered the entire record and conducted a plain error review, were discussed previously, *supra* at pp. 21-24, and determined to be without merit. Zagorski's third argument is that "a showing of actual innocence precludes any procedural bar to addressing the merits of a claim . . . ." (DE # 104, ¶ V.B.2.c, pp. 110-111) For reasons previously explained, *supra* at p. 18, to excuse procedural default Zagorski must show that he is "actually innocent" of the offense. This he has not done.

For reasons explained above, this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

### H. Sufficiency of the Evidence Regarding Where the Crimes Were Committed (Paragraph 13 of the Amended Petition (DE # 16, p. 20))

Zagorski claims that the evidence was insufficient to establish that the murders occurred in

Robertson County, thereby violating his rights under the Fourteenth Amendment. (DE # 16, ¶ III.13, p. 20; DE # 104, ¶V.B.2, pp. 107-109)  The respondent argues that the Tennessee Supreme Court addressed this issue on the merits, and its determination was not an unreasonable determination of the facts in view of the evidence, neither was it contrary to or an unreasonable application of clearly established federal law.  (DE # 17,  ¶ V.13, p. 16; DE # 100, IV.G.8, p. 30; DE # 114, ¶ I.8, 19-21)

On federal *habeas corpus* review, evidence is deemed sufficient to support a verdict if, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson v. Virginia,* 443 U.S. 307, 324 (1979); *Zuern v. Tate,* 336 F.3d 478, 482 (6th Cir. 2003).

Although the Tennessee Supreme Court did not say so specifically, it can be inferred from the record that the following evidence was before the Tennessee Supreme Court when it determined that "the evidence properly before the jury . . . is sufficient for a rational tri[er] of fact to find beyond a reasonable doubt that the defendant killed . . . Dotson and . . . Porter in Robertson County . . . ." (DE # 9, Add. 2, Doc. 2C, pp. 12-13):

1) The victims' bodies were found in Robertson County. (DE # 9, Add. 2, Doc. 2C, p. 4)

2) The knife scabbard found at the scene of the crime belonged to Zagorski.  (DE # 9, Add. 2, Doc. 2C, p. 4)

3) A case for "Rec Specs" glasses, the type of glasses worn by Zagorski, was found at the murder scene.  (DE # 9, Add. 2, Doc. 2C, p. 4)

4) A spent .308 cartridge found at the crime was identified as having been fired by Zagorski's HK-91 semi-automatic rifle.  (DE # 9, Add. 2, Doc. 2C, p. 4)

5) In Zagorski's June 1, 1983 statement to law enforcement officials, he told them that the murders had occurred in Robertson County.  (DE # 9, Add. 2, Doc. 2C, p. 6)

109

The record indicates that, in addition to the evidence cited above, the following testimonial evidence was adduced at trial and, therefore, was part of the record on appeal:

1)  Marsha Dotson and Don Peery testified that the victims left to meet Zagorskin in Porter's Datsun pickup truck. (DE # 9, Add. 1, Vol. V, p. 656; Vol. VI, p. 759)

2)  James Bruce testified that, when he met Zagorski in Ohio, Zagorski was driving Porter's Datsun pickup truck. (DE # 9, Add. 1, Vol. VI, p. 771)

3)  Dr. Harlan testified that both victims had been shot twice and their throats had been cut, the inference being that these were bloody crimes. (DE # 9, Add. 1, Vol. V, pp. 634-641)

4)  Detective Henderson of the Robertson County Sheriff's Department testified that there was blood "all over" the victims' shirts. (DE # 9, Add. 1, Vol. V, pp. 598-599)

5)  Bruce testified that the bed of the Datsun pickup truck was carpeted and there was no evidence of blood on the carpet. (DE # 9, Add. 1, Vol. VI, pp. 791, 778-779)

6)  Detective Perry and Margaret Bash, a serologist with the TBI, testified that there was no blood on the sample of the carpet from the bed of the truck. (DE # 9, Add. 1, Vol. VII, pp. 896-897, 947-948)

9)  Detective Perry testified that no plastic bags were recovered that might have been used to transport the bodies to Robertson County, this in response to Zagorski's statement in which he said that Dotson and Porter were killed elsewhere and taken in plastic bags to Robertson County. (DE # 9, Add. 1, Vol. VII, pp. 895-896)

10)  Baggett and his wife found the bodies near their house in Robertson County. (DE # 9, Add. 1, Vol. V, p. 578, 580)

11)  Baggett testified that, to access the murder scene by vehicle from Highway 31-W, the driver would have to proceed through a gate in a local farmer's "back yard,"

110

pass through a gap in a second fence, and pass through a lot of standing water. (DE # 9, Add. 1, Vol. V, p. 584)

12) Baggett testified that, to access the murder scene by vehicle via Young Road, the driver would have to pass through a locked gate. (DE # 9, Add. 1, Vol. V, p. 589)

13) Detective Henderson testified that there was no way to get a vehicle to the murder scene without going through the farmer's back yard, and even then, the Sheriff's jeep got stuck in the mud. (DE # 9, Add. 1, Vol. V, p. 610)

14) Detective Henderson testified that the murder scene was more than two hundred yards through the woods from the interstate. (DE # 9, Add. 1, Vol. 1, p. 610)

15) Detective Henderson testified that, apart from those belonging to the vehicles involved in the recovery of the victims' bodies, there were no other tire marks around the murder scene. (DE # 9, Add. 1, Vol. V, p. 604)

16) Detective Henderson testified that there was no evidence that the bodies had been dragged to the murder scene. (DE # 9, Add. 1, Vol. V, p. 604)

17) Baggett, who lived nearby, testified that he heard gunshots on either April 25 or 26, 1983, at approximately the time when Zagorski was to have met Dotson and Parker. (DE # 9, Add. 2, Doc. 2C, p. 5)

18) Salli Salmon testified that the shots that she and Blackwell heard on April 23, 1983 were too close to have come from the "Spot." (DE # 9, Add. 1, Vol. VI, pp. 743)

19) Baggett testified that a knife scabbard was found at the murder scene. (DE # 9, Add. 1, Vol. V, p. 585)

20) Blackwell identified the scabbard found at the murder scene as "just like" the scabbard in which Zagorski carried his knife. (DE # 9, Add. 1, Vol. VI, p. 695)

21) Ray Timberlake testified that Zagorski told him that he had lost the scabbard to his knife identical to the one found at the murder scene. (DE # 9, Add. 1, Vol. VI, pp.

111

766-767)

22) Bruce testified that Zagorski told him that he had lost the scabbard in South America or Tennessee. (DE # 9, Add. 1, Vol. VI, pp. 774-775)

23) Detective Henderson of the Robertson County Sheriff's Office testified that C-cell batteries were found at the murder scene, that C-cells are a less common size battery for a flashlight than D-cells, and that flashlights similar to the flashlight belonging to Zagorski used C-cell batteries. (DE # 9, Add. 1, Vol. V, pp. 594-595)

24) Blackwell identified Zagorski's flashlight, one that used C-cells rather than the more common D-Cells. (DE # 9, Add. 1, Vol. VI, pp. 696-697)

25) Detective Henderson found a glasses case with the words "Rec Specs" written on it. (DE # 9, Add. 1, Vol. V, p. 595)

26) Blackwell identified the "Rec Specs" glasses introduced into evidence as belonging to Zagorski, the same brand name as the glasses case found at the murder scene. (DE # 9, Add. 1, Vol VI, pp. 697-698)

In addition to the foregoing, Sheriff Atkinson testified that there was no physical evidence to link the crimes to Hickman County. (DE # 9, Add. 1, Vol. VIII, p. 978)

A review of its opinion shows that the Tennessee Supreme Court did not specifically identify *Jackson* as controlling in challenges to evidentiary sufficiency. However, the record shows that the Tennessee Supreme Court nevertheless applied the appropriate standard when it determined that, "[o]n considering the evidence before the jury in this case, we are convinced that it is sufficient for a rational tr[ier] of fact to find beyond a reasonable doubt that the defendant killed John Dotson and John Porter in Robertson County . . . ." (DE # 9, Add. 2, Doc. 2C, p. 13)

As previously established, *supra* at p. 13, where state courts make factual determinations regarding issues presented for federal *habeas corpus* review, such determinations are presumed to

112

be correct, and Zagorski has the burden of rebutting that presumption of correctness by clear and convincing evidence. Here, the Tennessee Supreme Court made the factual determination that a rational juror would have found beyond a reasonable doubt that the murders occurred in Robertson County. Although Zagorski has offered extensive argument on this issue, he has not rebutted the presumption of correctness by clear and convincing evidence, or otherwise. Moreover, because the Tennessee Supreme Court's determination of this issue adhered to the standard set forth in *Jackson*, the court also finds that the Tennessee Supreme Court's determination on this issue was neither contrary to nor an unreasonable application of clearly established federal law.

As reasoned above, Zagorski is not entitled to federal *habeas corpus* relief on this claim.

### I. Constitutionality of the "Heinous, Atrocious or Cruel" (HAC) Aggravating Circumstance (Paragraph 14 of the Amended Petition (DE # 16, pp. 20-26))

Zagorski argues that the HAC aggravating circumstance instruction considered by the jury was unconstitutionally vague in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments. (DE # 16, ¶ III.14, pp. 20-26; DE # 104, ¶ IV.C, pp. 81-99; DE # 115, ¶ 4, pp. 3-4) The respondent argues that the Tennessee Supreme Court's determination of this issue was not an unreasonable determination of the facts in view of the evidence, nor was it contrary to, or an unreasonable application of, clearly established federal law. (DE # 17, ¶ V.14, pp. 16-19; DE # 100, ¶ IV.G.9, pp. 30-31; DE # 114, I.9, pp. 21-28)

The HAC aggravating circumstance instruction at issue required that the jury find the following for it to apply: "[T]he murder were especially heinous, atrocious or cruel in that it [*sic*] involved torture or depravity of mind . . . ." (DE # 9, Add. 1, Vol. IX, p. 1127) In *Bell v. Cone*, __ U.S. __, 125 S.Ct. 847 (2005), the Supreme Court addressed the Tennessee HAC aggravating circumstance instruction that is at issue here. In *Cone*, the Court determined that the manner in

113

which the Tennessee Supreme Court applies its "narrowing construction" to the HAC aggravating circumstance is not unconstitutionally vague. *Id.* The Court went on to add, "we think this interpretation of the [HAC] aggravating circumstance, standing alone, would be sufficient to overcome the claim that the aggravating circumstance applied by the state court was 'contrary to' clearly established federal law under 28 U.S.C. § 2254(d)(1)." *Id.* at 854-55. In other words, the Supreme Court has determined that Tennessee's HAC aggravating circumstance is not unconstitutional.

As explained above, Zagorski is not entitled to federal *habeas corpus* relief on these grounds.

> J. Trial Court Error in Not Instructing the Jury About Mitigating Circumstances and 'Mis-Instructing' the Jury as to the Meaning of a 'Mitigating Circumstance' (Paragraph 15 of the Amended Petition (DE # 16, pp. 26-32))

In this claim, Zagorski alleges that: 1) the trial court "refused" to instruct the jury on statutory mitigating factors (DE # 16, ¶ 15.a, pp. 26); 2) during *voir dire*, jurors were "incorrectly" told that there were eight mitigating circumstances (DE # 16, ¶ 15.a, pp. 26-27); 3) when the jury asked the trial court for a definition, the trial court defined mitigating circumstances incorrectly (DE # 16, ¶¶ 15.b-d, pp. 27-31; DE # 104, ¶¶ IV.B1-3., pp. 74-80). According to Zagorski, these alleged errors prevented the jury from considering and weighing relevant mitigating circumstances. (DE # 16, ¶¶ 15 and 15.e, p. 26, 31-32)

The respondent argues that Zagorski's first claim, *i.e.*, that the trial court's "refusal" to instruct the jury on the statutory mitigating factors, was adjudicated in state court and that the Tennessee Supreme Court's determination of this issue was not unreasonable in view of the facts, nor was it contrary to or an unreasonable application of federal law. (De # 17, V.15, pp. 17-19; DE # 100, ¶ IV.G.10, pp. 32-33) On the other hand, the respondent argues that, not only are claims 2) and 3) above procedurally defaulted, granting relief to Zagorski on these grounds would amount to

114

creating a new rule on *habeas corpus* which, according to the respondent, the court may not do under *Saffle v. Parks*, 494 U.S. 484 (1990). (DE # 17, ¶ V.15, p. 19; DE # 100, ¶ IV.G.10, pp. 31-32; DE # 114, ¶ I.10, pp. 28-30)

In his "traverse," Zagorski responds to the respondent's procedural default argument as "unwarranted hairsplitting" and, in particular, that his claim pertaining to the trial court's alleged mis-statement regarding the definition of a mitigating circumstance is not procedurally defaulted. (DE # 24, ¶ II.J, pp. 9-10; DE # 104, ¶ IV.B. 4 n. 25, p. 81) Zagorski also argues that this claim was "necessarily reviewed by the Tennessee Supreme Court as part of their statutory duty to review capital cases." (DE # 24, ¶ II.J, p. 10) Zagorski argues further that a ruling in his favor would not create a new rule on *habeas corpus*. (DE # 24, ¶ II.J, p. 110)

### 1. Procedural Default

In his brief on direct appeal, Zagorski averred that defense counsel asked the trial court to charge the jury on three mitigating circumstances: 1) that Dotson and Porter were engaged in a felonious criminal enterprise at the time of their deaths; 2) that Zagorski did not have a prior record of violence; 3) Zagorski's youth – 28 years of age. (DE # 9, Add. 2, Doc. 2A, p. 83) Zagorski asserts that the trial court "refused to charge the jury as to any mitigating circumstances . . . ." which, according to Zagorski, prevented defense counsel from arguing any of these mitigating factors. (DE # 9, Add. 2, Doc. 2A, p. 83)

A careful reading of Zagorski's brief on direct appeal reveals that he made no mention of allegedly "incorrect" instructions to potential jurors on *voir dire* or any mis-statement of the meaning of a mitigating circumstance by the trial court. For reasons previously explained, *supra* at pp. 16-27, these two claims are procedurally defaulted for purposes of *federal habeas* corpus review.

115

### 2.  Analysis of Zagorski's Claim That the Trial Court Erred in
### Not Providing the Defense's Request for Instructions
### on Specific Mitigating Circumstances

The following colloquy transpired between the trial court and trial counsel relevant to Zagorski's claim that the trial court did not instruct the jury on mitigating circumstances:[29]

> THE COURT:  I just want your guidance on these instructions regarding mitigating circumstances.  I need some guidance as far as the charge is concerned.  Do you have any suggestions?

> MR. WILKS:  With regard to one mitigating circumstance, we believe that the defendant – that the victims, your honor, were involved in the transaction and we believe that goes to one of the mitigating factors under the statute. . . 39-2-102, J-3 ['The victim was a participant in the defendant's conduct or consented to the act,' Tenn. Code Ann. § 29-2-203(j)(3)].

> MR. WHITLEY:  Your Honor, we would object to that inasmuch as the victims were not participants in the defendant's conduct, the defendant's conduct being murder, which he was charged, and they obviously were not participants in their own murders.

> THE COURT:  I've had an opportunity to consider this as being the only possible one.

> MR. WILKS:  Your Honor, I might also add that I have contemplated number one ['The defendant has no significant history of prior criminal activity,' Tenn. Code. Ann. § 29-2-203(j)(1)], the defendant has no significant history of prior criminal activity, the reason being that while the State has given us notice of three prior felonies, each one of those felonies did not involve any violence to a person.  One was receiving and concealing stolen property under a hundred dollars.  The other two involved marijuana.  I believe that would be applicable to that section.

> THE COURT:  I have read cases that say that the crimes must be of a violent nature, General.

> MR. WHITLEY:  That is, Your Honor, if the State is to prove an

---

[29]   This colloquy reflects that both the trial judge and the lawyers were struggling to interpret and apply a Tennessee statute that had only been in effect for some few years at the time of the trial.

116

aggravating circumstance. However, mitigating circumstances must be proved at trial or shown by the defendant during the sentencing hearing and certainly number 1 would not be applicable in this case inasmuch [as] they have not shown that he has no significant history of prior activity. The State has not shown affirmatively that he has. As far as mitigation is concerned it's not true, as much as he has significant history of prior criminal activity.

MR. WILKS: Your Honor, I would like to respond to that by saying the State has opened the door and placed that information in the record. It would be unconstitutional to require the defendant to take the stand to state that he has no prior convictions involving the use of violence. Somehow that seems unfair. I might add, Your Honor, that I believe the rules concerning what can be considered by the jury at a sentencing hearing is somewhat different than the normal rules of evidence. I am not aware of any particular guidelines that specify the outer perimeter of those rules, but I don't think this would be an unfair request on behalf of the defendant in this case.

THE COURT: If there are no mitigating circumstances, this whole charge is going to have to be reworked to some extent, General. That is, unless I charge every one of them, and I'm not supposed to do that.

MR. WILKS: Can I ask the Court, since the defendant has not testified, surely we can at least take notice of the youth [28 years of age] of the defendant ['The youth or advanced age of the defendant at the time of the crime,' Tenn. Code Ann. § 29-2-203(j)(7)].

MR. WHITLEY: Your Honor, if they're going to rely on mitigating circumstances, the burden is on them to show them, to introduce them into proof one way or the other. You can't take judicial notice of anything in this case. They have the burden of proving something in the sentencing hearing.

THE COURT: What is your opinion, General, of the charge as it is when there are absolutely no mitigating circumstances that will be shown, and yet we refer to them in the charge? Is the jury to assume there could be mitigating circumstances from the proof they've already heard somewhere?

MR. WHITLEY: That's true. I think the statute says that will not be limited to these mitigating circumstances, but other circumstances can be shown.

MR. WILKS: Your Honor, I agree that it says it's not limited to these particular circumstances.

THE COURT: All right.

MR. WILKS: The jury shall consider as heretofore indicated any mitigating circumstances shall include, but not be limited to the following. However, Your Honor, we're in a situation where in the record there's already proof about the defendant not having any prior physical violent record.

MR. WHITLEY: Where is that proof?

MR. WILKS: You've given it to us. Certainly, he wasn't required to take the stand in a case of this nature. That would violate the Fifth Amendment.

THE COURT: I can't require him to take the stand on that, but I believe that I'll just have to leave any mitigating circumstances up to what the jury might think there are. There are none in this statute that apply.

MR. WILKS: Does that also apply to the youth of the defendant?

THE COURT: I believe it does, Mr. Wilks. I just don't believe that the youth as used in the statute applies to anyone twenty-eight years old. I'll give you great leeway in your arguments; I frankly will. But I don't believe I can charge the statutory grounds.

. . .

THE COURT: [following the State's motion *in limine* regarding defense counsels' argument on closing]: General, I'll overrule that motion. I'm going to give the defense great leeway as to whether or not they would go far afield. You would feel free to object. It would not be discourteous, and I'd rule on at that time, but I do not want to limit them in their argument in a case like this.

(DE # 9, Add. 1, Vol. VIII, pp. 1101-1106)

The Tennessee Supreme Court observed the following regarding this claim in its opinion on direct appeal:

118

The defendant insists that the trial court erred in the sentencing phase of the trial in refusing to give requested instructions on mitigating circumstances and in refusing to allow the defendant to argue in mitigation of punishment the victims' participation in a drug deal, defendant's lack of a prior record of violent criminal activity and the defendant's youth.

The circumstances set forth in the requested instructions were not in accord with the evidence, nor were they included in the specifically delineated statutory mitigating circumstances, Tenn. Code Ann. § 39-2-203(j). The jury could consider them under the 'catchall' provision in the statute which directs them to consider 'any mitigating circumstances which shall include, but not be limited [to circumstances set out in the statute].' Tenn. Code Ann. § 39-2-203(j). The court therefore instructed the jury that[:]

Mitigating circumstances are within your province, if there are any. You have heard the evidence of the case, and no additional evidence was produced at the sentencing hearing, ***so you may consider all the evidence that was presented in the entire case***. The law sets out certain mitigating circumstances which have no particular applicability in this case, <u>but you're not limited to those, so you can consider any mitigating circumstances that in your judgment would comply with the instructions given</u>. . . .

(DE # 9, Add. 2, Doc. 2C, p. 17)(brackets and underline in the original)(bold added) The Tennessee Supreme Court went on to observe that, "[n]o limitation was placed on argument by the defense counsel. . . ." (DE # 9, Add. 2, Doc. 2C, p. 17) The Tennessee Supreme Court concluded, having reviewed the record, that there was "no error in the trial court's . . . instructions to the jury in the sentencing phase of the trial." (DE # 9, Add. 2, Doc. 2C, p. 18)

As shown above, the Tennessee Supreme Court made an informed determination that there was no trial court error with respect to the trial court's refusal to provide the three instructions at issue based on the evidence before it, *i.e.*, the transcript of the hearing on the instructions at issue. As previously established, *supra* at p. 13, where state courts have made factual determinations

regarding issues presented for federal *habeas corpus* review, such determinations are presumed to be correct, and a *habea*s petitioner has the burden of rebutting that presumption of correctness by clear and convincing evidence. Notwithstanding Zagorski's argument to the contrary on this issue, he has not established by clear and convincing evidence that the determination of the Tennessee Supreme Court on this issue is not entitled to the presumption of correctness. Even if the trial court should have provided the instructions requested, for reasons explained below, this court concludes that the trial court's failure to do so did not violate Zagorski's constitutional right to a fair trial.

The standard for determining trial court error is whether the alleged error was "harmless beyond a reasonable doubt," as set forth in *Chapman v. California,* 386 U.S. 18 (1967). At sentencing, the jury was instructed that they could "consider all of the evidence that was presented in the entire case." (DE # 9, Add. 1, Vol 9, p. 1131) The evidence available to the jury at the sentencing phase pertaining to the three instructions at issue was as follows.

First, the victims' conduct, *i.e.*, that which would have been instructed under Tenn. Code Ann. § 29-2-203(j)(3), was readily apparent from testimony that established that they were knowingly and willingly participating in a major drug buy involving tens of thousands of dollars. Next, as to Zagorski's lack of a prior criminal history involving violence, *i.e.*, that which would have been instructed under Tenn. Code Ann. § 29-2-203(j)(1), because no evidence was adduced at trial establishing that he had a prior criminal history involving violence, the jury would not have considered in its deliberations that he did. Moreover, given the instruction that the jurors were permitted to "consider all of the evidence that was presented in the entire case," and that the instruction on the jury forms specified that a mitigating circumstance was anything "sufficiently substantial to outweigh the statutory circumstance or circumstances," the jury was free to consider

his lack of a prior criminal history involving violence as a mitigating factor. Finally, as to Zagorski's age, *i.e.*, that which would have been instructed under 29-2-203(j)(7), Zagorski sat in the courtroom throughout both phases of his trial. Because his approximate age would have been apparent to the jurors during the course of trial, there was no need to highlight the fact that he was twenty-eight years old. For these reasons, this court concludes that any error on the trial court's part with respect to this issue was harmless beyond a reasonable doubt.

As reasoned herein, not only is the Tennessee Supreme Court's determination on this issue entitled to the presumption of correctness, its determination was neither contrary to nor an unreasonable application of federal law. Consequently, Zagorski is not entitled to federal *habeas corpus* relief on this claim.

> K. Ineffective Assistance of Counsel for Failure to Investigate, Present and Argue
> Mitigating Factors (Paragraph 16 of the Amended Petition
> (DE # 16, pp. 32-38))

Zagorski asserts that defense counsel were ineffective for failing to investigate, present, and argue mitigating circumstances at sentencing. (DE # 16, ¶ III.16, pp. 32-38; DE # 104, ¶ IV.E, pp. 95-97) Specifically, Zagorski claims that: 1) defense counsel failed to investigate and present evidence that Zagorski had a troubled childhood (DE # 16, ¶ III.16.a, pp. 32-34; DE # 104, ¶ IV.E, p. 98); 2) he never told defense counsel that he did not want mitigating evidence presented (DE # 16, ¶ III.16.b, p. 34; DE # 104, ¶ IV.E, p. 97); 3) he did not make an informed, knowing, intelligent, and voluntary decision not to present mitigating evidence at sentencing (DE # 16, ¶ III.16.c, pp. 34-35; DE # 104, ¶ IV.E, pp. 95-97)[30]; 4) defense counsel did not comply with the ethics opinion issued by the Board of Responsibility of the Supreme Court of Tennessee ("the Board of Professional

---

[30]   There are two paragraphs 16.c in the amended petition. Both pertain to the same issue. Therefore no distinction has been made between them.

Responsibility) (DE # 16, ¶ III.16.d, pp. 35-37);[31] 5) defense counsel did not present any of the evidence adduced at trial that would have supported a verdict of life rather than death (DE # 16, ¶ III.16.e., pp. 37-38; DE # 104, ¶ IV.D, pp. 92-95). Zagorski amplified claims 1) and 3) through 5) as shown below.

As to his first claim, Zagorski asserts further that defense counsel failed to investigate, present, and argue evidence that: 1) he came from a family in which there was a history of mental problems; 2) his family was at the bottom of the socio-economic ladder; 3) his family was dysfunctional; 4) he stuttered as a child; 5) he had a learning disability; 6) he turned to alcohol and drugs at an early age; 7) he suffered from major mental illness; 8) he had the love and support of an extended family and had been a loving child; 9) he was likely to make a positive adjustment to prison life and had previously been a model inmate; 10) he was a good worker and had a good work history. (DE # 16, ¶ III.16.a.1)-10), pp. 33-34)

With respect to his third claim, *i.e.*, that he never made an informed, knowing, intelligent, and voluntary decision not to present mitigating evidence, Zagorski also argues that the trial court never conducted a full hearing on the question of waiver. (DE # 16, ¶ III.16.c, pp. 34-35)

As to his claim that defense counsel failed to comply with the advisory ethics opinion issued

---

[31]     On February 23, 1984, the Board of Professional Responsibility issued Advisory Ethics Opinion 84-255 (DE # 9, Add. 3, Ex. 17) in response to defense counsels' inquiry pertaining to Zagorski's insistence that no mitigating evidence be presented at the penalty phase of the trial if he were convicted of the Dotson-Porter murders. In that advisory opinion, the Board of Professional Responsibility opined that counsel should: 1) advise Zagorski of his legal right to conduct a defense of his choice; 2) advise Zagorski that his choice of defenses was in conflict with defense counsels' moral beliefs and ethical responsibilities; 3) advise Zagorski that defense counsel would file a motion to withdraw from their representation if he persisted in his demands not to present any mitigating evidence; 4) advise Zagorski of the consequences of such an action; 5) inform the trial court of the conflict; 6) seek an adjudication of Zagorski's competency to represent himself during *voir dire*, the penalty phase of the trial, as well as any other part of the trial in which the conflict might arise; 7) move the court to withdraw from representing Zagorski during the part of the trial where the conflict arises in the event the conflict could not be resolved. On June 13, 1984, the Board of Professional Responsibility entered Formal Ethics Opinion 84-F-73 to this same effect. (DE # 9, Add. 3, Ex. 25) Although the informal ethics opinion was entered prior to trial, the formal ethics opinion was not entered until several months after the trial had concluded.

by the Board of Professional Responsibility, Zagorski maintains that: 1) by failing to comply with the ethics opinion, defense counsel violated his due process liberty interest in that opinion (DE # 16, ¶ III.16.d, pp. 35-36); 2) defense counsel did not inform the trial court of the ethics opinion (DE # 16, ¶ III.16.d.2), p. 36); 3) defense counsel did not take the steps necessary to determine whether Zagorski was competent to represent himself (DE # 16, ¶ III.16.d.4), pp. 36-37).

Finally, as to his claim that defense counsel failed to present mitigating factors in the record that would have supported a life sentence rather than a death sentence, Zagorski asserts that defense counsels' failure to do so was based on a misunderstanding of the trial court's ruling pertaining to the presentation of mitigation proof. (DE # 16, ¶ III.16.e, pp. 37-38) According to Zagorski, this misunderstanding resulted in defense counsels' failing to argue any of the mitigation proof raised during the guilt phase of the trial. (DE # 16, ¶ III.16.e, pp. 37-38)

The respondent argues that the following factual allegations pertaining to Zagorski's early personal life are procedurally defaulted: 1) his claims pertaining to his maternal aunt, maternal grandfather, and mercenary fantasies (DE # 100, ¶ IV.G.11.A, pp. 33; DE # 100, ¶ V.11.A, p. 33); 2) his claim about suffering from a mental illness (DE # 17, ¶ V.16.a.7), p. 20; DE # 100, ¶ IV.G.11.B, p. 33); 3) his claim that he had been a loving child (DE # 17, ¶ V.16.a.8), p. 20; DE # 100, ¶ IV.G.11.C, p. 33); 4) his claim pertaining to the ability to make a positive adjustment in prison (DE # 17, ¶ V.a.9), p. 20; DE # 100, ¶ IV.G.11.D, p. 34); 5) his claim pertaining to having a good work history (DE # 17, ¶ V.16.a.10), p. 20; DE # 100, ¶ IV.G.11.E, p. 34; 6) his claim that he never told defense counsel that he did not want any mitigation proof presented if he was convicted of first-degree murder (DE # 17, ¶ V.16.b, p. 34; DE # 100, ¶ IV.G.11.F, p. 34); 7) his claim that he did not make an informed, knowing, intelligent, and voluntary waiver of his right to present mitigating evidence (DE # 17, ¶¶ V.16.c, pp. 34-35; DE # 100, ¶¶ IV.G.11.G-H, p. 34); 8)

123

his claim that defense counsel failed to argue those mitigating circumstances that had been introduced into evidence during the guilt phase of the trial (DE # 17, ¶ V.16.e, pp. 37-38; DE # 100, ¶¶ IV.G.11.I-M, p. 34).

As to Zagorski's remaining claims, the respondent argues that the only claims litigated in state court were his claim that defense counsel failed to investigate and present mitigating factors pertaining to his character and background, less those enumerated 1) through 5) above, and his allegation that defense counsel failed to investigate and present mitigating evidence during the sentencing phase of the trial.  (DE # 17, ¶ V.16.d, pp. 21-22; DE # 100, ¶ IV.G, p. 35)  The respondent argues further that, in affirming the judgment of the trial court on the issues that were raised,  the Tennessee Supreme Court's ruling was not an unreasonable determination of the facts in view of the evidence, nor was it contrary to or an unreasonable application of federal law.  (DE # 100, ¶ IV.G.11, pp. 35-36; DE # 114, ¶ I.11, pp. 30-31)

Characterizing the respondent's procedural default argument as "unwarranted hairsplitting," Zagorski asserts that those claims to which the respondent refers as procedurally defaulted are not. (DE # 24, ¶ II.K, pp. 10-11)  Zagorski argues further that the Tennessee Supreme Court granted his application for permission to appeal on this issue and that the issue was briefed and addressed by that Court.  (DE # 24, ¶ II.K. pp. 10-11)

### 1.  Procedural Default

In his brief on appeal from the judgment of the post-conviction court, Zagorski argued that defense counsels' representation was deficient because they did not: 1) investigate and present mitigating evidence at sentencing, including mitigating factors in the record (DE # 9, Add. 4, Doc. 4A, ¶¶ IV.C.c and IV.C.c(2), (6), pp. 34-45); 2) seek a competency hearing (DE # 9, Add. 4, Doc. 4A,  ¶¶  IV.C.c  and  IV.C.c((4),  pp.  41-42,  45);  3)  comply  with  the  Board  of  Professional

124

Responsibility's ethics opinion (DE # 9, Add. 4, Doc. 4A, ¶¶ IV.C.c and IV.C.c(5), pp. 42-43, 45); 4) alert the trial court to the ethics opinion (DE # 9, Add. 4, Doc. 4A, ¶ IV.C.c, pp. 42-45); 5) ensure that Zagorski made a knowing and voluntary waiver of his right to present mitigating evidence at sentencing (DE # 9, Add. 4, Doc. 4A, ¶¶ IV.C.c and IV.C.c(3), pp. 42, 45); 6) subject the prosecution's case to adversarial testing (DE # 9, Doc. 4A, ¶ IV.C.c.(1), p. 45).

Although Zagorski did not argue every factual allegation associated with this claim, he discussed most of them in the summary of relevant facts in his brief. (DE # 9, Add. 4, Doc. 4A, ¶ IV.C.1, pp. 34-37) Although the summary of relevant facts does not constitute argument, the Court of Criminal Appeals nevertheless considered these aspects of his claim on the merits. (DE # 9, Add. 4, Doc. 4C, pp. 20-22) Moreover, Zagorski briefed this issue in the context of his character and childhood background in his brief in the Tennessee Supreme Court (DE # 9, Add. 4, Doc. 4G, ¶ IV.A1, pp. 8-12), and the Tennessee Supreme Court addressed these aspects of his claim in its opinion (DE # 9, Add. 4, Doc. 4H, pp. 5-6). Because this claim was raised and addressed on the merits by both the Court of Criminal Appeals and the Tennessee Supreme Court, it is not procedurally defaulted.

Moreover, a careful reading of Zagorski's brief on appeal from the judgment of the post-conviction court shows that he exhausted all but one of his remaining arguments, the single exception being the claim that Zagorski never told defense counsel that he did not want mitigating evidence presented in the event he was convicted of first-degree murder, ¶ 2), *supra* at p. 123. This claim was not raised by Zagorski in either his brief in the Court of Criminal Appeals or the Tennessee Supreme Court, nor did either court address the issue *sua sponte*. Therefore, for reasons previously explained, *supra* at pp. 16-27, Zagorski's claim that he never told defense counsel not to present mitigating evidence is procedurally defaulted for purposes of federal *habeas corpus*

125

review.

As to the remainder of the respondent's procedural default arguments (DE # 100, ¶¶ IV.G.11.G-M, p. 34), those arguments are without merit. Therefore, claims 1) and 3) through 5, *supra* at p. 123 are properly before the court.

### 2. Analysis of the Remaining Claims

The standard for reviewing claims of ineffective assistance of counsel are as previously set forth, *supra* at p. 104. In their opinions, both the Court of Criminal Appeals and the Tennessee Supreme Court properly identified *Strickland* as controlling in such inquiries. (DE # 9, Add. 4, Doc. 4C, pp. 15-16; Doc. 4.I, p. 7)

The Court of Criminal Appeals extensively analyzed this issue. (DE # 9, Add. 4, Doc. 4C, pp. 15-26) In its inquiry, the Court of Criminal Appeals analyzed the parties' arguments in depth (DE # 9, Add. 4, Doc. 4C, p. 17), the general duties of counsel in death penalty cases (DE # 9, Add. 4, Doc. 4C, pp. 18-19), the attorney-client relationship (DE # 9, Add. 4, Doc. 4C, pp. 19-20), the factual background pertaining to defense counsels' efforts to investigate mitigating proof (DE # 9, Add. 4, Doc. 4C, pp. 20-21), and the factual background pertaining to defense counsels' failure to present mitigation proof at sentencing (DE # 9, Add. 4, Doc. 4C, pp. 22-23).

In conducting its review, the Court of Criminal Appeals made the following factual determinations: 1) Zagorski had been properly informed by defense counsel at all stages of the proceedings regarding the ramifications of his desire not to present mitigation proof at sentencing (DE # 9, Add. 4, Doc. 4C, p. 24); 2) having been found competent by defense counsels' own psychiatrist, defense counsel were neither deficient, nor was Zagorski prejudiced, because defense counsel did not request a competency hearing (DE # 9, Add. 4, Doc. 4C, p. 24); 3) failure to follow

126

the Board of Professional Responsibility's advisory ethics opinion did not constitute ineffective assistance of counsel (DE # 9, Add. 4, Doc. 4C, pp. 24-25); 4) failure to argue mitigating factors in evidence on final argument did not constitute ineffective assistance of counsel (DE # 9, Add. 4, Doc. 4C, p. 26). With respect to Zagorski's claim that defense counsel failed to investigate and present proof regarding his character and background, the Court of Criminal Appeals, citing *Strickland* and noting that the jury found two aggravating circumstances in support of the death penalty, determined that Zagorski had failed to establish that he had been prejudiced. (DE # 9, Add. 4, Doc. 4C, pp. 21-22) As to Zagorski's claim that defense counsel failed to present any other mitigation proof at sentencing, the Court of Criminal Appeals determined that defense counsels' representation was not deficient for having adhered to Zagorski's "adamantly endorse[d] . . . position" (DE # 9, Add. 4, Doc. 4C, p. 23) Again citing *Strickland* and the two aggravating circumstances found by the jury, the Court of Criminal Appeals noted that, in any event, Zagorski once again had not demonstrated that he was prejudiced by defense counsels' representation. (DE # 9, Add. 4, Doc. 4C, p. 23)

As previously noted, the Tennessee Supreme Court also addressed this issue. As to Zagorski's claim that defense counsel failed to investigate and present mitigating evidence, the Tennessee Supreme Court concluded that Zagorski made an "intelligent and voluntary" decision to waive his right to have mitigating evidence presented on his behalf. (DE # 9, Add. 4, Doc. 4I, p. 11) The Tennessee Supreme Court considered the legal and constitutional importance of presenting mitigating evidence (DE # 9, Add. 4, Doc. 4I, pp. 7-8) in making the following factual determinations/conclusions of law: 1) defense counsel recognized the importance of exploring and presenting mitigating evidence (DE # 9, Add. 4, Doc. 4I, p. 8); 2) Zagorski knew that he faced the death penalty but nevertheless instructed his attorneys not to investigate and present any mitigating evidence on his behalf (DE # 9, Add. 4, Doc. 4I, p. 8); 3) the defendant has the ultimate and

127

exclusive authority to make decisions pertaining to his case, and those decisions are binding on the lawyer once the defendant has been properly advised of the potential consequences (DE # 9, Add. 4, Doc. 4I, pp. 8-10); 4) when a criminal defendant knowingly and voluntarily chooses a course of action, he is bound by that decision (DE # 9, Add. 4, Doc. 4I, p. 10); 5) defense counsels' representation in this case was reasonable despite Zagorski's chosen sentencing strategy (DE # 9, Add. 4, Doc. 4I, p. 10); 6) defense counsel made a strategic decision not to present the psychiatrists' testimony because it could have been damaging, *i.e.*, the psychiatrist, Dr. Bursten, advised defense counsel that there was nothing he could say on the witness stand that would help Zagorski, and that if he were called as a witness, he could end up having to testify that Zagorski could be a "mean person." (DE # 9, Add. 3, Vol. V, pp. 211-220; Add. 4, Doc. 4I, p. 10); 7) defense counsel advised Zagorski of the potentially devastating consequences of not presenting mitigating evidence (DE # 9, Add. 4, Doc. 4I, p. 10); 8) defense counsel had no difficulty in communicating with Zagorski and they consulted with him at every critical stage of the proceedings (DE # 9, Add. 4, Doc. 4I, p. 10); 9) defense counsel had no reservations about Zagorski's competency (DE # 9, Add. 4, Doc. 4I, p. 10).

Based on the foregoing factual determinations/conclusions of law, the Tennessee Supreme Court held that, under the facts of the case, defense counsels' performance did not fall below an objective standard of competence.[32] (DE # 9, Add. 4, Doc. 4I, p. 11)  Having determined that defense counsels' representation was not deficient, the Tennessee Supreme Court did not address

---

[32]   In addressing this issue, the Tennessee Supreme Court also addressed the informal ethics opinion.  Although the Tennessee Supreme Court expressed concern that defense counsel did not advise the trial court of the conflict, the Court nevertheless determined that "counsel acted both reasonably and competently in representing the petitioner instead of seeking to withdraw from [the] case." (DE # 9, Add. 4, Doc. 4J, p. 13)  In a footnote, the Tennessee Supreme Court also noted that defense counsels' "decision to remain on [Zagorski's] case was in accordance with EC 7-5, which permits counsel to continue representation 'even though the client has elected to pursue a course of action contrary to the advice of the lawyer,' provided the lawyer does not assist in illegal conduct or assert a frivolous legal position."  (DE # 9, Add. 4, Doc. 4J, p. 13 n. 9)

the issue of prejudice. (DE # 9, Add. 4, Doc. 4I, p. 11)

As shown above, in ruling on this issue, the Court of Criminal Appeals and the Tennessee Supreme Court made extensive factual findings, with one or both courts addressing each of the factual allegations that comprise this claim. Although Zagorski offers extensive argument on this issue, he has not established by clear and convincing evidence that those factual determinations were incorrect. Therefore, the court finds that the Tennessee courts' factual determinations are entitled to a presumption of correctness.

Moreover, Zagorski was not prejudiced. The evidence proving Zagorski's guilt on two counts of premeditated first-degree murder was overwhelming, and the evidence establishing the applicability of the two aggravating circumstances was equally strong. Therefore, given the evidence in this case, a reasonable probability does not exist that, but for defense counsels' failure to present mitigation evidence, the result of the sentencing phase of the trial would have been different. Because Zagorski has not established that he was prejudiced by defense counsels' representation, he has failed to establish that he received ineffective assistance of counsel. Therefore, the determination of the Tennessee courts on this issue is neither contrary to nor an unreasonable application of clearly established federal law.

As reasoned herein, Zagorski is not entitled to federal *habeas corpus* relief on this claim.

L. The Death Sentence in Zagorski's Case Was Imposed
Arbitrarily (Paragraph 17 of The Amended Petition
(DE # 16, pp. 38-39))

Zagorski alleges that the death penalty was imposed against him arbitrarily because the prosecution had previously offered Zagorski two life sentences in exchange for a guilty plea. (DE # 16, III.17, pp. 38-39) The respondent argues that this claim is procedurally defaulted. (DE # 17, ¶ V.17, p. 22; DE # 100, ¶ IV.G.12, p. 36; DE # 114, ¶ I.12, pp. 31-32) Zagorski admits that this

129

claim has never been presented in state court but argues that it is not procedurally defaulted because he did not violate a "valid, regularly and consistently applied and independent state procedural rule," and because he did "not 'knowingly and understandingly' fail to present the claim . . . ." (DE # 24, ¶ II.L, pp. 11-12; DE # 104, ¶ IV.A.2, p. 74) Zagorski also argues that this claim is not procedurally defaulted for the following reasons:

1)    He did not "violate a valid, regularly and consistently applied, adequate and independent state procedural rule (DE # 24, ¶ II.L, p. 11);

2)    He did not "'knowingly and understandingly' fail to present this claim as demanded by . . . . Tenn. Code Ann. ¶ 40-30-112(b)" (DE # 24, ¶ II.L, p. 11);

3)    There can be no procedural default "unless all similarly situated petitioners have been found defaulted by the state courts" (DE # 24, ¶ II.L, p. 12);

4)    "[A]n offer of life . . . renders the death sentence arbitrary and . . . ineligible for the death sentence," because the "petitioner is actually innocent of the death sentences" (DE # 104, ¶ V.A.2, p. 74);

5)    The error is structural in nature and, as such, makes him "a member of a class of persons for whom the death sentence is categorically prohibited – those [on] whom [the] death sentence was imposed after a clear offer of a life sentence" (DE # 104, ¶ V.A.2, p. 74);

6)    Federal courts may review procedurally defaulted claims if failure to do so would result in a "miscarriage of justice" (DE # 115, ¶ 5, p. 5); and,

7)    Zagorski can "still exhaust the claim in state courts under Tennessee's 'motion to reopen' procedure" (DE # 115, ¶ 5, p. 5).

130

With respect to Zagorski's argument that he violated no "adequate and independent" state procedural rule, Tenn. Code Ann. § 40-30-112(1982) in effect at the time in question – set forth in its entirety *supra* at p. 21 – provided that "a ground for relief is 'waived' if the petitioner knowingly and understandingly failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." *Id*. at (b)(1). The "waiver" statute also stated that "[t]here is a rebuttable presumption that a ground for relief not raised in any such proceeding which was held was waived." Tenn. Code Ann. §40-30.112(c). This unambiguous rule clearly established an adequate and independent state procedural rule that specified what constituted "waiver" at the time Zagorski filed his direct appeal. Moreover, for reasons already explained, *supra* at p. 25, Tennessee's waiver rule is a valid, regularly and consistently applied, adequate and independent state procedural rule.

Zagorski argues next that he did not "knowingly and understandingly" waive any claim. However, in *Coe*, 161 F.3d at 320, the Sixth Circuit, relying on *House v. State*, 911 S.W.2d 705 (Tenn. 1995), held that "waiver" under Tenn. Code Ann. 40-30-112(b) did not require a "knowing and understanding waiver." *Coe*, 161 F.3d at 331. The statute relied on in *House*, *i.e.*, Tenn. Code Ann. 40-30-112 (1990), was the same statute that was in force when Zagorski pursued his direct appeal. *House*, 911 S.W.2d at 706 nn. 2-3. Given that the Sixth Circuit relied on *House* in its opinion in *Coe*, there is no reason to conclude that the Sixth Circuit did not take the following reasoning in *House* into consideration:

> Considering the vast majority of Tennessee decisions applying waiver in the post-conviction context, and the relevant policy considerations, we conclude that the rebuttable presumption of waiver is not overcome by an allegation that the petitioner did not personally, knowingly, and understandingly fail to raise a ground for relief. Waiver in the post-conviction context is to be determined by an objective standard under which a petitioner is bound by the action

or inaction of his attorney.

*House*, 911 S.W.2d at 714. In a footnote to the foregoing, the Tennessee Supreme Court wrote, *inter alia*:

> We are not confronted with an alleged relinquishment of a fundamental constitutional trial right which may only be waived personally by a defendant . . . .

*Id.* at 714 n. 20 (citations omitted). That the Sixth Circuit considered the foregoing analysis is supported by the fact that the Sixth Circuit cited to the page in *House* on which this analysis appears. Moreover, given that the Tennessee Supreme Court made reference to the "vast majority of Tennessee decisions applying waiver" in the past, and its reference to the footnote in support of their holding, it is clear that the result would have been the same had the issue been before that court at the time of Zagorski's trial.

As to his argument that there can be no procedural default unless all similarly situated petitioners have been found defaulted by the state courts, apart from citing *Hathorn v. Lovorn*, 457 U.S. 255, (1982) (a voting rights case), Zagorski has offered no argument in support of his position and, as such, his argument is conclusory. The Sixth Circuit Court of Appeals has held that conclusory arguments, without supporting factual allegations or evidentiary support, do not provide a basis for relief in *habeas corpus*. *See Stanford*, 266 F.3d at 460 (citing *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir.1991)(bald assertions and conclusory allegations do not provide sufficient basis to hold an evidentiary hearing in federal *habeas corpus* proceedings).

As to arguments 4) and 5), these arguments go to the issue of whether Zagorski's sentence was imposed arbitrarily, not to the question of procedural default. Notwithstanding the fact that these two arguments do not pertain to procedural default, the court will address them nevertheless.

132

Zagorski cites four opinions in support of his argument that an offer of life renders the death sentence arbitrary and that, because he was first offered two life sentences if he entered a guilty plea, he is ineligible for the death sentence: *Sawyer v. Whitley*, 505 U.S. 333 (1992), *Sullivan v. Louisiana*, 508 U.S. 275 (1993), and *Penry v. Lynaugh*, 492 U.S. 302 (1989); *Van Tran v. State*, 66 S.W.3d 790 (Tenn. 2001). *Sawyer* stands for the proposition that "actual innocence" in the context of a death penalty case means that the petitioner is <u>actually innocent</u> of the death penalty. *Sawyer*, 505 U.S. at 339-348. *Sullivan* distinguishes between defects in the constitutional trial mechanism and those that defy analysis under the harmless error standard. *Sullivan*, 508 U.S. at 281. *Penry*, in turn, addresses the notion that applying the death penalty against a particular category of crimes and/or offenders is unconstitutional. *Penry*, 492 U.S. at 335-340. None of these cases, however, supports Zagorski's argument that, because he was first offered two life sentences in exchange for a guilty plea, he was ineligible for the death penalty and, as such, his death sentence was arbitrary. Finally, citing *Van Tran* for the proposition that a new rule of law constitutes grounds to reopen his post-conviction proceedings, there is nothing in *Sawyer*, *Sullivan*, or *Penry* that establishes a new rule of law that would permit Zagorski to reopen his post-conviction proceedings to exhaust this claim.

With respect to Zagorski's fifth argument, federal courts may, of course, review procedurally defaulted claims if failure to do so would result in a miscarriage of justice. As previously explained, however, a "miscarriage of justice" means "actual innocence" which, in the context of the death penalty, means being actually innocent of the death sentence itself, *i.e.*, of the aggravating circumstances that gave rise to the sentence of death. *Sawyer*, 505 U.S. at 347. Zagorski has not established that he is <u>actually</u> innocent of the death penalty, *i.e.*, that the two aggravating

133

circumstances in his case were applied improperly.  Therefore, this argument is without merit.

Finally, Zagorski argues that he can "still exhaust the claim in state courts under Tennessee's 'motion to reopen' procedure."  Because Zagorski has failed to establish any of the four circumstances required to reopen his post-conviction proceedings, *supra* at p. 20, this argument is without merit as well.

As explained above, each of Zagorski's arguments is without merit and, as such, the claim is procedurally defaulted for purposes of federal *habeas corpus* relief.

### M.  Prosecution's Misleading, Unconstitutional, and Fundamentally Unfair Statements to the Jury (Paragraph 18 of the Amended Petition (DE # 16, pp. 39-41))

Zagorski claims that the prosecution made "misleading, unconstitutional, and fundamentally unfair statements to the jury" in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments.  (DE # 16, ¶ III.18, pp. 39-42; DE # 24, ¶ II.M, pp. 12-13; DE # 104, ¶ V.C.2, pp. 113-115)  The respondent argues that the respondent's claims under the Sixth and Eighth Amendments are procedurally defaulted.  (DE # 17, ¶ V.18, p. 22)  Of the eight factual allegations comprising his claim under the Fourteenth Amendment, the respondent maintains that all but one are procedurally defaulted, most for failure to raise a contemporaneous objection at trial, a fact noted by the Tennessee Supreme Court on direct appeal.  (DE # 114, ¶ I.13, pp. 32-42; Add. 2, Doc. 2C, p. 19)  As to the one claim under the Fourteenth Amendment that the respondent admits is not procedurally defaulted, the respondent argues that the decision of the state courts was not an unreasonable determination of the facts in view of the evidence, nor was it contrary to or an unreasonable application of clearly established federal law.  (DE # 17, ¶ 18.a-h, pp. 22-25; DE # 100, ¶ IV.G.13, pp. 36; DE # 114, ¶ I.13, pp. 32-42)  Zagorski argues that those claims that the

134

respondent identifies a procedurally defaulted are not. (DE # 24, ¶ II.M, p. 12; DE # 104, ¶ V.C.115-116)

## 1. Procedural Default

In the amended petition, Zagorski raises the following claims pertaining to prosecution statements made during *voir dire* or at trial:

1) The prosecution improperly told prospective jurors during *voir dire* that it was the prosecution's "duty" to seek the death penalty, thereby cloaking the statement with an "aura of official authority" (DE # 16, ¶¶ III 18 and 18a.1)-3), pp. 39-40);*

2) The prosecution unfairly characterized the presumption of innocence as an "'advantage to the defendant" (DE # 16, ¶ III 18.b, p. 40);*

3) The prosecution misinformed prospective jurors that the mitigating circumstances "had to 'substantially'" outweigh the aggravating circumstances before a life sentence could be returned, and that it was up to the defense to present many mitigating circumstances (DE # 16, ¶ III.18.c, p. 40);*

4) The prosecution made a "fundamentally unfair and untrue argument" that Zagorski would present a danger if sentenced to life, when no proof to that effect had been introduced (DE # 16, ¶ III.18.d, pp. 40-41);*

5) The prosecution made a "fundamentally unfair argument" at sentencing when the jury was told that "if this jury sitting in this box, each one of you individually, cannot follow the law and render a death verdict in this case and find it isn't warranted, our system is in bad shape . . . ." (DE # 16, ¶ III.18.e, p. 41);*

6) The prosecution argued improperly that the death penalty

135

should be imposed to prevent Zagorski from "playing cards with other inmates, getting mail or visitors, talking on the phone, or watching television in prison" (DE # 16, ¶ III.18.f, p. 41);*

7) The prosecution called the defense argument at sentencing "begging, thereby denigrating mercy" (DE # 16, ¶ III.18.g, p. 41); and,

8) The prosecution argued improperly that the death sentence should be imposed because Zagorski showed no remorse for the murders (DE # 16, ¶ III.h, p. 41).*

The respondent argues that those claims with an asterisk (*) above are procedurally defaulted. (DE # 114, ¶¶ 13A-F, H, pp. 33-39, 41-42)

A review of Zagorski's brief on direct appeal shows that he raised the following claims pertaining to prosecution statements either during *voir dire* or at trial:

1) The prosecution improperly advised prospective jurors during *voir dire* that Zagorski had the advantage of the presumption of innocence (DE # 9, Add. 2, Doc. 2.A, ¶ 10, pp. 3-55);

2) The prosecution's repeated reference to the twelve statutory aggravating circumstances to prospective jurors during *voir dire* was prejudicial (DE # 9, Add. 2, Doc. 2.A, ¶ 11, pp. 3, 56);

3) The prosecution's repeated reference to the "cruel, atrocious, and heinous" aggravating circumstance in front of prospective jurors during *voir dire* was prejudicial to Zagorski (DE # 9, Add. 2, Doc. 2.A, ¶ 12, pp. 3, 57):

4) The prosecution misled prospective jurors during *voir dire* by telling them "that they were only to consider the death penalty and that the jurors could always return a life

136

sentence" (DE # 9, Add. 2, Doc. 2.A, ¶ 21, pp. 5, 72)

5)     The prosecution misled prospective jurors by telling them during *voir dire* that they could consider both the death penalty and life imprisonment, and then telling the jury at the conclusion of the sentencing phase of the trial that it was the jury's duty to return the death penalty (DE # 9, Add. 2, Doc. 2.A, ¶ 22, pp. 5, 73);

6)     The prosecution's reference to defense counsels' closing remarks as "begging" was improper (DE # 9, Add.2, Doc. 2.A, ¶ 33, pp. 6-7. 88); and,

7)     The prosecution's closing argument at the sentencing phase of the trial was improper, prejudicial, and harmful when the prosecution characterized Zagorski, if he were sentenced to life: a) playing cards with his fellow inmates; b) receiving mail; c) having visitors; d) receiving telephone calls; e) watching television; e) bragging to his fellow inmates about killing the victims (DE # 9, Add. 2 Doc. 2.A. ¶ 34, pp.7, 89-90).

Zagorski argues that the claims before the court are not procedurally defaulted. (DE # 104, ¶ V.C.3, pp. 115-116) First, Zagorski argues that the record shows that the claims at issue were raised and fully adjudicated in state court. (DE # 104, ¶ V.C, p. 16) However, a comparison of those claims that Zagorski raised on direct appeal with those that he raised in these proceedings shows that claims3)-5) and 8), *supra* at pp. 136-137, *i.e.*, those claims marked by an asterisk, were not raised on direct appeal. Zagorski argues next that it can be inferred from the record that these claims were reviewed when the Tennessee Supreme Court wrote that, after "consideration of . . . the entire record," there was "no reversible error." However, as previously established, *supra* at pp. 21-22, the Tennessee Supreme Court's plain error review does not excuse the procedural default. For these reasons, and for reasons previously explained, *supra* at pp. 16-27, claims 3)-5) and 8) are procedurally defaulted for the purposes of federal *habeas corpus* review.

137

As to claims 1)-2) and 6), *supra* at pp. 136-137, the respondent argues that these claims are procedurally defaulted because defense counsel did not make a contemporaneous objection at the time the statements were made. The court does not view these claims as waived. Specifically, although the Tennessee Supreme Court mentioned in general defense counsels' failure to raise contemporaneous objections, that Court did not make an unambiguous determination that these claims were procedurally defaulted but, instead, considered them on the merits. (DE # 9, Add. 2, Doc. 2C, pp. 14, 19) Accordingly, the respondent's procedural default argument as to claims 1)-2) and 6) is without merit.

## 2. Analysis of The Remaining Claims

To establish plain error on a claim for prosecutorial misconduct, Zagorski must show that the comments made by the prosecutor were improper and so flagrant that, when viewed in context, they would undermine the fundamental fairness of the trial and contribute to a miscarriage of justice. *United States v. Young,* 470 U.S. 1, 16 (1985); *United States v. Beverly,* 369 F.3d 516, 543 (6th Cir. 2004). In considering whether the prosecutor's statements were flagrant, thereby rendering the trial fundamentally unfair, the court evaluates four factors: 1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; 2) whether the conduct or remarks were isolated or extensive; 3) whether the remarks were deliberately or accidentally made; 4) whether the evidence against the defendant was strong. *United States v. Modena,* 302 F.3d 626, 635 (6th Cir. 2002)(citing *United States v. Carter,* 236 F.3d 777, 783 (6th Cir.2001)); *see also United States v. Monus,* 128 F.3d 376, 394 (6th Cir.1997).

On direct appeal, the Tennessee Supreme Court wrote the following with respect to the prosecution's statements during *voir dire*: "We have carefully considered each of the contentions and have found them to be without merit." (DE # 9, Add. 2, Vol. 2C, p. 14) This determination

pertains to Zagorski's claim on direct appeal that the prosecution improperly told the prospective jurors that it was the prosecution's duty to seek the death penalty and that the prosecution unfairly characterized the presumption of innocence as an advantage to the defendant.

As to comments made by the prosecution during closing arguments, the Tennessee Supreme Court wrote:

> As to the closing argument of the prosecution, no objection was made by counsel at the time of argument. However, we have considered each statement of the district attorney general in context, and find that they are within the bounds of propriety and in accord with the evidence, and that the arguments did not prejudice the defendant or deprive him of any rights.

(DE # 9, Add. 2, Doc. 2C, p. 19)  This determination pertains to Zagorski's claim challenging remarks made in closing argument where the prosecution portrayed the manner in which Zagorski would serve his sentence if given life imprisonment, *i.e.*, playing cards, getting mail, having visitors, watching television, etc., and the prosecution's characterization of the defense's closing argument as "begging."

As to claim 1), Zagorski alleges that the prosecution improperly advised prospective jurors during *voir dire* that "it was the prosecution's 'duty' to seek the death penalty, thus unfairly giving an aura of official authority . . . ."  (DE # 16, ¶ III.a, p. 39)  According to Zagorski, this amounted to interposing "prosecutorial expertise" into the argument, thereby implying that the prosecution, or higher authority, has already made the . . . decision" that the death penalty is required.  (DE # 16, ¶¶ III.a.1)-3), pp. 39-40)

In support of his claim, Zagorski refers to the prosecution's specific remarks on pages 14, 53, 94, 182, 208, 270, 413 of the transcript of *voir dire* (DE # 9, Add. 1, Vols. I-III).  The statements on those pages are quoted below:

139

1)    "In this case, as Judge Kelly has already pointed out to you, the State is in the position through the facts of this case – it has become my duty to ask for the death penalty in this case against Mr. Zagorski. This is a very serious affair for all of us." (DE # 9, Add. 1, Vol. I, p. 14)

2)    "As you already know by now, it has become our duty to ask for the death penalty in this case against Edmund George Zagorski. This is a very, very serious undertaking for us . . . ." (DE # 9, Add. 1, Vol. I, p. 53)

3)    "[B]ased upon what I anticipate that the proof will develop in this case, it's the State's duty in this case to ask for the death penalty. It's a very serious matter for everybody involved." (DE # 9, Add. 1, Vol. 1, p. 94)

4)    "[I]t's the State's duty in this case to ask for the death penalty, and it's a serious matter for everyone involved . . . ." (DE # 9, Add. 1, Vol. II, p. 182)

5)    "[I]t's the State's duty in this case to ask for the death penalty. It's a serious matter for everybody involved . . . ." (DE # 9, Add. 1, Vol. II, p. 208)

6)    "[H]earing this case is not something that's going to be pleasant for anybody, but still we're citizens of the United States and we have a duty, and I'm just asking you if you can live up to your duty and your oath as a juror to take the facts that you find and be guided by the law that the Judge gives you and determine what should be done." (DE # 9, Add. 1, Vol II, p. 270)

7)    "Now, ladies and gentlemen, it's become the duty of Mr. Gay and myself as representatives of the State of Tennessee to seek the death penalty in this case on behalf of the people of the State of Tennessee, which is a very, very serious grave responsibility . . . ." (DE # 9, Add. 1, Vol. III, p. 413)

The prosecution's statements above neither mislead the potential jurors nor prejudiced

Zagorski.  Telling prospective jurors that it is the prosecution's responsibility to seek the death penalty under the law is not the same thing as telling the prospective jurors that it is their responsibility to return the death penalty.  Moreover, there is nothing in these statements that prejudiced Zagorski.  On the contrary, the prosecution very clearly expressed the seriousness of the matter that would be before them, not that it was important that they sentence Zagorski to death.  Of the seven statements quoted above, only the statement in 6) falls outside the context of the prosecution's duty and the seriousness of the matter.  However, the statement in 6) cannot be said to mislead the jury by inferring that it was their duty to return the death sentence.  Rather, the statement merely advises the jurors that it is their duty to live up to their duty and their oath, "be guided by the law," and "determine what should be done."  Because these statements at issue did not mislead the potential jurors, or prejudice Zagorski, the court finds that they neither undermined the fundamental fairness of Zagorski's trial nor contributed to a miscarriage of justice.

Zagorski's second claim, 2), pertains to the statement that the presumption of innocence is an "advantage" to Zagorski.  The relevant portion of the record is quoted below:

> MR. WHITLEY:  Mr. Zagorski, the defendant, like all defendants in all criminal cases in this state is presumed at this point to be innocent. When a person is charged with a crime, he's presumed to be innocent until the facts at trial prove him to be guilty.  Do you understand that?

> (Whereupon, jurors nodded in the affirmative.)

> MR. WHITLEY:  That's the advantage that he has, and that's the advantage that we all want.  If we ever got accused of anything, we'd want to be presumed to be innocent right off the bat.  Like in France or some of these other countries, it's up to the defendant to prove that he's not guilty, and that's pretty tough to do.  Even though he has that advantage, he doesn't have the advantage of having the benefit of more of a fair trial than the State is supposed to have; in other words, the State is entitled to just as fair a trial as Mr. Zagorski is.

(DE # 9, Add. 1, Vol. I, pp. 139-140)  This statement neither misleads the prospective jurors into believing  that the presumption of innocence was unfair to the prosecution, nor did it prejudice Zagorski by leading the prospective jurors to conclude that they should somehow view the presumption of innocence against him.  Rather, taken in context, the statement merely points out the advantages that criminal defendants have in the United States over citizens in other countries. Because these statements at issue did not mislead the potential jurors, or prejudice Zagorski, the court finds that they neither undermined the fundamental fairness of Zagorski's trial nor contributed to a miscarriage of justice.

Zagorski's third claim, 6), pertains to the following statement made by the prosecution during closing argument:

> [Zagorski] shows so little regard for human life, that he did what he did to Dotson and Porter.  He didn't want to face the music in Ohio; that he, in order to avoid arrest, just tried his best to kill Mr. Hall, Estes Hall.  Now, is it enough for Mr. Zagorski to be given a life sentence and go down to the state penitentiary and play his cards and deal out cards with his fellow convicts and get phone calls and have visitors, get mail, watch television down there and brag about how he killed two people in Robertson County, Tennessee; how he shot them, zip, zip; how he slit their throats with his dagger, his knife; be talking about that to his fellow convicts, or not?  Or is it better to follow the law in this case and give Mr. Zagorski what he deserves in this case?

(DE # 9, Add. 1, Vol. IX, pp. 1124-1125)  Although it is clear from the prosecution's argument that the statement was somewhat inflammatory, the statement cannot be said to have misled the jury. Although the statement at issue also is not an isolated remark in the context of the prosecution's overall argument, neither can it be said to have been part of an extensive pattern of inflammatory remarks.  Clearly, the remark was deliberate as well.  Notwithstanding the foregoing, it remains that the evidence against Zagorski was overwhelming.  Consequently, the court finds that the remark did

not undermine the fairness of the trial at sentencing, nor did it contribute to any miscarriage of justice.

The thrust of Zagorski's final claim, 7), is that, by characterizing the defense's closing argument as "begging," the prosecution "denigrated mercy, which is a proper . . . mitigating circumstance and a legitimate basis for imposing a sentence of life in a capital case." (DE # 104, ¶ V.C.2.e, p. 114)  In addressing this claim, it is important to establish the context in which the prosecution characterized the defense's closing argument as "begging."  During closing argument, defense counsel made the following statements:

> The sentence of death is something that us, as a group, individually, will be dealing with; what you decide as a group, for the remainder of our lifetime.  ***In making that decision I ask you, I beg you***, to have compassion, to see that the death penalty will not accomplish the ends of justice.  The death penalty will present problems.  You can accomplish what you want to do, and I know what you want to do, in punishing this man.  Society will be protected; my family, my friends, your family and friends.  They will be protected from this man you found guilty.
>
> . . .
>
> Can you be convinced beyond a reasonable doubt that death by electrocution is the answer to this problem?  It is a tremendous responsibility.  I know that – realizing that none of us are perfect, the State can make a mistake in the trial of a lawsuit, the defense can make a mistake in the trial of a lawsuit, the Judge can make a mistake; ladies and gentlemen of the jury, you can make a mistake.  But the decision of life or death rests squarely on your shoulders.  I do not envy you. I don't mind telling you, ***I am begging, absolutely begging, for this man's life.***

(DE # 9, Add. 1, Vol. IX, pp. 1116-1117)(emphasis added)

> ***I submit to you that you can give life here tonight, if you will.  I'm begging, too***. . . .  [I]f that man is killed, there's no coming back.  It's final.  It doesn't matter if somebody has confessed.  If somebody else confesses, it doesn't matter.  It can't be undone.

143

So I say to you, not with my head, but with my heart, *I beg you to spare this man's life*.  I wish I could think of something else to tell you, but I can't.  I just ask for your mercy and your understanding and your love and your care for one of God's creatures. . . .

(DE # 9, Add. 1, Vol. IX, pp. 1119-1120)(emphasis added)

The prosecution made the following statements in its response to the defense's closing argument:

*I wish, if there was any begging to be done, that I could have done a little begging on April the 23rd of 1983.  I wish I could have been out there and begged Ed Zagorski not to shoot Mr. Dotson and Mr. Porter, kill them*; not to take his knife out and cut their throats and leave them lying there dying, gasping, bleeding to death; not to take off with their money to Ohio.  *That's when the begging should have been done.  it's too late to beg now.*

*I think it's appropriate for Mr. Walton and Mr. Wilks to beg, and I appreciate them for doing that*.  They're doing the best they can with what they have.  Mr. Walton mentioned the Bible, mentioned an eye for an eye.  Don't go on that theory, he asked you.  But we're not talking here about the Bible.  We're talking about morality – we are talking about that – and we are talking about the law.

. . .

You've heard about aggravating circumstances, and I've talked about it from day one.  You heard about mitigating circumstances, but on your oaths have you heard any mitigating circumstances?  *Was one mitigating circumstance even mentioned by the defense attorneys when they were begging with you?*  Not one.  I say to you there is not a mitigating circumstance in this case.  You haven't been reminded of a mitigating circumstance or even intimated to by the attorneys of a mitigating circumstance.

(DE # 9, Add. 1, Vol. IX, pp. 1120-1121)(emphasis added)

I don't know what else to say. . . .  *I'm not going to beg you but what I want, and I think most of us lawyers do, judges, citizens, is that the law is obeyed* because, as I said earlier in this trial, that if this jury

144

> sitting in this jury box, each one of you individually, cannot follow the
> law and render a death verdict in this case and find it isn't warranted,
> our system is in bad shape. those are hollow words, I know, ladies and
> gentlemen, but I would like to challenge you and remind you of your
> oaths.

(DE # 9, Add. 1, Vol. IX, p. 1125)

As to the first factor, the court is of the opinion that the prosecution's characterization of the defense's closing argument did not mislead the jury. The defense did, in fact, "beg" during closing argument on at least four separate occasions. The court also concludes that the prosecution's responsive argument did not prejudice Zagorski by denigrating "mercy," a valid mitigating consideration. In fact, the defense did ask for mercy, and the prosecution did nothing to denigrate that plea.

In examining the other relevant factors, it also is clear from the record that the prosecution's argument was a deliberate response to the defense's argument and was not isolated. However, the evidence of guilt against Zagorski was very strong, two aggravating circumstances having been amply demonstrated by the evidence presented during the guilt phase, and the defense offered no mitigation proof at sentencing.

On balance, the prosecution's characterization of the defense's argument as "begging" did not undermine the fundamental fairness of the trial, nor contribute to a miscarriage of justice. Moreover, the Tennessee Supreme Court's ruling on the aforementioned claims was not an unreasonable determination of the facts in view of the evidence, nor was it either contrary to or an unreasonable application of clearly established federal law. Accordingly, Zagorski is not entitled to federal *habeas corpus* relief on these grounds.

N. Trial Court Error in Not Providing Funds for Investigative and
Expert Assistance (Paragraph 19 of the Amended Petition

145

Zagorski claims that the trial court erred in denying the defense team's request for funds to hire investigative and expert assistance in violation of Zagorski's rights under the Sixth, Eighth, and Fourteenth Amendments. (DE # 16, ¶ III, p. 42) Three factual allegations comprise this claim. First, Zagorski asserts that the trial court erred in not providing funding to hire an investigator. (DE # 16, ¶ III.19 & 19.a, p. 42) Second, Zagorski claims that the trial court erred in not providing funding to hire a ballistics expert. (DE # 16, ¶ III.19 and 19.b, p. 42) Finally, Zagorski alleges that the trial court's rulings on funding rendered defense counsel ineffective because, apparently owing to the court's previous rulings denying the defense's funding requests, defense counsel did not request funding to hire expert "pathologist, criminologist or other medical forensic" assistance. (DE # 16, ¶ III.19 and 19.c, p. 42) The respondent argues that this claim was determined on post-conviction to have been waived and, as a consequence, it is procedurally defaulted. (DE # 17, V.19, p. 25; DE # 100, ¶ IV.G.14, p. 37; DE # 114, ¶ I.14, pp. 42-43) Zagorski argues that this claim is not procedurally defaulted. (DE # 24, ¶ II.N, p. 13)

### 1. Failure to Provide Funds to Hire an Investigator

Inviting the court's attention to page 51 in his brief on direct appeal (DE # 9, Add. 2, Doc. 2A, p. 51), Zagorski argues that his claim pertaining to the trial court's failure to provide funds to hire an investigator is not procedurally defaulted (DE # 24, ¶ II.N, p. 13). However, the issue on page 51 of Zagorski's brief on direct appeal is that the trial court erred in not granting his request for funding to hire a ballistics expert, not that the trial court erred in refusing to provide funding for an investigator. (DE # 9, Add. 2, Doc. 2A, p. 51) There is nothing in the issue as it was presented on direct appeal, or anywhere else in Zagorski's brief, pertaining to Zagorski's claim that the trial court's refused to provide funding for an investigator.

146

Zagorski did raise this claim on appeal from the judgment of the post-conviction court. (DE # 9, Add. 4, Doc. 4A, ¶ IV.D, pp. 45-49) The Court of Criminal Appeals determined, however, that this claim was waived because it should have been raised on direct appeal. (DE # 9, Add. 4, Doc. 4.C, p. 28) In his application for permission to appeal the judgment of the Court of Criminal Appeals, Zagorski raised this issue again. (DE # 9, Add. 4, Doc. 4D, pp. ¶ IV.D, pp. 46-49) The Tennessee Supreme Court granted Zagorski's application for permission to appeal, but not with respect to the claim at issue. (DE # 9, Add. 4, Doc. 4F)

Zagorski argues that this claim is not procedurally defaulted for two reasons: first, that there is no adequate and independent state procedural rule which would preclude federal *habeas corpus* review of this claim; second, the Court of Criminal Appeals addressed the issue on the merits. (DE # 24, ¶ II.N, p. 13) For reasons previously explained, *supra* at pp. 25-26, Zagorski's first argument is without merit. Specifically, Tennessee has an adequate and independent state procedural rule that precludes federal *habeas corpus* review, and that rule is regularly applied.

As to Zagorski's second argument, the Court of Criminal Appeals stated the following in its opinion on appeal from the judgment of the post-conviction court:

> We first note that the issue relating to the private investigator . . . was not raised on direct appeal. Accordingly, this issue is waived pursuant to Tenn. Code Ann. § 40-30-112(b)(1) . . . .

(DE # 9, Add. 4, Doc. 4C, p. 28)(citation omitted) Having concluded that the issue was waived, the Court of Criminal Appeals nevertheless noted:

> There is . . . no showing as to what significant information a private investigator would have discovered that was not known by defense counsel as a result of their own investigation.

(DE # 9, Add. 4, Doc. 4.C, p. 29) This statement, which Zagorski appears to view as addressing the

147

issue on the merits, followed the Court of Criminal Appeals' "clear and express" statement of its reliance on state procedural grounds and, if anything, it is an alternative holding. As previously established, *supra* at p. 26, an alternative holding will not excuse procedural default. Because Zagorski does not argue cause and prejudice, and because he has not established that he is actually innocent, this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

## 2. Funding for a Ballistics Expert

Zagorski argued on direct appeal that funding for a ballistics expert was required to contest whether the spent .308 cartridges entered into evidence were fired by the same weapon. (DE # 9, Add. 2, Doc. 2A, p. 51) However, the record shows that the Tennessee Supreme Court did not address this issue, even though Zagorski raised it on direct appeal. (DE # 9, Add. 2, Doc. 2C) The Court of Criminal Appeals subsequently concluded – erroneously – that Zagorski did not raise the issue of funding for a ballistics expert on direct review and, as such, the claim was waived. (DE # 9, Add. 4, Doc. 4C, p. 28)

That the Tennessee Supreme Court neglected to consider this issue on direct appeal does not count against Zagorski for purposes of exhaustion. *See Clinkscale v. Carter*, 375 F.3d 430 (6th Cir. 2004)(a petitioner is only required to raise his claims in the state's highest courts; exhaustion does not require the state court actually to adjudicate the merits of the claim). Accordingly, even though this part of Zagorski's claim has not been reviewed by the state courts, Zagorski is nevertheless deemed to have exhausted this claim because of the Tennessee appellate courts' error.

The court notes that, in the instant proceedings, Zagorski asserts that a ballistics expert was required to "undertake a comprehensive analysis of the ballistic evidence, including demonstrating

the falsity of the prosecution's claims concerning the ejection and location of [the] casings."[33]  (DE # 16, ¶ 19.b, p. 42)  Although the issue pertaining to the ballistics expert on direct appeal differs from that argued in these proceedings, the court construes the two to be sufficiently similar to withstand further procedural default scrutiny.  The question becomes, then, whether the trial court's refusal to provide funding for a ballistics expert amounted to a violation of Zagorski's constitutional right to a fair trial on the two grounds alleged.  The standard for determining trial court error is whether the alleged error was "harmless" beyond a reasonable doubt as set forth in *Chapman,* 386 U.S. at 18.

### a.  The Distance That the Spent .308 Cartridges Were Ejected

When funding for a ballistics expert was denied, defense counsel obtained the services of Colonel John Oliver, a twenty-four year Army veteran stationed at Fort Campbell, Kentucky, to test fire Zagorski's HK-91.  (DE # 9, Add. 1, Vol. VII, p. 963)  Colonel Oliver was not offered as an expert witness, although his testimony established that he was experienced with firearms similar to the HK-91.  As the Court of Criminal Appeals correctly noted in its opinion on appeal from the judgment of the post-conviction court, Colonel Oliver testified "that the weapon would not have ejected the shells in the pattern demonstrated by the state's proof." (DE # 9, Add. 4, Doc. 4C, p. 28) (DE # 9, Add. 1, Vol. VII, pp. 966-967)  More particularly, Colonel Oliver testified that he fired six rounds with Zagorski's HK-91 and that all of the spent cartridges ejected approximately forty feet from the gun.  (DE # 9, Add. 1, Vol. VII, pp. 966-967)

For their part, the prosecution presented evidence as to the pattern in which spent .308 cartridges were ejected from the HK-91 through the testimony of Detective Perry.  (DE # 9, Vol. VI,

---

[33]  To the extent that Zagorski's use of the term "including" in the context of this claim is intended to imply claims other than those specified, such vague expressions are inconsistent with Rule 2(c), Rules – Section 2254 Cases, which provides that "[t]he petition must . . . specify all the grounds for relief available to the petitioner . . . [and] state the facts supporting each ground . . . ."  *Id.* at § (c)(1)-(2).

pp. 874, 892-193) Detective Perry, who had been a Detective for less than six months, and who had worked at the Robertson County Sheriff's Office for little more than five years at the time of the trial, testified that he had no prior military experience and that he was neither a firearms expert in general nor an expert on the HK-91 in particular. (DE # 9, Vol VI, pp. 931-934) Detective Perry, who fired seven rounds from the HK-91, testified that the spent cartridges fell between three and forty-three feet from the weapon – the later the shot, the greater the distance. (DE # 9, Add. 1, Vol. VII, pp. 891-892)

The record shows that no expert testimony was adduced at trial by either the prosecution or the defense regarding the pattern in which spent cartridges would have been ejected from the HK-91. The court concludes that, given his background, Colonel Oliver's testimony called the results of the novice Detective Perry's test-firing of the HK-91 into doubt, thereby effectively challenging that part of the prosecution's case. The court finds, therefore, that the trial court's failure to provide funding to hire a ballistics expert to determine the distance that the spent .308 cartridges were ejected from the HK-91 was harmless beyond a reasonable doubt and, as such, did not deny Zagorski a fair trial. Zagorski is not entitled to *habeas corpus* relief on these grounds.

### b. Whether the Spent .308 Cartridges Were Fired from the Same Weapon

As to the second half of this claim, evidence adduced at trial regarding whether the spent cartridges in question had been fired from the same weapon was introduced through the expert testimony of Tommy Heflin, a TBI firearms expert. (DE # 9, Vol. VII, pp. 949-960) The evidence involved three cartridges: the first was provided by Hickman County investigator Jeff Long, who received it from Blackwell; the second was recovered at the murder scene; the third was provided by Detective Perry after he test fired the HK-91. (DE # 9, Vol. VII, pp. 953-954) According to Heflin, microscopic analysis established that all three cartridges had been fired by the same weapon –

150

Zagorski's HK-91.  (DE # 9, Vol. VII, pp. 955-956)

Assuming for the sake of argument that a ballistics expert could have mounted a successful challenge to Heflin's testimony, the fact remains that a successful challenge would have resulted in eliminating but a single piece of circumstantial evidence from the mix, thus leaving the jury with still-substantial evidence of Zagorski's guilt.  Because of the strength of the remaining evidence arrayed against Zagorski, the court finds that any error by the trial court in not providing funding for a ballistics expert to challenge whether the spent cartridges introduced at trial were fired from Zagorski's HK-91 was harmless beyond a reasonable doubt.  Accordingly, Zagorski is not entitled to *habeas corpus* relief on these grounds.

### 3. Funding for Expert Pathology, Criminology, Medical, or Forensic Assistance

Although unclear from the petition, this claim appears to be two-fold: first, that the trial court's error in not providing funding for the expert assistance at issue created an environment that caused defense counsel to provide ineffective assistance of counsel, *i.e.*, an allegation of trial court error; and/or second, that defense counsel were *per se* ineffective for not requesting expert pathology, criminology, medical, or forensic assistance because the trial court had previously denied similar requests for funding.

To the extent that this claim pertains to an allegation of trial court error, this claim was not raised on direct appeal when it should have been.  (DE # 9, Add. 4, Doc. 4C, p. 28)  As in the instance of the trial court's refusal to provide funding for other expert services, the Court of Criminal Appeals determined that this claim was waived.  (DE # 9, Add. 4, Doc. 4C, pp. 28-29)  The record shows that, in an alternative holding, the Court of Criminal Appeals nevertheless determined that Zagorski had not demonstrated that he was prejudiced because the trial court would not fund expert

151

assistance. However, as previously established, *supra* at p. 26, an alternative holding will not excuse procedural default. Because Zagorski does not argue cause and prejudice, and because he has not established that he is actually innocent, this aspect of this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

To the extent this claim alleges ineffective assistance of counsel, the record shows that Zagorski raised this claim on appeal from the judgment of the post-conviction court. (DE # 9, Add. 4, Doc. 4A, pp. 34-37) In his brief on appeal from the judgment of the post-conviction court, Zagorski couched his ineffective assistance claim in the following terms:

> [T]rial counsel failed to request the trial court's permission to hire a pathologist, criminologist, medical experts and/or a forensic expert to help in the trial of this matter. All of these experts would have been crucial to both the guilt and sentencing phases of this case. . . . Mr. Zagorski did not receive effective assistance of counsel because of . . . trial counsel's failure to request expenditures for these experts.

(DE # 9, Add. 4, Doc. 4A, pp. 45-46) In addressing this claim – in the context of trial court error – the Court of Criminal Appeals wrote:

> [P]etitioner has demonstrated no prejudice as a result of the denial of funds for the various expert witnesses. . . . Specifically, there is no showing as to what the testimony of a . . . pathologist, criminologist, medical expert and/or forensic expert would be.

(DE # 9, Add. 4, Doc. 4C, pp. 28-29)

At the post-conviction evidentiary hearing, defense counsel testified only in generalities as to the importance of obtaining the services of experts, *e.g.*, "[i]t would have been nice to have had another professional to try to balance [Dr. Harlan's] expertise or to at least consult with us"; "[a]s much as we would have liked to have had another medical doctor, pathologist, we didn't have one"; "[w]e would have liked to have had somebody like Dr. Harlan to have looked at this case and been

152

our consultant that we could have put on the stand."  (DE # 9, Add. 3, Vol. V, pp. 198-202)  The transcript of defense counsels' testimony at the post-conviction evidentiary hearing, as reflected by the foregoing excerpts, reveals that no effort was made to elicit from defense counsel how the experts at issue would have been employed, what evidence defense counsel expected to develop through those experts, or how defense counsel believed the results of the trial would have differed had such assistance been obtained.[34]

Because Zagorski failed to establish at the post-conviction evidentiary hearing how the expert services at issue would have been used, or what difference they would have made in the outcome of his trial, the Court of Criminal Appeals concluded that Zagorski had not "demonstrated . . . ***prejudice*** as a result of the denial of funds for the various expert witnesses" that he argues defense counsel should have sought.  (DE # 9, Add. 4, Doc. 4C, p. 28)(emphasis added)  As shown above, the transcript of the proceedings at the post-conviction evidentiary hearing supports that determination. (DE # 9, Add. 4, Doc. 4C, p. 29)

The Court of Criminal Appeals made its "no prejudice" determination in the context of alleged trial court error, not in the context of alleged ineffective assistance of counsel.  However, as previously established, the standard for determining prejudice in allegations of trial court error under *Chapman* is "harmless beyond a reasonable doubt," *supra* at p. 150, whereas the standard for "prejudice" under *Strickland* is "a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different," *supra* at p. 104.  As *Chapman's*  "beyond a reasonable doubt" standard is more stringent than *Strickland's* "reasonable probability" standard,

---

[34]    In his brief on appeal from the judgment of the post-conviction court, Zagorski writes that he "requested funds to hire experts" for the post-conviction evidentiary hearing but that his "request was . . . denied."  (DE # 9, Add. 4, Doc. 4A, p. 46)  However, a review of the technical record does not reveal that Zagorski filed any motions for expert assistance on post-conviction.  (DE # 9, Add. 3, Vol. I, PC Tech. Record)  Neither has Zagorski filed an exception to the record of state proceedings filed by the respondent, challenging the completeness of those records.

153

Zagorski cannot establish that he was prejudiced within the meaning of *Strickland* and, as such, he cannot establish that he received ineffective assistance of counsel in the context of this claim.

As reasoned above, Zagorski has not shown that he was prejudiced by defense counsels' failure to request funding to retain the experts at issue. Therefore, the court finds that Zagorski cannot maintain a claim of ineffective assistance of counsel, even if defense counsels' representation were deemed to have been deficient for not having pursued funding for expert services despite the trial court's denial of similar requests. Accordingly, Zagorski is not entitled to federal *habeas corpus* relief with respect to this part of his claim.

### O. Trial Court Error in Excluding Jurors Who Opposed the Death Penalty (Paragraph 20 of the Amended Petition (DE # 16, pp. 42-43))

Zagorski alleges that the trial court improperly excluded potential jurors who "expressed qualms about the death penalty" in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments. (DE 16 # ¶ 20, pp. 42-43; DE # 24, ¶ II.O, pp. 13-14; DE # 104, ¶ V.D, pp. 116-117) The respondent argues that the decision of the Tennessee Supreme Court did not involve an unreasonable determination of the facts in view of the evidence presented, nor was it either contrary to or an unreasonable application of clearly established federal law. (DE # 17, ¶ V.20, p. 25; DE # 100, ¶ IV.G., pp. 37-38; DE # 114, ¶ I.20, pp. 43-44)

The potential juror at issue was Mr. Cal Payne. During *voir dire*, the following colloquy transpired relevant to Zagorski's claim pertaining to Mr. Payne:

> THE COURT: . . . Now in this case the defendant could be found not guilty of first degree murder . . . . The only punishments that apply to first degree murder in the State of Tennessee at the present time are death by electrocution or life imprisonment.
>
> Now, without asking you to commit yourself . . . could you consider

both possibilities without automatically excluding the other. . . . No commitment . . . [b]ut should, after the evidence, all twelve of you find the defendant guilty of first degree murder, then you would be asked and told to consider one penalty or the other penalty; one being death by electrocution or the other one, life imprisonment.

My question to you individually and as a group: if you serve on this jury, if the defendant was found guilty of first degree murder, would you consider both of those options, life or death, without automatically excluding the other? . . .

. . .

THE COURT:  . . . .  Mr. Payne, can you do that?

JUROR [Payne]:  I'm not for it.

. . .

THE COURT:  Now, Mr Payne, since I've explained that more in detail, [*i.e.*, that the question is whether he would consider either of the penalties if Zagorski was found guilty of first-degree murder,] can you do the same thing, sir?

JUROR:  No, I still can't agree with it.

THE COURT:  Cannot What?

JUROR:  I can't agree with it.

THE COURT:  Agree with what?

JUROR:  Neither one.

THE COURT:  Neither life or death?

JUROR:  No, sir.

THE COURT:  We have laws in Tennessee, which are not just my

155

laws, they are your laws. They're made by your representatives and mine. They say that in the event a defendant was found guilty of first degree murder, then he should receive one penalty or the other. Now, I'm asking you if you could follow that law?

JUROR: Yea, I guess I could. . . .

THE COURT: I'm not trying to dissuade anybody, but it will be – I hope to make this very clear. What we're asking you to do is not to form any opinion at this time, and that would mean that you would not just right now, sitting before me, as I'm facing you and you're facing me, automatically exclude either the death penalty or life imprisonment, but that you would consider both. . . .

THE COURT: Does that explanation help you, Mr. Payne? And you can do that, too?

JUROR: Yes, sir.

(DE # 9, Add. 1, Vol. III, pp. 405-408)

MR. WHITLEY: . . . . Mr. Payne, I believe that you initially answered the Judge's question that you couldn't go for the death penalty or for life imprisonment. that was your first answer, wasn't it"

JUROR: Right, sir.

MR. WHITLEY: What do you feel about the death penalty?

JUROR: The way I feel about it, they should not do a person like that. They should just let life take its course. That's my religion, that I don't think you should take a person's life.

MR. WHITLEY: What do you feel about a life sentence then?

JUROR: Well, I probably could go along with that.

156

MR. WHITLEY:  As far as the death penalty is concerned, no?  that's your answer?

JUROR:  (Responds in the affirmative.)

MR. WHITLEY:  Well, let me ask you this: could you listen feeling the way you do – listen to the Judge's instructions as to the law, listen to the facts and everything, and consider and seriously consider both the death penalty and life imprisonment in this case, if you and the rest of the jurors were to find Mr. Zagorski guilty of first degree murder?

JUROR [Payne]:  I still wouldn't like the death penalty.

MR. WHITLEY:  You threw that word, like, in there.  The real question is if you would consider both penalties or would you automatically vote against the death penalty?

JUROR:  I would vote against it.

MR. WHITLEY:  With no questions asked?

JUROR:  No questions asked.

MR. WHITLEY:  Are you telling the Judge and myself and everybody else that you wouldn't in this case or any other kind of case, no matter what the facts and circumstances are, you wouldn't consider the death penalty as –

JUROR:  (Responds in the negative.)

THE COURT:  Do I understand that, in spite of the fact of me questioning the juror, that before the trial starts that you would automatically exclude the possibility of giving the death penalty at all?

JUROR:  That's right.

> THE COURT: Do I understand that before the trial starts that, regardless of the facts and circumstances, you would not consider the death penalty?
>
> JUROR: Right, sir.
>
> THE COURT: Well, under those circumstances, gentlemen, I would have to excuse Mr. Payne. . . . .

(DE # 9, Add. 1, Vol. III, pp. 415-417)

A criminal defendant's right to an impartial jury is infringed upon when a jury is selected that is uncommonly willing to sentence the defendant to death. *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968); *Gall v. Parker*, 231 F.3d 265, 331 (6th Cir. 2000). A death sentence is improperly imposed if the jury was chosen excluding potential jurors for cause merely because they voiced general objections to the death penalty or expressed conscientious or religious principles against its infliction. *Witherspoon*, 391 U.S. at 522. However, the State retains a legitimate interest in obtaining jurors who can follow the court's instructions. *Wainwright v. Witt*, 469 U.S. 412, 420 (1985); *Adams v. Texas*, 448 U.S. 38, 44 (1980). Therefore, a potential juror is properly excused for cause when their views would prevent or substantially impair the performance of their duties as a juror in accordance with the court's instructions and juror oaths. *Wainwright*, 469 U.S. at 424; *Williams*, 380 F.3d at 953; *Dennis v. Mitchell*, 354 F.3d 511, 522 (6th Cir. 2003); *Greer v. Mitchell*, 264 f.3d 663, 686 (6th Cir. 2001). The prosecution may "death qualify" a juror by determining whether the juror could impose capital punishment, if warranted, regardless of any personal opposition that he may have. *Lockhart v. McCree*, 476 U.S. 162, 173 (1986); *Byrd v. Collins*, 209 F.3d 486, 528-530 (6th Cir. 2000).

On direct appeal, the Tennessee Supreme Court correctly identified *Witherspoon* as controlling with respect to this claim. (DE # 9, Add. 2, Doc. 2C, p. 14) In addressing this issue, the

Tennessee Supreme Court wrote that it had "carefully considered" this issue and determined that Payne:

> made it clear that [he] would vote against the imposition of the death penalty, no matter what the circumstances of the case were, which is what <u>Witherspoon</u> requires for juror disqualification.

(DE # 9, Add. 2, Doc. 2C, p. 14)(underline in the original)  The record supports the Tennessee's Supreme Court's ruling on this issue.

Where, as here, a state court has made factual determinations regarding issues presented for federal *habeas corpus* review, such determinations are presumed to be correct unless the petitioner rebuts that presumption of correctness by clear and convincing evidence. Zagorski has failed to establish by clear and convincing evidence that the Tennessee Supreme Court's determination of this issue is not entitled to the presumption of correctness.  Moreover, the record supports the conclusion that the Tennessee Supreme Court's determination of this issue was neither contrary to nor an unreasonable application of clearly established federal law.  Therefore, Zagorski is not entitled to federal *habeas corpus* relief on this issue.

## P.  Zagorski's Competence to be Executed
### (Paragraph 21of the Amended Petition
### (DE # 16, p. 43))

Zagorski asserts that he is not competent to be executed.  (DE # 16, ¶ 21, p. 43; DE # 24, ¶ II.P, p. 14; DE # 114, ¶ V.G, p. 119)  He also avers that this claim is not yet ripe and, as such, it should be dismissed without prejudice.  (DE # 16, ¶ 21, p. 43; DE # 24, ¶ II.P, p. 14; DE # 114, ¶ V.G, p. 119)  The respondent argues that Zagorski has failed to allege any factual basis for this claim. (DE # 17, ¶ V.21, p. 26)  The respondent argues further, however, that Zagorski's execution is not imminent; therefore, this claim should be dismissed without prejudice.  (DE # 100, ¶ IV.G.16, p. 38;

DE # 114, ¶ I.16, pp. 48-49)

The Eighth Amendment "prohibits a State from inflicting the death penalty upon a prisoner who is insane." *Ford v. Wainwright*, 477 U.S. 399, 410 (1986). A state must determine whether a prisoner is competent to be executed "when execution is imminent." *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-645 (1998); *Coe v. Bell*, 209 F.3d 815, 824 (6th Cir. 2000). Moreover, a prisoner sentenced to death must follow the procedures established by the Tennessee Supreme Court as those procedures were set forth *Van Tran*, 6 S.W.3d at 265-172 to challenge his competency to be executed. *Coe*, 209 F.3d at 820-822.

Zagorski's execution does not appear to be imminent, nor does he argue that it is. Neither does the record support the conclusion that Zagorski has exhausted those procedures set forth in *Van Tran* to determine whether he is competent to be executed. For these reasons, this claim is not ripe. As reasoned above, Zagorski is not entitled to *habeas corpus* relief on this issue at this time.

### Q. The Death Penalty Is Unconstitutional Because of the Length of Time That Zagorski Has Been Imprisoned Under a Sentence of Death (Paragraph 22 of the Amended Petition (DE # 16, p. 43))

Zagorski argues that the length of time he has been imprisoned under a sentence of death constitutes cruel and unusual punishment under the Eighth Amendment. (DE # 16, ¶ III.22, p. 43; DE # 104, ¶ V.E, p. 117) The respondent argues that this claim is procedurally defaulted but that, even if it were not, granting relief on this claim would create a new rule of *habeas corpus*. (DE # ¶ V.22, p. 26; DE # 100, ¶ IV.G.17, p. 38; DE # 114, ¶ I.17, p. 49) Zagorski counters by arguing that this claim is not procedurally defaulted. (DE # 24, ¶ II.Q, p. 14) Zagorski also argues that he has raised this claim to "preserve it for further federal review, should the Supreme Court ultimately conclude that his claim has merit." (DE # 104, ¶ V.E, p. 117)

160

As the respondent correctly notes, Zagorski has never raised this claim in state court. Therefore, for reasons previously stated, *supra* at pp. 16-27, this claim is procedurally defaulted for purposes of federal *habeas corpus* review. The court also concurs in the respondent's assessment that, to grant *habeas corpus* relief to Zagorski on this issue would constitute creating a new of rule of law.

In *Saffle*, 494 U.S. at 484, the Supreme Court defined a "new rule of law" as a "rule that 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not dictated by precedent existing at the time the defendant's conviction became final." *Id.* (quoting *Teague v. Lane*, 489 U.S. 288, 301 (1989)(italics in the original). It is clear from the thrust of this claim that granting *habeas corpus* relief on these grounds would impose additional obligations on state and federal governments by requiring that courts conduct and complete direct review, post-conviction/collateral review proceedings, and *habeas corpus* proceedings according to a heretofore unspecified time frame, obligations that do not exist presently.

There is no United States Supreme Court precedent that supports this ground for relief. *See Foster v. Florida*, 537 U.S. 990, 123 S.Ct. 470 (2002); *Knight v. Florida*, 528 U.S. 990, 120 S.Ct. 459 (1999)(both opinions standing for the proposition that a defendant cannot avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed). Moreover, research has failed to reveal a single case in which any circuit court has granted federal *habeas corpus* relief on these grounds. To the contrary, every circuit to have addressed this issue has held that the length of time spent on death row does not offend the Eighth Amendment, especially where the length of time that an inmate spends on death row is the result of an inmate's pursuing available legal remedies. *See Johns v. Bowersox*, 203 F.3d 538, 547 (8th Cir. 2000); *Carter v. Johnson*, 131 F.3d 452, 465 (5th Cir. 1997); *Stafford v. Ward*, 59 F.3d 1035, 1028 (10th Cir. 1995); *Free v. Peters*,

161

50 F.3d 1362 (7th Cir. 1995); *Porter v. Singletary*, 49 F.3d 1483, 1485 (11th Cir. 1995); *Richmond v. Lewis*, 948 F.2d 1473, 1491 (9th Cir. 1990).

As reasoned above, to grant Zagorski relief on these grounds not only would impose a new rule of law, which the court may not do, but it would in the absence of United States Supreme Court precedent, and without regard for the persuasive authority provided in the opinions of at least six of the Sixth Circuit's sister circuits. For these reasons, Zagorski is not entitled to *habeas corpus* relief on this issue.

### R. The Constitutionality of Tennessee's Death Penalty Statute
### (Paragraph 23 of the Amended Petition)
### (DE # 16, p. 43)

Zagorski challenges the constitutionality of Tennessee's death penalty statute on the grounds that it constitutes cruel and unusual punishment. (DE # 16, ¶ 23, p. 43) The respondent argues that the determination of the Tennessee Supreme Court was neither contrary to nor an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts in view of the evidence. ( DE # 17, ¶ 23, pp. 26-27; DE # 100, ¶ 18, p. 38; DE # 114, ¶I.18, pp. 50-53)) Zagorski disagrees with the respondent's characterization of the findings of the Tennessee Supreme Court. (DE # 24, ¶ II.R, p. 15; DE # 104, ¶ V.F, pp. 118-119).

In *Workman v. Bell*, 178 F.3d 759 (6th Cir. 1998), the Sixth Circuit held that Tennessee's death penalty statute – enacted in 1977 – is constitutional. *Id*. at 778. Because Tennessee's death penalty statute has been determined to be constitutional, this claim is without merit, and Zagorski is not entitled to habeas corpus relief.

### S. Zagorski's Motion for a *De Novo* Review
### of All of His Claims
### (DE # 176)

162

Zagorski argues that, under the Schaivo Act, he is "no longer subject to any provisions of the . . . AEDPA, nor are any of his claims subject to any assertion of procedural default." (DE # 176) More particularly, Zagorski argues that, in the recent case involving Marie Schiavo, "Congress and the President have enshrined the principle that when a fundamental right to life is involved . . . [a] federal petitioner cannot be subjected to procedural default, and state court determinations which will result in the deprivation of life are entitled to no deference." (DE # 195, p. 1)

Section 1 of the Schaivo Act provides the following:

> The United States District Court for the Middle District of Florida shall have jurisdiction to hear, determine, and render judgment on a suit or claim by or on behalf of Theresa Marie Schaivo for the alleged violation of any right of Theresa Marie Schaivo under the Constitution or laws of the United States relating to the withholding or withdrawal of food, fluids, or medical treatment necessary to sustain her life.

Section 2 of the Schaivo Act provides, in pertinent part, that "[a]ny parent of Theresa Marie Schaivo shall have standing to bring a suit under this Act."

A plain reading of the Schaivo Act shows that it permits the complainant to assert a violation only as to the rights of Theresa Marie Schaivo, and no one else. Moreover, this court is not located in the Middle District of Florida. Therefore, it does not have jurisdiction under the Schaivo Act. Finally, § 2 of the Schaivo Act clearly states that only a "parent of Theresa Marie Schaivo" shall have standing to bring a suit under this Act. Clearly, the Act does not grant standing to Zagorski.

As explained above, there is nothing in the plain, unambiguous text of the Schaivo Act that even remotely suggests that Congress intended it to pertain to federal *habeas* petitioners. Zagorski's reliance on the legislative history of the Schaivo Act is misplaced because, "[w]hen confronted with a statute which is plain and unambiguous on its face, [the courts] do not look to legislative history as a guide to its meaning. . . ." *TVA v. Hill*, 437 U.S. 153, 184 n.29 (1978). Zagorski's argument that,

163

under the Schaivo Act, he is entitled to a *de novo* review of all his claims, and that none of his *habeas corpus* claims are procedurally defaulted, lacks an arguable basis in law or fact. As such, his argument is frivolous. *See Neitzke v. Williams*, 490 U.S. 319, 327-328 (1989); *see also Lawler v. Marshall*, 898 F.2d 1196, 1198-99 (6th Cir. 1990). Because this claim lacks merit, Zagorski's request for a *de novo* review of all his claims under the Schaivo Act will be denied

### IV.  CONCLUSION

The evidence against Zagorski at trial was overwhelming. Although entirely circumstantial, a reasonable juror could have concluded that Zagorski lured Dotson and Porter into the woods in Robertson County under the pretext of a large drug deal, murdered them, and then fled to Ohio to avoid prosecution. The jury's verdict was a "verdict worthy of confidence." *Spirko*, 368 F.3d at 615.

Zagorski has failed to establish that he is entitled to federal *habeas corpus* relief on any of the numerous grounds that he has presented to this court. Therefore, his petition will be denied and this action dismissed.

ENTER this 31st  day of March 2006.

_____
Aleta A. Trauger
United States District Judge